Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Austin J. Richardson (SBN 319807)
ajr@smlavvocati.com
**SML AVVOCATI P.C.**
888 Prospect Street Suite 200
San Diego, CA 92037
Tel:   949.636.1391

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Nosirrah Management, LLC**, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>**Franklin Wireless Corporation**, a Nevada corporation, and **O.C. Kim**, an individual,<br><br>Defendants. | Case No. 3:21-cv-01316-CAB-JLB<br><br>**DEFENDANTS' MOTION TO DISMISS COMPLAINT; MEMORANDUM IN SUPPORT**<br><br>Date:  November 1, 2021<br><br>Honorable Cathy Ann Bencivengo<br><br>**NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED** |

PLEASE TAKE NOTICE that on November 1, 2021 before the Honorable Cathy Ann Bencivengo, Defendants Franklin Wireless Corporation ("Franklin") and O.C. Kim ("Kim") respectfully will move to dismiss the complaint in this action for failure to state a claim upon which relief can be granted under Rule 12(b)(6), or in the alternative, for judgment on the pleadings under Rule 12(c).  This Motion is based upon this Notice and the Memorandum herein, and the pleadings and other papers on file in this action, including the declarations and exhibits filed herewith, and such further evidence or argument as may be presented at or before the hearing of this Motion.

## Memorandum

On January 12, 2021, Defendant Franklin received an email at 12:35 pm from the SEC online filing system <edgar-postmaster@sec.gov> indicating that a Form 4 had been accepted for submission. Just one minute later, Franklin received a demand letter via email from counsel for Plaintiff Nosirrah Management, LLC demanding repayment of "swing profits" under Section 16. *See* Bauer Decl. ¶ 2, Ex. A. That same day, Franklin received four more demand letters from other law firms with ostensibly the same claims and demands, some of which also arrived within a few minutes of the filing. *See id.* ¶ 3. Apparently, Plaintiff had purchased one share of Franklin's stock on June 5, 2020 for $5.60. *See id.* ¶ 4, Ex. B. Ultimately, Franklin responded appropriately to Plaintiff's demand letter. *See id.* ¶ 4, Ex. C ("The Board has investigated these trades with regard to both the factual context and legal requirements as established by the SEC and determined that they were legally and properly conducted and are not in violation of Section 16(b) of the Securities Exchange Act, as alleged in your correspondence.").

In its Complaint, Plaintiff asserts "an action to recover 'short swing' profits under Section 16(b) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), 15 U.S.C. § 78p(b)" (*see* ECF No. 1 at 1) based on the following alleged facts:

> 8. On October 5, 2020, a Form 4 "Statement of Changes in Beneficial Ownership" was filed with the Securities and Exchange Commission ("SEC") by Defendant Kim (the "October 5 Form 4"). The October 5 Form 4 reported a purchase of Franklin Wireless common stock made on September 25, 2020 (the "September 25 Purchase").
>
> 9. The October 5 Form 4 disclosed several anomalies. First, it was filed six business days after the September 25 Purchase, in violation of SEC Rule 16a-3(g)(1), which requires reporting within two business days of changes of beneficial ownership which fall under the reporting requirements of Section 16.

10. Second, the closing price of Franklin Wireless stock on September 25, 2020 was $15.97 per share, yet the September 25 Purchase was made at a price of $2.50 per share, a nearly 85% discount.  When asked about this discrepancy, counsel for Franklin Wireless stated:

> Almost half of Franklin shares are restricted and over 150 shareholders hold paper certificates.  Many of those shareholders also live in South Korea.  Historically, Franklin shares have traded around $2.50 per share.  These factors are all part of the context of these transactions.

Requests for further detail as to how the $2.50 price was determined revealed little except reiterations that many of the company's shareholders are in South Korea and purportedly have no means of selling their shares other than private nonmarket sales.

11. Third, although the October 5 Form 4 reported that 400,000 securities were acquired, it only identified 160,000 shares as beneficially owned following the transaction.  When asked about this mismatch, counsel for Franklin Wireless responded on March 1, 2021, that there was an error in reporting the number of shares and that the transaction was, in fact, an acquisition of 160,000 shares at an aggregate price of $400,000.  Counsel stated on March 1, 2020 that he expected an amended Form 4 would be filed correcting this error.  As of the date of this complaint, no amendment to the October 5 Form 4 has been filed.

12. Fourth, the September 25 Purchase was reported on Form 4 as an indirect beneficial ownership by Defendant Kim by Code I in column 6, with the purchase made "By child" in column 7.  The child was later identified upon plaintiff's request as Ms. Rachel (Haesook) Kim.  Yet later, counsel for Franklin Wireless stated that Rachel Kim had maintained a separate household from Defendant Kim for at least eight years and that Defendant Kim had "no pecuniary interest in or control over the shares owned by his daughter."

13. On December 31, 2020, when Franklin Wireless shares closed at a price of $23.50 per share, Defendant Kim sold 500,000 shares in a private transaction at a price of $15.00 per share (the "December 31 Sale").  The December 31 Sale was reflected in a Form 4 filed by Defendant Kim with the SEC, also late, on January 12, 2021, seven business days after the sale occurred.

14. The December 31 Sale at $15.00 per share was at a higher price than the September 25 Purchase at $2.50 per share and occurred within six months of the September 25 Purchase.

15. As President of Franklin Wireless, Defendant Kim is and was at all relevant times an "insider" for the purposes of Section 16 of the 1934 Act, 15 U.S.C. § 78p.

16. On January 12, 2021, Plaintiff sent an email to Franklin Wireless identifying the above transactions as a violation of Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), and demanding that the company take action to recover all profits received by Defendant Kim from these and any other short-swing trades.

17. Franklin Wireless responded through counsel on February 12, 2021, stating that the Board had investigated the transactions and determined they were not in violation of Section 16(b) because the September 25 Purchase was made by Defendant Kim's daughter while the December 31 Sale was made by Defendant Kim.

18. The irregularities in the October 5 Form 4 and other facts outlined here cast significant doubt on this explanation. Rachel Kim is approximately 30 years old, obtained her Doctor of Pharmacy degree from the University of California, San Francisco, in 2017, and has worked as an inpatient pharmacist at UC San Diego Health since October 2018. According to Franklin Wireless, Rachel Kim had the independent financial means to pay $400,000 for 160,000 shares of Franklin Wireless stock which she possibly purchased from a relative in South Korea.

19. Plaintiff requested further information from Franklin Wireless to investigate whether Rachel Kim in fact purchased the shares independent of Defendant Kim's pecuniary interest in or control over the shares.

20. In response to Plaintiff's questioning of Rachel Kim's investment experience and financial ability to pay $400,000 for the shares, Franklin Wireless disclosed that her income for the past three years was $153,578 (2020), $167,574 (2019), and $98,661 (2018) and that, aside from the 160,000 Franklin Wireless shares, her investment portfolio includes only $35,000 in a 401(k) and IRA. Franklin Wireless indicated that, over the past three years, although Defendant Kim has not provided support for Rachel Kim's living expenses, he did provide a $100,000 loan (which has been paid in full) for a down payment for a September 2019 purchase for $760,000 of a home that is valued at that same amount.

21. The information provided by Franklin Wireless showed that Rachel Kim is not an experienced investor and did not have the financial ability to pay for the shares solely from her own funds. According to Franklin Wireless, the source of funds for Rachel Kim's

home purchase was (a) $175,000 of her own funds; (b) $100,000 from her mother; and (c) a $485,000 mortgage loan from Wells Fargo Bank with a 30-year term.

22. Aside from financial considerations, Plaintiff also sought to understand the extent of Defendant Kim's involvement in arranging the share purchase for his daughter.

23. Franklin Wireless's explanation showed that Defendant Kim in fact arranged the share purchase. According to Franklin Wireless, in August 2020, Defendant Kim introduced Rachel Kim to a seller in Korea who was eager to sell the shares even at their original investment cost, because the seller had apparently been unable to sell the shares due to Korean government restrictions preventing the sale of paper shares through Korean securities companies and the fact that virtually no Korean securities companies handle OTC shares due to limited trading volume. (Plaintiff has not independently verified these explanations.) After Rachel Kim hesitated due to the cost, the seller and Rachel Kim entered into an agreement under which the seller agreed to sell her shares "on a contingent payment basis, with a deadline of December 31, 2023."

24. Considering the information from Franklin Wireless showing that Defendant Kim in fact orchestrated the September 25, 2020 share purchase, Plaintiff was left with significant doubt as to Defendant Kim's independence from the share purchase. Thus, Plaintiff has requested further information about the circumstances of the agreement with the seller in Korea, including: (1) information explaining the meaning of the phrase "on a contingent payment basis with a deadline of December 31, 2023"; (2) a copy of the purchase contract and an explanation of how Rachel Kim paid or intends to be able to pay the $400,000 purchase price; (3) an explanation as to why Defendant Kim chose to introduce Rachel Kim to a buyer rather than purchasing the shares himself, including whether Defendant Kim was already in discussions with the investment group that purchased shares in December 2020 or was expecting that he might be selling shares in December 2020 (i.e., within six months); and (4) an explanation as to what convinced Rachel Kim to commit $400,000 to a single block of shares, considering Rachel Kim's overall finances and much smaller investment portfolio.

25. As of the filing of this complaint, Franklin Wireless has failed to provide the additional information sought by Plaintiff. Upon information and belief, Franklin Wireless has taken no further action

with regard to Defendant Kim's trades of September 25, 2020 and December 31, 2020.

26. Despite Franklin Wireless' claims that Defendant Kim does not have pecuniary interest in or control over the shares purchased by Rachel Kim, Franklin Wireless has not filed an amended Form 4 with the SEC.  Thus, Defendant Kim has not clarified his SEC filing to state clearly that he has no pecuniary interest in the shares purchased on September 25, 2020.

27. Taking into account all of the facts recited above, including (i) Defendant Kim's having arranged the purchase in his daughter's name despite resistance on her part, (ii) Rachel Kim's apparent absence of any financial experience or wherewithal that would justify this large purchase of a speculative stock, and (iii) the unexplained so-called "contingent payment basis" for her share purchase, an inference should be drawn that Defendant Kim had a pecuniary interest in and control over the shares purchased in Rachel Kim's name.

28. The September 25, 2020 purchase and the December 31, 2020 sale resulted in Defendant Kim realizing a profit of no less than $2,000,000.00 calculated using the "lowest-in, highest-out" method.

29. This action is brought within two years of the violations described in this Complaint or within two years of the time when the transactions were disclosed in SEC filings as required by Section 16(a) of the 1934 Act. 15 U.S.C. § 78p(a).

. . .

31. Defendant Kim purchased and sold Franklin Wireless common stock within a six-month period.

32. Defendant Kim realized profits of $2,000,000.00 in connection with this purchase and sale.

33. As President of Franklin Wireless, Defendant Kim was a Franklin Wireless insider subject to Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b) at the time of the purchase and sale of the Franklin Wireless stock.

34. As of the date of this Complaint, Defendant Kim has failed to account for and disgorge the entirety of his short swing profits from the September 25 and December 31, 2020 purchase and sale despite Plaintiff's January 12, 2021 demand.

35. As a result, Defendant Kim and Franklin Wireless are in breach of Section 16(b) of the 1934 Act.

36. In the event that Defendant Kim made other purchases and sales of Franklin Wireless stock within the above or any other six-month period resulting in short-swing profits, such transactions are also

>       a breach of Section 16(b) of the 1934 Act requiring disgorgement by
>       O.C. Kim to Franklin Wireless.
>           37. Through such purchases and sales or sales and purchases,
>       Defendant Kim realized profits the exact amounts which are unknown
>       to Plaintiff, which inure to the benefit of, and are recoverable by,
>       Plaintiff on behalf of Franklin Wireless.

ECF No. 1 at 2-8.

Defendant O.C. Kim's daughter is Rachel Kim. Her Korean name is Haesook Kim. She is over 30 years old, and has not lived at the same address with her parents for nearly a decade. *See* Rachel Kim Decl. ¶ 2; O.C. Kim Decl. ¶ 2. She works as a pharmacist with the University of California at San Diego, and typically earns more than $150,000 annually. The only financial support Defendant Kim has provided Ms. Kim was a $100,000 loan in 2019 (from Mr. Kim's wife) for the down payment on Ms. Kim's home, which is titled in her name. The home purchase price was $760,000, and the $100,000 loan has been repaid in full. *See* Rachel Kim Decl. ¶ 3; O.C. Kim Decl. ¶ 3. Ms. Kim presently has no debt obligations to or from Defendant Kim. *See* Rachel Kim Decl. ¶ 4; O.C. Kim Decl. ¶ 4. Ms. Kim's investment portfolio includes $35,000 (401k and IRA), 160,000 Franklin shares (purchase price contingent), and no other restricted shares. *See* Rachel Kim Decl. ¶ 5.

Franklin has many South Korean shareholders who have owned shares for many years and do not have a market available to sell their shares. Virtually no Korean securities companies handle OTC shares due to limited trading volume. *See* O.C. Kim Decl. ¶ 5. The share purchase by Mr. Kim's daughter was a private transaction. The circumstances of the purchase were as follows. Rachel Kim's aunt, who lives in Korea, purchased shares 6 years ago and was interested in selling. Paper shares are not allowed to be sold through Korean securities companies due to Korean government restrictions. Her aunt had been complaining and demanding to sell the shares even at the original investment cost. *See id.* ¶ 6. In August 2020,

Defendant Kim told Rachel that her aunt wanted to sell the shares if she was interested in the purchase. Ms. Kim was interested, but could only agree to the purchase on a contingent payment basis, with a deadline of December 31, 2023. *See id*. The parties agreed and entered into an agreement in August 2020, to sell and purchase 160,000 shares @ $2.5. *See* Rachel Kim Decl. ¶ 6.

Defendant Kim had no knowledge that there was a buyer interested in buying his shares until several months later. Defendant Kim's sale was also a specific deal with a third-party investment group. The parties to that transaction negotiated at arm's length for the buyers to acquire restricted shares. Neither Franklin nor Ms. Kim was a party to the transaction. *See* O.C. Kim Decl. ¶ 7.

### **Plaintiff's Allegation of "Short Swing" Profits Is Not Plausible**

Plaintiff's Complaint, even if all reasonable allegations are true, does not state a claim upon which relief can be granted. *See Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009) (claim plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant acted unlawfully" but is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Here, the Complaint alleges a conspiracy between two separate and financially independent individuals to profit from Franklin's shares, even though the only alleged "conspiracy" is not any act but just their familial, father-daughter relationship. These allegations are plainly insufficient. *See Probility Media Corp. v. Isen*, No. 3:17-CV-2583-CAB-WVG, at *1 (S.D. Cal. Apr. 10, 2018); *Covino v. Spirit Airlines, Inc.*, 2:20-cv-01039-GMN-NJK, at *1 (D. Nev. Sep. 17, 2021) ("Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are 'functionally identical' to motions to dismiss for failure to state

a claim under Federal Rule of Civil Procedure 12(b)(6).") (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)).

In *Probility*, this Court dismissed an analogous claim for implausibility, reasoning as follows:

> [T]he Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or . . . allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). . . .
> Section 16(b) of the Exchange Act bars corporate insiders from profiting on short-swing trades, "defined as the purchase and sale of stock within a six-month period." *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 945 (9th Cir. 2006) (citing 15 U.S.C. § 78p(b)). It "identifies three classes of insiders—directors, officers and beneficial owners [of more than 10% of any share class]—and makes them liable, without fault or intended wrongdoing, for trading in their company's shares." *Id.* at 947 (citing 15 U.S.C. § 78p(b)). "The elements of a claim under § 16(b) are (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a 6-month period (5) resulting in profit." *Greenfield v. Criterion Capital Mgmt., LLC*, No. 15-CV-3583-PJH, 2017 WL 2720208, at *5 (N.D. Cal. June 23, 2017) (citing *Dreiling*, 578 F.3d at 1001).
> Probility contends that Section 16(b) barred short-swing trading by Defendants because Defendants became beneficial owners of more than 10% of Probility's stock in June 2017 based on a convertible note obtained in connection with the settlement of a state court lawsuit. [Doc. No. 1 at ¶ 75.] **The Court need not accept the truth of this conclusory allegation, however, because the settlement agreement and convertible note, which are attached to the complaint, directly contradict it**. *See Daniels-Hall*, 629 F.3d at 998. Specifically, the Settlement Agreement states that "[u]nder no circumstances will Probility issue to Mesa . . . at any one time a number of shares which, when aggregated with all shares of Common Stock then beneficially owned or controlled by Mesa or its affiliates, exceed 9.99% of the total number of shares of Common Stock outstanding after such issuance."

[Doc. No. 1-2 at 5.] The convertible note itself similarly states that "in no event shall [Probility] have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock." [Doc. No. 1-3 at 3.] ***In other words, by their plain language, the Settlement Agreement and convertible note cap Defendants' ability to convert the outstanding principal on the note into shares at 9.99% of Probility's outstanding stock***. In light of this conversion cap, the settlement agreement and convertible note did not give Defendants the right to acquire more than 10% of the outstanding Probility stock, meaning that, contrary to the allegations in the text of the complaint, the settlement agreement and convertible note did not make Defendants beneficial owners of more than 10% of Probility's outstanding stock. Accordingly, Section 16(b)'s short-swing trading prohibition was not triggered by the state court settlement.

Regardless, even if the settlement agreement and convertible note attached to the complaint subjected Defendants to Section 16(b)'s short-swing trading bar, ***the complaint lacks any factual allegations of actual short-swing trades that violated Section 16(b)***. Section 16(b)'s short-swing trading prohibition does not "cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security." 15 U.S.C. § 78p(b). The Supreme Court has interpreted this language to mean that "in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner 'before the purchase.'" *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 249-50 (1976). In other words, using the elements of a Section 16(b) claim enumerated above, the shareholder must have held 10% of the share class both before the purchase (*i.e.*, not as a result of the purchase) and at the time of the sale of the stock.

***Probility does not (and cannot) allege that Defendants were beneficial owners of 10% of Probility's stock both at the time of purchase and the time of any sales of Probility stock***. Although the complaint makes the conclusory and vague statement that "before each short-swing transaction, Defendants [] were beneficial owners of 10% of the outstanding common stock of Probility," this conclusion is contradicted by Probility's position that Defendants only became beneficial owners of more than 10% of Probility's stock as a result of the June 20, 2017 state court settlement. [Doc. No. 1 ¶¶ 74-75, 103.]

>The complaint does not allege that Defendants purchased, or acquired the right to obtain, any Probility stock after June 20, 2017, only that Defendants sold stock after that date. If Defendants did not purchase any Probility stock while they were a beneficial owner, Defendants cannot be liable under Section 16(b) for any sales that may have happened while they were a beneficial owner. Thus, even assuming Defendants became beneficial owners of 10% of Probility's outstanding shares via the settlement agreement and convertible note, Defendants' subsequent sales of Probility stock did not trigger Section 16(b).
>
>The complaint and exhibits thereto indicate that Defendants became beneficial owners of, at most, 9.99% of issued and outstanding shares of Probility's common stock on June 20, 2017. ***Because Defendants never became beneficial owners of at least 10% of Probility stock, Section 16(b) of the Exchange Act did not apply to any subsequent transactions by Defendants***. Moreover, even if Section 16(b)'s short-swing trading prohibition did apply as of June 20, 2017, there are no allegations in the complaint that Defendants both purchased and sold Probility stock after June 20, 2017. Thus, the complaint does not state a claim for violation of Section 16(b). Accordingly, the last remaining claim in the complaint, claim two for violation of Section 16(b), is DISMISSED.

*Probility* at *1-4 (emphasis added).

Plaintiff admits that Ms. Kim has lived separate from her parents for almost a decade, and that "Defendant Kim had 'no pecuniary interest in or control over the shares owned by his daughter.'" *See* Complaint ¶ 12. Plaintiff admits that Defendant Kim's only connection to his daughter's share purchase in September 2020 was to inform his daughter about a potential seller (her aunt) of the shares Ms. Kim eventually purchased. *See id.* ¶ 25. All of this was legal and reported, and there is no factual support to reasonably infer any illegal activity on the part of Defendant Kim. Plaintiff asserts that Ms. Kim's purchase was effectively Defendant Kim's purchase, but she is not her father, and her financial decisions are not her father's decisions. Plaintiff knows this. *See id.* ¶ 12. Plaintiff's false

pretense is that two financially independent individuals colluded simply because they are related to each other.

Plaintiff uses a lone typo on form, but this was merely a non-substantive error in reporting. *See id.* ¶ 11. Plaintiff acknowledges Ms. Kim alone agreed with the seller to "a contingent payment basis, with a deadline of December 31, 2023." *See id.* ¶ 23. Although Plaintiff proposes that Ms. Kim was unable to immediately pay $400,000, and therefore she was not the true purchaser of the shares, but Plaintiff acknowledges that, per the terms of her purchase agreement, she never had to immediately pay $400,000. *See id.* ¶ 23. Therefore, Plaintiff attempts—implausibly—to connect two separate transactions, bought and sold by different people, at different times, and in different countries. Much like in *Twombly* where the pleading did not "plausibly suggest an illicit accord because it was only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior," this Court should rule similarly here that Defendant Kim's actions are explained by unrelated, lawful, and unchoreographed activity. *See Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567).

## Conclusion

For each of the foregoing reasons, Defendants respectfully request that the Court grant this Motion and dismiss this action.

Respectfully submitted,

Dated:  September 27, 2021	**SML Avvocati P.C.**

By:    /s/ Stephen M. Lobbin
	Attorneys for Defendants

## **PROOF OF SERVICE**

I hereby certify that on September 27, 2021, I electronically transmitted the foregoing document using the CM/ECF system for filing, which will transmit the document electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies have been served on those indicated as non-registered participants.

Dated: September 27, 2021                    /s/ Stephen M. Lobbin