```
 1                  UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   NOSIRRAH MANAGEMENT, LLC, a   )
     Delaware limited liability   ) CASE NO.: 3:21-cv-01316-RSH-JLB
 5   company,                     )
                                  )
 6              Plaintiff,        ) DATE: MONDAY, OCTOBER 16, 2023
                                  )
 7   v.                           ) SAN DIEGO, CALIFORNIA
                                  )
 8   FRANKLIN WIRELESS CORP., a   ) JURY TRIAL - DAY 1
     Nevada corporation,          )
 9                                )
                Nominal Defendant, )
10                                )
        and                       ) HONORABLE ROBERT S. HUIE
11                                ) UNITED STATES DISTRICT JUDGE
     O.C. KIM, a California       ) SOUTHERN DISTRICT OF CALIFORNIA
12   resident,                    )
                                  )
13              Defendant.        )
     _____)

14

15                   JURY TRIAL - DAY 1

16

17
        (Appearances on page 2)
18

19

20

21

22   _____

23        Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891
                  333 West Broadway, Suite 420
24                San Diego, California  92101
                  tricia_rosate@casd.uscourts.gov
25   Reported stenographically; Transcribed with CAT software
```

```
 1    APPEARANCES:

 2    For the Plaintiff:       STERLINGTON, PLLC
                               One World Trade Center
 3                             85th Floor
                               New York, New York  10007
 4                             (212) 433-2993
                               BY:  MARI KRISTINE BONTHUIS, ESQ.
 5                                   mari.bonthuis@sterlingtonlaw.com
                                     ERIC STEVEN SMALL, ESQ.
 6                                   eric.small@sterlingtonlaw.com

 7

 8

 9    For the Defendants:      SML AVVOCATI, P.C.
                               888 Prospect Street
10                             Suite 200
                               La Jolla, California  92037
11                             (949) 636-1391
                               BY:  STEPHEN M. LOBBIN, ESQ.
12                                   sml@smlavvocati.com
                                     CHRISTOPHER M. FERRI, ESQ.
13

14

15

16    Korean Interpreter:      AERYONG KIM

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

                                                          PAGE
2
     JURY IMPANELMENT           .............................   36
3
4    OPENING STATEMENT          (Ms. Bonthuis) ...............   99

5                               (Mr. Lobbin)   ...............  105

6

7    WITNESS:  Robert Kantowitz

8    Direct Examination         (Ms. Bonthuis) ...............  120

9    Cross-Examination          (Mr. Lobbin)   ...............  121

10

11   WITNESS:  Ok Chae Kim

12   Direct Examination         (Ms. Bonthuis) ...............  124

13

14                        E X H I B I T S

15   EXHIBIT                 DESCRIPTION                        PAGE

16   Exhibit 4       September 25, 2020 Form 4                  154
                     (Deposition Exhibit 4)
17
     Exhibit 6       Form 4 Instructions                        169
18                   (Deposition Exhibit 27)

19   Exhibit 10      January 11, 2021 Form 4                    179
                     (Deposition Exhibit 22)
20
     Exhibit 14      Declaration of OC Kim in Support of        129
21                   Defendants' Motion to Dismiss
                     (ECF No. 5-6; Deposition Exhibit 28)
22
     Exhibit 17      June 20, 2012 Form 4 amendment             172
23                   (Deposition Exhibit 49)

24   Exhibit 34      November 16, 2019 Globis e-mail thread     187
                     Modified:  Second e-mail only
25                   (Deposition Exhibit 31) (FRANKLIN078-80)

```
 1                SAN DIEGO, CALIFORNIA; MONDAY, OCTOBER 16, 2023
 2                        8:52 a.m. - 4:46 p.m.
 3                            -   -   -   -
 4              THE COURT:  Good morning, everyone.
 5              MR. LOBBIN:  Good morning, Your Honor.
 6              MS. BONTHUIS:  Good morning, Your Honor.
 7              THE CLERK:  Please be seated and come to order.
 8              Calling number 1 on the calendar, 21-cv-01316,
 9     Nosirrah Management, LLC v. Franklin Wireless Corp. et al.
10              THE COURT:  All right.  Good morning.
11              Could I have the appearances of counsel, please.
12              MS. BONTHUIS:  Yes.
13              Your Honor, Mari Bonthuis for the plaintiff,
14     Nosirrah Management.
15              With me is my colleague, Eric Small, and our client
16     representative, Robert Kantowitz.
17              THE COURT:  All right.  Ms. Bonthuis, Mr. Small,
18     Mr. Kantowitz, good morning to all of you.
19              ALL:  Good morning, Your Honor.
20              MR. LOBBIN:  Good morning, Your Honor.
21              Stephen Lobbin here on behalf of the defendants.
22     My law firm is SML Avvocati.
23              With me is my associate, Christopher Ferri, who is
24     on the end, as well as the defendant, Mr. OC Kim who's next to
25     him, and the defendant's company's general counsel, Mr. Bill
```

1    Bauer, who's general counsel for Franklin Wireless.

2              THE COURT:  All right.  Thank you for the

3    introductions.

4              Mr. Lobbin, Mr. Bauer, Mr. Kim, and Mr. Ferri, good

5    morning to all of you, as well.

6              ALL:  Good morning, Your Honor.

7              THE COURT:  I understand counsel have some matters

8    to discuss.

9              MS. BONTHUIS:  Yes, Your Honor.

10             THE COURT:  I also have some matters.  So maybe I'll

11   just go through mine first, and it may preempt some of the

12   points that counsel had to make, but I'll give you a chance to

13   be heard after that.

14             We have some new counsel -- maybe not new to the

15   case; maybe new to the case -- but certainly folks that

16   weren't present at the in limine hearing or the final pretrial

17   conference.  That would be Mr. Ferri and Mr. Small.

18             Welcome to the case, first of all.

19             Mr. Small, I think you had recently filed a pro hac

20   application that was approved, so that's wonderful.

21             I just want to reinforce to everybody what

22   Mr. Lobbin and Ms. Bonthuis know; that I expect counsel to be

23   familiar with and to follow the Federal Rules of Civil

24   Procedure, of course, but also the local rules of this court

25   and my chambers' rules.  I'm going to assume that counsel,

| | |
|---|---|
| 1 | even if they weren't present at the in limine hearing or the |
| 2 | final pretrial conference, that they are fully aware of the |
| 3 | rulings I made, which I don't think should be a problem, |
| 4 | because Mr. Lobbin or Ms. Bonthuis or her colleague, Ms. |
| 5 | Jernow, were present at those hearings. |
| 6 | So welcome, everybody. |
| 7 | So let me go through some of the filings from the |
| 8 | last couple weeks, including yesterday.  Some of them I'm |
| 9 | prepared to rule on; others, I'll address at some later time. |
| 10 | So the first is plaintiff's request for a judicial |
| 11 | notice of legislative facts.  That's ECF No. 98.  Plaintiff's |
| 12 | request was filed on October 6th, and defendants filed an |
| 13 | opposition yesterday. |
| 14 | That request is denied.  The plaintiff hasn't shown |
| 15 | that these legislative facts are relevant to an element of the |
| 16 | claim.  I also find that it would be unduly confusing to the |
| 17 | jury to take judicial notice of these facts.  I'm already |
| 18 | going to be giving instructions to the jury, and I previously |
| 19 | declined to instruct the jury on the legislative history of |
| 20 | the Exchange Act.  So I don't intend to provide a similar |
| 21 | instruction that I previously denied under the rubric or the |
| 22 | guise of granting judicial notice. |
| 23 | Next is plaintiff's request for a judicial notice |
| 24 | regarding historical stock price.  That's ECF No. 99, also |
| 25 | filed on October 6th.  Specifically, this is asking for a |

1    judicial notice of a 30-page Yahoo finance report showing the

2    daily opening and closing prices and daily highs and lows of

3    Franklin stock price for 2015, 2021, and 2022.  The defendants

4    oppose judicial notice.

5         That request for judicial notice is also denied.

6    The plaintiffs have not established the relevance of the data,

7    and this massive data risks confusing the jury in my view.

8    Finally, the 30-page exhibit is not listed in the pretrial

9    order as a trial exhibit.

10        Now, this denial of judicial notice, Ms. Bonthuis,

11   is without prejudice to the plaintiff seeking to offer some

12   subset of this information that's shown to be specifically

13   relevant to this case.  If you're going to do this, I

14   encourage you to consult -- to confer, rather, with the

15   defendants so that they're able to evaluate, to verify the

16   accuracy of that data before you make that request.

17             MS. BONTHUIS:  Your Honor --

18             THE COURT:  Yes.

19             MS. BONTHUIS:  We have been consulting with them

20   about this for six weeks at least.  We informed them, I think,

21   back at the end of August or early September that we would be

22   seeking request for judicial notice.  We sent them a

23   portion -- I'm confirming exactly what portion, but we've sent

24   them, I believe, the key portions of what we were seeking

25   judicial notice on, which is 2020 through the present.  We

1    sent that to them September 8th.

2              On September 26th, the response they had was

3    "No comments, but we may want to file a response."

4              So they've been aware of the bulk of what wee seek.

5    It's 2020 through the present.  They have had a month to look

6    at it, to see if it's correct.  We followed up with them

7    multiple times.

8              THE COURT:  Well, just to be clear, I'm not denying

9    the request on grounds that you haven't provided notice to the

10   defendants.  I'm denying it because it wasn't in the pretrial

11   order and because of relevance and 403 concerns.  So I'm just

12   encouraging you, if there's some subset that you want to try

13   to get in, what I don't want to have happen is the defendants

14   say, "We haven't had a chance to look at it."

15             So it sounds like they have had a chance, but again,

16   if there's some subset you intend to offer down the road,

17   let's just make sure they have had a chance to look at it.

18             MS. BONTHUIS:  So maybe we reapply to request

19   judicial notice of the stock price from January 1, 2020,

20   through August of 2022?

21             THE COURT:  Well, I'm not going to address that at

22   this time, but you may make that request.  Again, I've stated

23   my concerns as far as relevance and 403, but the ruling on the

24   request that was made, ECF No. 99, is denied at this time

25   without prejudice.

1              MS. BONTHUIS:  We do have a demonstrative or two

2    that is based on the stock price.  We do intend to use that

3    during examinations.  We've provided it to opposing counsel

4    four or five days ago.  It's exactly entirely --

5              We dumped the Excel file of the stock price and

6    created a chart.  Can we get a ruling on the request -- the

7    renewed request for judicial notice on the subset of stock

8    price before tomorrow?  Because I think that's probably at the

9    latest when we're going to want to use a demonstrative to

10   discuss the stock price.

11             THE COURT:  Well, we can endeavor to do that.  I

12   don't know what the subset is, so it's not before me right

13   now.  So I guess that's --

14             MS. BONTHUIS:  Okay.

15             THE COURT:  That's in your hands.

16             MS. BONTHUIS:  Okay.

17             THE COURT:  But thank you for the heads-up on that

18   issue.

19             Next is plaintiff's motion for an adverse inference.

20   This is ECF 100, also filed on October 6th.

21             Ms. Bonthuis, can you inform me, what efforts did

22   the plaintiff make to depose Misun Kim?

23             MS. BONTHUIS:  So Ms. Kim was on their original list

24   of witnesses.  They identified Mr. Lobbin as her

25   representative.

1           My colleague, Ms. Jernow, reached out to Mr. Lobbin

2    and asked -- you know, basically asked to begin discussions

3    about what a deposition might look like, where it would be.

4           Mr. Lobbin then advised he did not represent Ms. Kim

5    but said he would provide the name of a counsel who did.

6           We followed up.  We got the name of the attorney in

7    Korea who was representing Ms. Kim.  We began reaching out to

8    him at that time and began looking at what we would need to do

9    to go through The Hague procedures.  At that time, defendants

10   filed their amended disclosures and removed Ms. Kim as a

11   witness.  So given that she was no longer a witness, we

12   stopped pursuing her deposition.

13          THE COURT:  As I understand it from the filings, the

14   defendants advised on March 14th of this year that they would

15   not call Misun Kim as a witness.  Ms. Bonthuis, it appears to

16   me that you could have raised the issue of an adverse

17   inference during our discussion of the jury instructions on

18   March 23rd or six months later at the motion in limine hearing

19   on September 28th.

20          Why did the plaintiff not raise this adverse

21   inference instruction issue before October 6th?

22          MS. BONTHUIS:  We thought it was an issue that was

23   so limited to trial, that it was most appropriate for a short

24   motion right before trial.  I believe we filed it in

25   accordance with Your Honor's rules on final disputed issues

1       before trial and filed it on that date.

2              THE COURT:   I'm going to respectfully deny the

3       motion as untimely.

4              Also, I don't think the instruction is appropriate

5       where the plaintiff who bears the burden of proof in this case

6       didn't pursue the taking of the deposition of the witness

7       during discovery, didn't adequately pursue it.

8              In the alternative in that request, the plaintiff

9       seeks leave to comment on the defendant's failure to call

10      Misun Kim.  It's not clear to me what sort of comment you have

11      in mind.  So I can distinguish two situations:  One, to

12      mention to the jury that the defendants didn't call Misun Kim;

13      and then, second, related but distinct, is to argue that

14      because the defendants didn't call Misun Kim, that the jury

15      can infer that Ms. Kim's testimony would have helped -- I'm

16      sorry -- would not have helped the defendants; in other words,

17      in the absence of an adverse inference instruction, simply

18      arguing that adverse inference.

19             So my ruling on that is this:  The plaintiff can

20      mention that the defendant didn't call Misun Kim, but as far

21      as argument or commentary, I'm going to deny that request

22      without prejudice.  You can raise it with me.  If you're

23      seeking to make that argument at closing, raise it with me,

24      and I'll address it at that time in the context of the trial

25      record that we have.

1           Next is the plaintiff's trial brief on the issue of

2     profits.   This is ECF 101 filed on October 11th.   The

3     defendants have opposed it.   The trial brief does not seek a

4     ruling from the Court as I read it, so I'm not going to issue

5     a ruling on that at this time.

6           Next are the jury instructions.   Plaintiffs filed

7     another set of instructions yesterday.   That's ECF 102.   The

8     defendants filed objections yesterday.   Plaintiff's new filing

9     includes two new instructions, 6.1 and 6.11.   We'll address

10    the jury instructions at the instructions conference in the

11    course of trial.

12          Next is the defendant's objections to plaintiff's

13    final amended witness list.   Plaintiff's amended final witness

14    list was e-mailed on October 12th, so four days ago.   It

15    contains an additional witness, Mr. Kantowitz, who was not

16    disclosed in the pretrial order.   He was also not disclosed in

17    the plaintiff's 26(a)(3) pretrial disclosures.

18          So my first question is going to be:   Who is

19    Mr. Kantowitz and his relationship to the plaintiff?

20          Well, I understand now that he's affiliated with the

21    plaintiff.

22          Ms. Bonthuis, can you just give a little more color

23    as to Mr. Kantowitz's relationship to the plaintiff first and

24    second as to why he wasn't disclosed earlier?

25          MS. BONTHUIS:   Yes.   If I might address the latter

| | |
|---|---|
| 1 | first, we have been trying to streamline the issues in this |
| 2 | trial all along by entering into stipulations.  We proposed to |
| 3 | defendants that they stipulate to the fact that plaintiff is a |
| 4 | shareholder.  You may recall that defendants raised the issue |
| 5 | of standing as an affirmative defense yet also submitted in |
| 6 | their own motion papers at one point evidence that plaintiff |
| 7 | is a shareholder, evidence that their general counsel went out |
| 8 | and found.  There was evidence submitted during briefing that |
| 9 | plaintiff is a shareholder and the Court ruled that plaintiff |
| 10 | is a shareholder and therefore there was standing. |
| 11 | It came up really at the motion in limine conference |
| 12 | that defendants intended to contest that plaintiff was a |
| 13 | shareholder notwithstanding the fact that the Court had found |
| 14 | that there was standing based on the fact that plaintiff was a |
| 15 | shareholder; that they intended to contest that. |
| 16 | We asked whether they would be willing to enter into |
| 17 | a stipulation to the fact that plaintiff was a shareholder. |
| 18 | We produced a copy of the most recent brokerage statement that |
| 19 | shows that Nosirrah Management continues to own |
| 20 | Franklin Wireless stock.  Defendants have steadfastly refused |
| 21 | to enter into any such stipulation.  We sought the assistance |
| 22 | of the magistrate to have a stipulation conference, and |
| 23 | defendants declined. |
| 24 | With that, we are mindful that we do need to show |
| 25 | that plaintiff is currently a shareholder, and so we are left |

| | |
|---|---|
| 1 | with the option of having Mr. Kantowitz, who is a |
| 2 | representative of the plaintiff, testify to the simple fact |
| 3 | that plaintiff is a shareholder.  It's the entire content and |
| 4 | purpose of his testimony. |
| 5 | THE COURT:  I see.  That's it for Mr. Kantowitz's |
| 6 | testimony? |
| 7 | MS. BONTHUIS:  That's it.  Yes. |
| 8 | THE COURT:  So we're talking about two minutes?  One |
| 9 | minute? |
| 10 | MS. BONTHUIS:  I think it's about a page -- it's |
| 11 | literally -- |
| 12 | I would be shocked if it went more than two |
| 13 | minutes. |
| 14 | THE COURT:  Mr. Lobbin, what about that?  So |
| 15 | ordinarily my view, if it's not -- if a witness isn't |
| 16 | disclosed, they can't be used at trial.  It's pretty |
| 17 | straightforward.  But at the same time, there's no real |
| 18 | dispute that the plaintiff has standing.  In addressing the |
| 19 | summary judgment motions, I determined that the plaintiff has |
| 20 | standing.  Nonetheless, it's something they have to establish |
| 21 | at trial.  Mr. Kantowitz is here.  We can do it in two |
| 22 | minutes.  It doesn't sound like anything about his testimony |
| 23 | is in any way surprising to the defendants. |
| 24 | What about just having Mr. Kantowitz give his two |
| 25 | minutes of testimony? |

1                    MR. LOBBIN:  Your Honor, this is a fundamental

2      issue.  This is a federal court; this is a plaintiff seeking

3      relief in a federal court.  Plaintiff must show standing at

4      the time of trial as the opposition counsel just told you.  We

5      do not have a burden.  We have no idea what Nosirrah is, what

6      it owns, what it doesn't own.  We know that two years ago, it

7      owned a share.  We have no idea what they own today or they

8      don't own.  This is plaintiff's burden.

9                    Now, we've been preparing for trial for almost a

10     year, and they disclosed back in the spring their list of

11     witnesses.  All their witnesses were our people.  Did I find

12     that odd?  Yes.

13                   "We're going to call OC Kim, we're going to call

14     Rachel Kim, we're going to call the third party who did a deal

15     with OC Kim."  Fine.

16                   We've been preparing for trial for almost a year,

17     and three days ago, with no leave of Court, beyond any

18     deadline, they not only tell us that, "Oh, we have a new

19     witness.  We're going to put Mr. Kantowitz on the stand" and

20     "Oh, by the way, here's a new document."

21                   "Oh.  It's a statement of what shares of

22     Franklin Wireless they own now."

23                   I don't know what this document is.  I haven't had a

24     chance to depose Mr. Kantowitz.  I haven't had a chance to see

25     what other trades that they've made on this stock in the

1    interim.  I have no idea about any of it.

2            THE COURT:  Mr. Lobbin, I'm not hearing that they

3    intend to offer a document through Mr. Kantowitz.  What I'm

4    hearing is they just intend to have him say, "Yes.  At the

5    relevant time frame, the plaintiff owned one or more shares of

6    the defendant's" --

7            Look, I understand.

8            MR. LOBBIN:  It's completely prejudicial.  It's

9    completely prejudicial, and it's outside the rules, as we put

10   in our brief.  This is a pretrial order this court entered in

11   March.  Okay?  The rules require, 16(e), that this can only be

12   modified to prevent manifest injustice.  How is it possibly

13   manifest injustice for a plaintiff, who intentionally puts

14   forward their case, lists their witnesses and lists their

15   exhibits, goes to the pretrial conference --

16           They even served on October 9th, one week ago, their

17   final exhibit and witness list.  No mention of Mr. Kantowitz.

18   How is it possibly manifest injustice for this court to allow

19   at the eleventh -- at the eleventh and a half hour a new

20   witness, even if it's just two minutes?

21           This is entirely improper and entirely prejudicial

22   to my client and entirely prejudicial to our system of

23   jurisprudence where a plaintiff has a burden.  We don't have

24   any counterclaims.  We're here to defend ourselves.  We don't

25   have to put on any evidence.  We have to respond to evidence

1    that they put on.  After a two-year litigation, they say three

2    days before trial, "Oh, this key element of our case, we have

3    a new witness, and he's going to say this.  It shouldn't take

4    long."

5              What?

6              We haven't had any chance to pre-try that issue, to

7    examine the witness, to figure out his credibility.  Of course

8    they're going to show this document to him.  If he doesn't --

9              What?  He had personal knowledge about everything?

10   They're going to show this to him to refresh his recollection.

11   "Oh, now I know.  On such and such a date, we owned one

12   share."

13             It's entirely prejudicial, and I think this court

14   should uphold the standards that this court requires for

15   litigating cases:  Put your witnesses in your pretrial

16   disclosures and do it timely, and if you don't do it, you must

17   show manifest injustice.  There's no manifest injustice from

18   plaintiff not marshalling its facts, figuring out what it

19   needs to prove at trial, doing the work, and listing the

20   witnesses, and putting on its case and making sure it has

21   evidence for every element of its case, including standing.

22             This is federal court.  This is not the playground.

23             THE COURT:  Well, Mr. Lobbin, I agree with you to

24   the extent they haven't heard a valid reason for why

25   Mr. Kantowitz wasn't disclosed earlier.

```
 1              Ms. Bonthuis, let me ask you this:  So we call
 2     Mr. Kantowitz to the stand.  You ask him, "What's your name?
 3     Who do you work for?  How long have you worked for Nosirrah?"
 4              What exactly do you intend to ask him after that?
 5              Because if I understood you correctly, we're talking
 6     about maybe two questions.  But let's just be as concrete as
 7     possible, because I think that will inform the prejudice
 8     inquiry.
 9              MS. BONTHUIS:  "Does Nosirrah own stock in
10     Franklin Wireless today?"
11              "When did Nosirrah purchase stock in
12     Franklin Wireless?"
13              "Has Nosirrah held that stock continuously since
14     that time?"
15              THE COURT:  That's it?
16              MS. BONTHUIS:  That's it.
17              THE COURT:  All right.  What about that, Mr. Lobbin?
18              MR. LOBBIN:  Well, it doesn't relieve the prejudice,
19     that we haven't had a chance to pre-try that issue.  We know
20     nothing about Mr. Kantowitz or his credibility.
21              MS. BONTHUIS:  Your Honor --
22              THE COURT:  Hang on.  Hang on, Ms. Bonthuis.
23              MR. LOBBIN:  We have no idea about Mr. Kantowitz or
24     his credibility.  They're raising this issue three days before
25     trial.  It's entirely opposite to how the cases are supposed
```

| | |
|---|---|
| 1 | to be pre-tried and tried.  This is a fundamental important |
| 2 | issue of the standing of this court to potentially penalize |
| 3 | Mr. OC Kim and his company for short-swing profits based on a |
| 4 | case brought by a plaintiff who has no evidence that they have |
| 5 | standing but for this surprise evidence at the eleventh hour. |
| 6 | So we're just teeing ourselves up for -- |
| 7 | Hopefully we win on the merits, but it's just going |
| 8 | to continue the litigation forever. |
| 9 | THE COURT:  Well, Mr. Lobbin, look.  I understand |
| 10 | your point about the need to follow the rules.  At the same |
| 11 | time, the reality of plaintiff's stock ownership is not a |
| 12 | surprise to the plaintiff.  When we were here a few weeks ago |
| 13 | at the in limine hearing, we were talking about whether the |
| 14 | plaintiff would be allowed to offer -- I'm sorry -- about |
| 15 | whether the defendants would be able to offer into evidence a |
| 16 | sheet that showed the fact that the plaintiff owned a single |
| 17 | share.  You know, there's no surprise at all associated -- |
| 18 | there's really no dispute throughout the pendency of the case |
| 19 | associated with the fact that Nosirrah was a shareholder of |
| 20 | defendants -- of Defendant Franklin at the relevant time. |
| 21 | MR. LOBBIN:  At the time.  At the time. |
| 22 | THE COURT:  So I'm going to allow the plaintiff to |
| 23 | pose those three questions. |
| 24 | In terms of prejudice, Mr. Lobbin, you've now heard |
| 25 | those questions, so you know exactly what's going to be asked. |

```
1              You know, I've required the plaintiff to lay out
2    every question that counsel intends to ask Mr. Kantowitz.
3    You've heard them now.  I'm going to hold them to it.  So in
4    that regard, your objections are overruled, but
5    Mr. Kantowitz's testimony is limited to what we've discussed
6    this morning.
7              MS. BONTHUIS:  That's it.
8              MR. LOBBIN:  Thank you, Your Honor.
9              MS. BONTHUIS:  And, Your Honor, if I may just note
10   for the record, they did seek a 30(b)(6) deposition of
11   plaintiff.  We moved to -- we opposed certain portions of
12   that.  We prevailed on that, and they dropped their request.
13   So they did have an opportunity.  They chose not to take
14   advantage of it.
15             THE COURT:  All right.  Thank you, Counsel.
16             Mr. Bauer was listed as a witness in the pretrial
17   order.  Does any party intend to call Mr. Bauer in its case in
18   chief?
19             Mr. Lobbin?
20             MR. LOBBIN:  Yes, we do.
21             THE COURT:  Ms. Bonthuis?
22             MS. BONTHUIS:  We do not intend to call him in our
23   case in chief.
24             THE COURT:  All right.  Next is the issue of whether
25   the question of damages go to the jury.
```

```
1              At the in limine hearing last month, Ms. Bonthuis,

2    you asked for the opportunity to file a brief on the issue of

3    whether the jury should weigh in on damages.  I gave the

4    plaintiff a week to file the brief and provided the defendants

5    a week to respond to the filing, but the plaintiff didn't file

6    anything.

7              Ms. Bonthuis, is it still the plaintiff's position

8    that the jury should not be given the opportunity to compute

9    damages?

10             MS. BONTHUIS:  Our position is that they should not.

11   If they are allowed to compute damages, it must be according

12   to the mathematical calculation that the Ninth Circuit

13   requires in Whittaker.  Highest -- the sale price, the

14   purchase price, you multiply, you subtract, you get the

15   number.  It's $2 million.

16             If Your Honor wishes the jury to make that

17   calculation themselves, we would respect that, but if it is

18   found that there is a purchase and the purchase was $2.50,

19   there can be no other answer.

20             THE COURT:  Well, if there's a question of

21   methodology, we can address it at the instructions conference.

22             But, Ms. Bonthuis, it remains plaintiff's position

23   that the jury should not compute damages at all?

24             MS. BONTHUIS:  That is our position.  Yes.

25             THE COURT:  So why didn't the plaintiff file a brief
```

1    in that regard?  If you had filed a brief, I'd have your

2    brief; defendants would have a chance to respond; we'd address

3    it this morning.

4              MS. BONTHUIS:  That was the intent of our trial

5    brief, Your Honor.  I apologize if I misunderstood what you

6    were instructing or requesting us to do.  I apologize if

7    that's my error.

8              THE COURT:  Well, the trial brief is talking about a

9    methodology, but it's not talking about the precedent question

10   of whether the jury applies that methodology at all.

11             Or am I misreading your trial brief?

12             MS. BONTHUIS:  No.

13             We also did address the issue in our motion

14   in limine number three, if I'm remembering correctly; that the

15   jury does not need to decide the question of the amount to be

16   disgorged because it is a mathematical calculation.

17             THE COURT:  All right.  So we'll take that up

18   further at the instructions conference.

19             With regard to scheduling, the parties previously

20   estimated four days.  Of course as you get closer to trial,

21   you have a better idea of the case you want to put on.

22             When we bring in the members of the jury panel this

23   morning, one of the important questions is "Does anybody have

24   a problem with serving on a trial of this length?"

25             Now, fortunately, a four-day civil trial is pretty

1    darn short, and I always like to underpromise and overdeliver;

2    to give a conservative estimate of the length of trial.

3         That said, if this trial is only going to last a day

4    or it's going to last a day and a half, then I'd like to hear

5    from counsel so I can revise that estimate just so the jury

6    doesn't think, "What's going on?  You said four days, and here

7    it is Tuesday afternoon."

8         Anything to add to that, Mr. Lobbin?

9         MR. LOBBIN:  Thank you.  Thank you, Your Honor.

10        I think that we're sort of the side to talk to about

11   the length of trial.  I mean, I have an idea of what plaintiff

12   is going to ask our witnesses.  So the primary issue,

13   Your Honor, is Mr. OC Kim was born and raised in Korea.  He's

14   lived here in San Diego for 20 years.  He speaks fine English;

15   however, the kinds of questions and the specificity and the

16   cross-examination, the adverse nature of how they're going to

17   present testimony from him as an adverse witness requires that

18   he have a translator because persnickety, detailed questions

19   in English, I think it's prejudicial -- and we've gone through

20   this with counsel -- to Mr. Kim to have to English-ize those

21   questions and his answers.  I think to be clear, he has to

22   have translation.

23        Now, respectfully, I don't want the jury to be left

24   with the impression how is this man a businessman here in the

25   United States and he's not speaking English so I would like

1    leave from the Court to have him answer the warm-up

2    questions -- "Where do you live?" you know -- in English,

3    question and answer in English.  But once it gets into "You

4    filed this form, and on line 7, this means this," and, you

5    know, "What did you mean by this?" and "How do you" --

6              This is fraught with disaster for someone who -- for

7    whom Korean is his native tongue.  To give an example --

8              I don't know how much you know about Korean, but in

9    Korean, "yes" and "no" actually mean the opposite.  Like, if

10   you're talking English and you say, "Isn't that true?" and you

11   want to say "yes" in English, but -- in Korean, it would be

12   "no."

13             I don't fully understand it, but I've had enough

14   discussions with Mr. Kim to know it's quite confusing.

15             So that's the way I expect that to go.

16             THE COURT:  They'll start with cross-examination.

17             So what's your proposal?

18             MR. LOBBIN:  My proposal is the Court allow Mr. Kim,

19   if he's comfortable with easy questions, hearing it in

20   English, answering it in English without the use of the

21   translator.  If necessary for the record, the translator can

22   do the translation.  That's fine.

23             But "Do you live here in San Diego?" "Yes, I do," we

24   don't need to go into Korean and then, you know, "Yes," back

25   to English.

1              But once they get into, "Okay.  So this case is

2    about this form, and you filed it," and these details, and

3    "What was the -- what was the thinking here?" those questions

4    need to be precisely translated into Korean for him to be able

5    to understand fully exactly what's being asked so he can

6    answer exactly what his answer is and then translated back

7    into English.  So that's what we request.

8              THE COURT:  Okay.  Is that --

9              MR. LOBBIN:  That he be given a little leeway,

10   because we don't want to slow down things further because all

11   the simple questions have to go into Korean and back and

12   forth.

13             THE COURT:  First of all, I have no objection to

14   Mr. Kim using a translator if English isn't his native

15   language, but we talked about this at the final pretrial

16   conference in March.  What I don't want to do is I don't want

17   to jump back and forth in a way where nobody except the

18   witness knows whether the next answer is going to be in

19   English or Korean.  I think what I said at that hearing was --

20             Look.  For example, let's say you're examining

21   Mr. Kim.  You could start with the background in English, and

22   then we can flip over and go to Korean, but we wouldn't be

23   going back and forth.

24             Now, the dynamic is that Mr. Kim is being called in

25   the plaintiff's case in chief.  So there's no necessary set of

1        **preliminary questions that they would ask for which they would**

2        **necessarily use English.  So given --**

3              **Well, my inclination -- and I'll hear from**

4        **Ms. Bonthuis -- with regard to the plaintiff's examination of**

5        **Mr. Kim, it sounds like, Mr. Lobbin, he needs a translator at**

6        **some point.**

7              **MR. LOBBIN:  Yes.**

8              **THE COURT:  So I'd like him to use a translator**

9        **throughout.**

10             **When you cross-examine him, certainly you might ask**

11       **him, "Now, how is it that you're using a translator today, but**

12       **you're the CEO, the president of a company?"  That might be a**

13       **question you ask.  "If you re-call, Mr. Kim, in your case in**

14       **chief" -- and I'm not sure what the intent is in that regard,**

15       **if you want to start out with some questions in English, you**

16       **can do that before switching over into Korean, but what I**

17       **don't want to do is -- I don't want to go back and forth.  I**

18       **think it risks confusing the jury, and I'm not sure it would**

19       **necessarily come off well for your client if it looked like he**

20       **was the one who was making the call whether he, for example,**

21       **wanted more time to answer.  Not that I think that's his**

22       **intention.**

23             **MR. LOBBIN:  Perhaps we could have him just decide**

24       **when he needs Korean and then stick with Korean the rest of**

25       **the way, the rest of the exam.  You know, if plaintiff wants**

| | |
|---|---|
| 1 | to ask him a few warm-up questions, he can answer in English; |
| 2 | the jury gets comfortable with the fact that he's not just a |
| 3 | total foreign language speaker.  But then once counsel asks a |
| 4 | more difficult question, he can say, "Well, for this one I |
| 5 | need translation," and then stick with that the rest of the |
| 6 | way. |
| 7 | THE COURT:  Okay.  Ms. Bonthuis? |
| 8 | MS. BONTHUIS:  I think that's going to lead to |
| 9 | confusion.  I think there are plenty of opportunities to |
| 10 | demonstrate that he is perfectly comfortable in English, but |
| 11 | for the jury to sit there and wonder, "Well, he was -- he |
| 12 | answered only two of Ms. Bonthuis' questions in English, and |
| 13 | then he needed a translator, but he was able to go for |
| 14 | 15 minutes with Mr. Lobbin without needing -- |
| 15 | I think it creates all sorts of confusion and |
| 16 | questions for the jury that just aren't relevant.  I think |
| 17 | it's by far cleaner, I think it's by far simpler, and I think |
| 18 | it leaves no room for any sort of prejudice on either side. |
| 19 | Because I don't know -- I don't know how a jury might |
| 20 | interpret it either way.  I think the cleanest, least |
| 21 | prejudicial way is to simply have the translator for all |
| 22 | questions. |
| 23 | THE COURT:  Okay.  So let's say -- |
| 24 | You mean for all questions in your case in chief and |
| 25 | in the defendant's case in chief? |

1                    MS. BONTHUIS:  Yes.  Yes.

2                    THE COURT:  Ms. Bonthuis, I take it you don't intend

3       in any way to comment on the fact that Mr. Kim uses a

4       translator.  You don't intend to use that to comment -- to

5       suggest, first, that he's not a -- I don't know -- not an

6       effective CEO or, second, to suggest that he is being evasive

7       by using a translator.

8                    You don't intend to comment or intimate either of

9       those points, do you?

10                   MS. BONTHUIS:  No.  We may ask questions about his

11      comfort with English, but we have no intent of commenting on

12      use of translation.

13                   THE COURT:  What would the questions about his

14      comfort with English relate to?

15                   MS. BONTHUIS:  That he's comfortable with things

16      like the Form 4 that he filled out, which is in English; that

17      he is comfortable with writing in English, in e-mails.

18                   MR. LOBBIN:  This is exactly the issue.  Exhibit 1

19      is a funnel about how competent you are in English, their

20      Exhibit 1.  This is clearly an issue.  It was an issue his

21      whole deposition.  We need the jury to understand he's fine in

22      English.  Out on the street, you see him, fine.  Have a whole

23      conversation.  It's all great.

24                   We're in court.  They're trying to pin him with

25      $2 million in damages.  He needs to know exactly what they're

```
1    asking and exactly what he intends to say in response.  So
2    that requires a translator.  However, it's prejudicial to
3    force him to have every single question and every single
4    answer throughout this whole trial be in Korean, because he
5    needs the jury to understand he's fine in English.  Just for
6    these --
7              This is a courtroom.  It's a little different.
8              THE COURT:  So my ruling is for plaintiff's case in
9    chief, Mr. Kim can choose a translator or no translator.  It's
10   going to be one throughout.
11             For defendant's case in chief, if they choose to
12   re-call Mr. Kim, they can start in English, and if they want,
13   switch over into Korean, but I just don't want to do that when
14   it's the other side's examination.
15             So any questions about my ruling in that regard?
16             MR. LOBBIN:  No questions.  I have a quick point
17   that you just reminded me of, if I could ask.
18             THE COURT:  Just one second.
19             Do you have any questions?
20             MS. BONTHUIS:  I guess if he chooses to use a
21   translator for the entirety of our examination but then does
22   not use a translator for significant portions or for a
23   material portion of Mr. Lobbin's, are we allowed to comment on
24   that fact?
25             THE COURT:  You could take that up with me before
```

```
 1          closing.  I don't want to rule on that in a vacuum.
 2                    MS. BONTHUIS:  Okay.
 3                    THE COURT:  Your other point, Mr. Lobbin?
 4                    MR. LOBBIN:  Quick question.  So plaintiff's witness
 5          is our person, so it's adverse.  They finish; I get to
 6          redirect.  I pose within the scope of what they examine.
 7                    Then am I also then allowed to call him again in my
 8          case in chief?
 9                    THE COURT:  Well, certainly.
10                    MR. LOBBIN:  All right.
11                    THE COURT:  Absent some stipulation --
12                    Sometimes parties say, "All right.  We're going to
13          agree that the witness will be called once; that the scope of
14          cross won't be limited to cross."
15                    MS. BONTHUIS:  That's what we had --
16                    Pardon me, Your Honor.
17                    THE COURT:  But if there's no agreement like that,
18          then you're entitled to present your case in chief and re-call
19          witnesses who have been called.
20                    MS. BONTHUIS:  Is that not what we agreed?
21                    MR. LOBBIN:  I'm not recalling.
22                    MS. BONTHUIS:  We had agreed, because of the need to
23          have the translator here for his testimony and the desire not
24          to -- for us to call Rachel Kim then they call Mr. Kim back up
25          to the stand, and then Ms. Kim has to come back --
```

```
 1                We had discussed this.  This is the first time
 2       hearing they're not intending to do that.
 3                    MR. LOBBIN:  Perhaps I'm just not recalling.
 4                    THE COURT:  Ms. Bonthuis, is there --
 5                I'm not aware of any agreement on the record.  So I
 6       don't want to hold the parties to an agreement that is not
 7       before me.  But it sounds like maybe counsel can work that out
 8       between the two of you --
 9                    MR. LOBBIN:  I think so.
10                    THE COURT:  -- potentially.
11                But, Mr. Lobbin, back to my original question, which
12       was the estimate of length.  Recognizing that a translator
13       makes things move a little more slowly --
14                    MR. LOBBIN:  That's the issue.  So I think with the
15       translator, with the detailed nature of their questions,
16       depending how long they go with Mr. Kim, it could make the
17       trial three days instead of two, but I don't see it going more
18       than three days.
19                    THE COURT:  Ms. Bonthuis, anything to add on that?
20                    MS. BONTHUIS:  I think four days is a most
21       reasonable estimate.  I hope we are done in four days, and I
22       aim to be done in four days, but yes, I would not tell the
23       jury two days if it were up to me.
24                    THE COURT:  I'll stick with four days.  If I say
25       four and it's three, great; everybody's happy.  If I say four
```

```
 1    and it's one and a half, I think people justifiably would say,
 2    "What happened here?"
 3            Okay.  I'll let counsel know that in the event that
 4    the evidence is still being presented, I have a medical
 5    appointment on Thursday morning at 9:00.  So we would be
 6    starting at 10:15 on Thursday.
 7            Anything else to address before we call in the
 8    panel?
 9            I'll start with you, Ms. Bonthuis.
10            MS. BONTHUIS:  Yes.  Thank you.
11            We would like to use the September 2020 Form 4
12    during our opening statement.  I don't think there's any
13    dispute that this is going to be admitted as an exhibit, as
14    the key exhibit, in this case.  But I wanted to let the Court
15    know and see if there was any objection to that.
16            THE COURT:  All right.  Any objection, Mr. Lobbin?
17            MR. LOBBIN:  I'm sorry.  I didn't hear.  The Form 4,
18    you said?
19            THE COURT:  Form 4.
20            MR. LOBBIN:  Yeah.  No objection.
21            THE COURT:  All right.
22            MS. BONTHUIS:  And also we have some deposition
23    testimony that we will be using for Mr. Hirschman who cannot
24    appear at trial.  He is beyond the subpoena power.  We would
25    like to read that into the record after Mr. Kim -- after we
```

1    finish with Mr. Kim's testimony.

2           We previously designated the portions.  You ruled on

3    it.  We have gone back through and whittled it down to try to

4    make it as efficient as possible.

5           Defendants have our revised designations.  If they

6    have any counterdesignations, you know, if they let us know,

7    we can address it.  But we'd like to do that after Mr. Kim

8    finishes.

9           THE COURT:  If the testimony that you're putting on

10   the record is something different and smaller than what was

11   previously in the record --

12          MS. BONTHUIS:  Yes.

13          THE COURT:  -- I just want to make sure that our

14   trial record somehow reflects what that is.

15          So of course what you say will be taken down by our

16   court reporter, but just at some point -- maybe it's after you

17   say it -- you'll just recite what page and line number it is

18   so we have some reference.

19          MS. BONTHUIS:  Yeah.  We can file it.  We just

20   wanted to give defendants the opportunity --

21          If they thought, "Oh, you need this additional

22   paragraph to make it accurate," we wanted to give them the

23   opportunity to counter designate.

24          THE COURT:  But it's less?

25          MS. BONTHUIS:  Less.  Yes.  Nothing new.

```
1                    THE COURT:  All right.  Anything else, Ms. Bonthuis?
2                    MS. BONTHUIS:  No.  That's all.
3                    THE COURT:  Mr. Lobbin, anything else?
4                    MR. LOBBIN:  A question about schedule.  The lunch
5        is when?  I think I probably could have looked at your
6        chambers rule, but the lunch is 12:00 to 1:30?
7                    THE COURT:  So typically we start at 9:00; we go to
8        4:30.  We typically have a lunch break of about an hour
9        between noon and 1:00.  You know, if we break a little before
10       noon, I want to give the jurors a little more time rather than
11       less.  So we go an hour plus a little more for lunch, and we
12       usually take a morning break and an afternoon break of 10 to
13       15 minutes.
14                   MR. LOBBIN:  Thank you.
15                   MS. BONTHUIS:  And if I might just raise one other
16       question, I've noticed that Mr. Lobbin is continuing to refer
17       to this as damages that the defendant is going to have to pay.
18       This is not damages.  This is disgorgement.  This is an
19       equitable remedy.  So I would ask that Mr. Lobbin cease
20       referring to this as some sort of penalty we're going to pin
21       on the defendant.  It's a strict liability statute.  There's
22       no fault.  It's simply a disgorgement that's made, and I think
23       referring to it as a penalty to pin on him is prejudicial to
24       the plaintiff.
25                   THE COURT:  So what exactly is your request,
```

1    Ms. Bonthuis?

2              MS. BONTHUIS:  That he not refer to this as damages

3    or penalties that we are trying to pin on Mr. Kim.  We are

4    seeking that he return money to the company.  We are seeking

5    that he disgorge profits.  That's it.  We're not trying to

6    punish him.

7              THE COURT:  Mr. Lobbin?

8              MR. LOBBIN:  In the parlance of a lay jury, one

9    party's here to get money from another party.  That's all.  If

10   she wants to make that distinction, she can argue that.  She

11   can tell the jury that I'm misrepresenting something, but this

12   is -- you know, I can't --

13             You know, speaking extemporaneously, as trial

14   lawyers often do -- I'm not going to say anything nutty, but

15   damages, you know, a penalty.  This is court.  So --

16             MS. BONTHUIS:  But that's not --

17             MR. LOBBIN:  It's totally improper to --

18             MS. BONTHUIS:  It's not § 16, Your Honor.

19             THE COURT:  Well, the Court's instructions will

20   describe and characterize the payment, if any, that the jury

21   awards.  I'm not going to make an additional order at this

22   time.

23             MS. BONTHUIS:  Okay.

24             THE COURT:  Hearing nothing else from counsel,

25   Loraine, would you please call up our panel.

```
1                    THE CLERK:  Sure.  Yes.

2                    THE COURT:  Thank you.

3                    I have a binder of hard-copy exhibits from

4       plaintiff.

5                    Thank you, Ms. Bonthuis.

6                    MS. BONTHUIS:  Yes.  That includes both.

7                    Ms. Court Reporter, would you like the USB of the

8       exhibits?

9                    MR. LOBBIN:  Is there a copy for our side from

10      the --

11                   MS. BONTHUIS:  We have copies over here.  Yes.

12                   (Recess taken 9:42 a.m. - 9:58 a.m.)

13                   (Jury panel present at 9:58 a.m.)

14                   THE COURT:  Good morning, everyone.

15                   ALL:  Good morning, Your Honor.

16                   THE CLERK:  Please be seated and come to order.

17                   Calling No. 1 on the calendar, 21-cv-01316,

18      Nosirrah Management, LLC v. Franklin Wireless Corp. et al.

19                   THE COURT:  Could I please have appearances of

20      counsel for the record.

21                   MS. BONTHUIS:  Yes.  Good morning, Your Honor,

22      again.

23                   Mari Bonthuis and Eric Small for the plaintiff.

24      We're with the law firm Sterlington PLLC.

25                   THE COURT:  Good morning, Ms. Bonthuis and
```

1    Mr. Small.

2               MR. LOBBIN:  Good morning, Your Honor.

3               Stephen Lobbin here again from SML Avvocati here in

4    San Diego on behalf of the defendants.

5               With me is my associate, Christopher Ferri, of the

6    law firm as well as Mr. Bill Bauer, who's counsel for

7    Franklin Wireless.

8               THE COURT:  All right.  Good morning, Mr. Lobbin,

9    Mr. Ferri, and Mr. Bauer.

10              And good morning to the members of the jury panel

11   and welcome to all of you.  My name is Judge Robert Huie.

12   I'll be presiding over the trial of the civil case Nosirrah

13   Management, LLC v. Franklin Wireless Corporation and O.C. Kim.

14              So you all have been selected as possible jurors to

15   hear this case for the purposes of deciding the contested

16   factual issues that relate to the plaintiff's claims in this

17   case.

18              First of all, thank you all for being here and

19   performing your civic duty to serve as possible jurors.  I

20   know that each of you has busy schedules and numerous

21   obligations and that coming here and serving on a potential

22   jury panel involves putting those on hold in the interest of

23   serving our community, and we all take note of that and

24   appreciate it.

25              You might ask, "If there's a judge, why do we also

1    have a jury?  Isn't that a duplication?"

2            Well, the answer is that there's a division of labor

3    in a case.  In a trial, those of you who are selected as

4    jurors will be the judges of the facts.  You will decide what

5    happened, you will decide who's telling the truth, you will

6    decide the important facts that relate to the plaintiff's

7    claims in this case.

8            My job as the judge is to make rulings on issues of

9    law.  So when a jury is impaneled, I'll be the one giving the

10   jury direction on what law to apply to the facts as you find

11   them.  You might have seen on TV or through a past experience

12   in a courtroom, during a trial, sometimes there may be a

13   witness on the stand and an attorney stands up and says,

14   "Objection."  Then at that point, I either sustain or overrule

15   the objection.  "Sustained" means that the attorney has to ask

16   a new question; "overruled" means the witness can answer it.

17   That's an example of the type of legal ruling that a judge

18   makes, but it is you who will be selected as jurors to be the

19   fact-finders in this case.

20           What that means is that your being here involves

21   playing a very special role in our system.  So in a democracy,

22   you -- of course you vote for the president, you vote for the

23   governor, you vote for members of the Congress, but you don't

24   actually get to do their job for a week out of the year.

25   Here, it's a little bit different.  You are the ones who are

1    the fact-finders.  You are the ones who, as I say, will be the

2    ones to decide what happened, and if there's a dispute,

3    deciding who to believe.

4            What we're here to do this morning is to find jurors

5    who can be fair and impartial in the context of this

6    particular case.  So the parties, both sides, are entitled to

7    a fair and impartial jury to determine the issues here.

8    That's something that our U.S. Constitution guarantees them.

9    A fair and impartial jury is a jury where each individual

10   juror is without bias and is objective.  It's a jury that is

11   able to disregard and set aside any prejudices, sympathy, or

12   other feelings about the parties, and it's a jury that is

13   willing and able to return a verdict solely based on the

14   evidence and based on the law as I give it to the jury

15   applicable to the evidence and not do any independent

16   research.

17           Now, I can't stress this too heavily.  Jurors are

18   not allowed to check Google; they're not allowed to do any

19   independent research, in person or online; to do a quick

20   search in your phones.

21           Now, this is very different from normal

22   interactions.  Normally, you're having a conversation with

23   somebody; they ask you a question, you don't know it, and your

24   hand reaches for your pocket to check your phone.  You have to

25   check that instinct here, because we can't do that.  Those of

1        you who are selected as jurors must decide the case based

2        solely on the evidence that you hear in open court, and again

3        that's something that our constitution guarantees.

4              Now, to help the parties to select a fair and

5        impartial jury to hear this case, I'm going to ask this

6        morning some questions to all of you, to the members of the

7        panel as a whole, and then we're going to follow up with

8        questions to individual members of the panel.

9              Now, if your answer to any of these questions

10       concerns private or potentially embarrassing matters, just

11       raise your hand, and we can go sidebar, and that means that

12       we'll be having a discussion over here.  It would be you, the

13       attorneys, our court reporter, and me rather than talking

14       about it in open court.

15             After we go through the individual jurors, then

16       finally the attorneys will have a brief chance to ask some

17       follow-up questions.  This process we're going to undertake

18       this morning is called voir dire.  Now, the purpose of this

19       process, as I say, is to allow the parties to select a fair

20       and impartial jury and to determine whether or not a

21       particular one of you should be excused for cause, for some

22       reason or other, but it's also to enable attorneys to exercise

23       what are called peremptory challenges, and that's where a

24       party says, "We choose not to have this person on our jury,"

25       and they don't need to give a reason for it.  That's just part

1      of the way our system works.

2              At this time, I'm going to ask my deputy clerk,

3      Loraine, to give an oath to all of you.

4              (Jury panel sworn.)

5              THE COURT:  All right.  So, as I mentioned, the

6      parties in the case are entitled to have a fair and unbiased

7      and impartial jury.  If there's any reason why any of you

8      might be biased or partial in any way, you must disclose that

9      reason when you're asked to do so, and I'll get to some

10     specific questions.  It's your duty, having been placed under

11     oath, to make this disclosure.

12             Now, the trial in this case will likely -- the trial

13     in this case will take no longer than four days for the

14     presentation of evidence.  So let me explain this a little

15     bit.

16             In our justice system, we have civil cases and

17     criminal cases.  This is a civil case.  It's a dispute between

18     private parties.  What we have here is kind of a rare bird,

19     and that is a civil case that is a relatively short civil

20     case.  So in this courtroom, our trials go from Monday to

21     Thursday.  On Fridays, I have my criminal matters.  What that

22     means in this case is that whoever's impaneled as the jury

23     will have all the evidence presented to them, will have the

24     case argued to them by no later than the end of the day on

25     Thursday.  It could be sooner, but it would be no later than

1    the end of the day on Thursday.  Now, that doesn't mean the

2    trial is over.  It means at that point, the jury retires to

3    deliberate.  That deliberation can take place here on Friday,

4    even though I have my criminal matters, because you won't be

5    deliberating in this courtroom.  You'll be in a jury

6    deliberations room.

7            So keeping that time frame in mind -- this is a

8    short civil case, but it's still a significant demand on your

9    time -- my first question is:  Will any of you find it

10   difficult or impossible to participate for this period of

11   time?

12           Now, I've asked a question, but here's how we're

13   going to handle answers to questions.  My court reporter,

14   Tricia, takes down everything that's said in open court,

15   whether it's by me, the attorneys, the witness, or by any of

16   you.

17           So if anyone wants to speak, please raise your hand,

18   and -- you can also hold up your juror number, and then

19   Loraine will hand you the microphone.  Please wait until you

20   have the mic before you start answering, and that just

21   guarantees that Tricia is able to take down everything that is

22   said in open court.

23           So, again, my question is:  Is there anybody here

24   who will find it not convenient, because I'm not sure it's

25   particularly convenient for anybody, but difficult or

```
1    impossible to sit as a juror for a case of this length?
2              All right.  So we'll try to go in general order.
3    I'll start with Juror No. 3, and we'll make sure we get to
4    everybody.
5              Good morning.
6              PROSPECTIVE JUROR NO. 3:  Good morning.
7              My name is Travis Graham.
8              I didn't know that calling back from last week, that
9    it would happen this week.  This week, I have a cybersecurity
10   final from Wednesday to Friday, starting at 5:00 p.m. and
11   ending at 1:00 p.m.
12             THE COURT:  All right.  So, Mr. Graham, you're a
13   student; is that correct?
14             PROSPECTIVE JUROR NO. 3:  No.  I'm a government
15   contractor, but I'm also taking a cybersecurity scaling course
16   right now.
17             THE COURT:  Is that course through your employer
18   or --
19             PROSPECTIVE JUROR NO. 3:  Yes.
20             THE COURT:  All right.  And the timing of that --
21             This is the final exam; is that right?
22             PROSPECTIVE JUROR NO. 3:  Yes.
23             THE COURT:  The timing is that it starts at
24   5:00 p.m.?
25             PROSPECTIVE JUROR NO. 3:  5:00 a.m.
```

1           THE COURT:  Oh.  5:00 a.m.

2           Okay.  And runs to 1:00 p.m.?

3           PROSPECTIVE JUROR NO. 3:  Uh-huh.

4           THE COURT:  I see.  And given that this exam is

5    administered by your employer as opposed to a university, do

6    you know whether they're able to change the timing of the exam

7    to accommodate your jury service?

8           PROSPECTIVE JUROR NO. 3:  They've been saying that

9    it's mandatory; that everyone has to be here.  This is

10   basically the final.  They have another set of students that

11   are going to come in right after us, so they won't have time

12   to reschedule that final.

13          THE COURT:  How long has the course been going on?

14          PROSPECTIVE JUROR NO. 3:  It's been going on for

15   eight months now, since April.

16          THE COURT:  This is the final for the entire

17   eight-month course?

18          PROSPECTIVE JUROR NO. 3:  Yes.

19          THE COURT:  Thank you, Mr. Graham.

20          I think Juror No. 6.

21          PROSPECTIVE JUROR NO. 6:  Hi.  Good morning.

22          My issues are a few.  One, I have a mother that is

23   recently hospitalized, and I am the person who communicates

24   with her providers and such.  And I am a medical provider, and

25   I take care of veterans.  I am the only provider because of

1    someone who was out on an emergency, and so I am the only
2    provider available.

3              I'm newly diagnosed with a pretty sizable tumor, and
4    so I have to have workup myself.  Hopefully something this
5    week.  I am in a significant amount of pain, especially when
6    sitting for an extended period.

7              THE COURT:  Okay.  Ma'am, I'm sorry to hear that,
8    but thank you for sharing that information.  I just want to --

9              So here's how it works.  I've got questions for
10   folks.  And the attorneys and the Court, we're all listening;
11   we're taking notes.  We're not going to make decisions on the
12   spot.  It will be once we've gone through this questioning
13   process.  So the fact that I've moved on to somebody else, it
14   doesn't mean your reasons aren't fully good and legitimate.
15   We're just going through this process in an orderly fashion.

16             So I think there was also a hand in this row here.
17             Do I remember correctly?
18             Yes.  Juror No. 9.

19             PROSPECTIVE JUROR NO. 9:  Good morning.

20             I just want to make sure I have enough time to sit
21   as a juror.  I'm going out of town on the 26th, and I'm not
22   sure if that's enough time.  I'm hoping it is.

23             THE COURT:  Let's see.  The 26th would be next
24   Thursday.

25             PROSPECTIVE JUROR NO. 9:  Thursday.

1          THE COURT:  With the case being given to the jury by

2     the end of Thursday of this week --

3          There's no set period of time for how long the jury

4     needs to deliberate, but if you have it by the end of the day

5     on Thursday and then the jury has it Friday, Monday, Tuesday,

6     Wednesday the following week, I can't foresee you not being

7     able to undertake your commitment on October 26th, but

8     thank you for mentioning it.

9          PROSPECTIVE JUROR NO. 9:  Perfect.  Thank you.

10         PROSPECTIVE JUROR NO. 23:  I'm also going out of

11    town on the 25th.

12         THE COURT:  All right.  Let's see.

13         Juror No. 23; is that right?

14         PROSPECTIVE JUROR NO. 23:  Yes.

15         THE COURT:  You're going out of town on the 25th?

16         PROSPECTIVE JUROR NO. 23:  Correct.

17         THE COURT:  And that's Wednesday of next week?

18         PROSPECTIVE JUROR NO. 23:  Yes.  I think so.

19         THE COURT:  Okay.  All right.  Thank you for

20    speaking up.

21         Juror No. 18.  Good morning.

22         PROSPECTIVE JUROR NO. 18:  Hi.  Yes.

23         I have a surgery scheduled for Tuesday morning, the

24    24th.  So as long as I could be done before then.

25         THE COURT:  Okay.  Okay.  Thank you.

```
 1              PROSPECTIVE JUROR NO. 27:  Hello.  I'm a registered
 2    nurse, and I just got a new job at Rady's Children's, and I'm
 3    in the middle of nursing orientation.  It kind of sets me
 4    back, just to let you know.
 5              THE COURT:  All right.  Juror No. 27, good morning.
 6              Congratulations on the new job.
 7              Can you tell me a little bit more what the
 8    orientation involves?
 9              What I'm going to get as is:  Is this a situation
10    why your employer needs to accommodate the fact that you're
11    here serving the community by acting as a potential juror?
12              PROSPECTIVE JUROR NO. 27:  Yes.  I did tell my
13    supervisor.  She did tell me to tell the judge, as well,
14    because they are short of staff right now.  So I am helping
15    fill those needs.
16              THE COURT:  So I guess those are maybe two different
17    things.  One is you're in the orientation for you as a new
18    employee; but, second, you're doing your employer's work, as
19    your employer wants you to do.  Of course they do.
20              PROSPECTIVE JUROR NO. 27:  Yes.
21              THE COURT:  How long does the orientation program
22    last?
23              PROSPECTIVE JUROR NO. 27:  It's been two months.
24    It's about to end next week.
25              THE COURT:  You're two months into it, and next week
```

1    is the last week?

2              PROSPECTIVE JUROR NO. 27:  Uh-huh.

3              THE COURT:  Is there anything about this week's

4    curriculum that's --

5              I'm sure it's all important or you wouldn't be doing

6    it, but is there anything about this week that distinguishes

7    it from the two-month program?

8              PROSPECTIVE JUROR NO. 27:  I did just switch to

9    night shifts, 6:00 p.m. to 6:00 a.m.  They are short of staff

10   for night shifts, so I was trying to help out with that, in

11   filling in for the night-shift nurses.

12             THE COURT:  All right.  Thank you for speaking up.

13             Any other hands on the difficulty with timing

14   issues?

15             Yes.  Juror No. 12.  Good morning.

16             PROSPECTIVE JUROR NO. 12:  Good morning.

17             I am also going out of town on the 25th of next

18   week.  So I just want to make sure --

19             Next Wednesday.  I think that's the 25th.

20             THE COURT:  25th --

21             You're going out of town on the 25th?

22             PROSPECTIVE JUROR NO. 12:  The 25th.  Yes.

23             THE COURT:  Thank you.

24             Further hands on timing?

25             All right.  Do any of you --

1            To the extent you haven't already mentioned it, do

2      any of you suffer from a medical condition that would make it

3      difficult for you to serve as a juror in this case?

4            And, ma'am, you're welcome to add more, but we've

5      already addressed your issue.  You know, you have a number of

6      concerns, one of which was what was described to us.

7            All right.  Anybody else on that question, medical

8      condition or concern?

9            All right.  Does anybody here have any difficulty

10     understanding, speaking, or reading the English language?

11           All right.  Seeing no hands --

12           All right.  At this time, I'm going to ask

13     counsel -- Ms. Bonthuis for the plaintiff, Mr. Lobbin for the

14     defendant -- to briefly again reintroduce themselves, their

15     colleagues and their clients.

16           And I want you to take note, because my question is

17     going to be:  Do you know any of these individuals?

18           MS. BONTHUIS:  Thank you, Your Honor.

19           Good morning.  My name is Mari Bonthuis.  I'm with

20     the law firm of Sterlington, PLLC.

21           With me is my colleague, Eric Small, and a

22     representative of our client, Robert Kantowitz.  The name of

23     our client is Nosirrah Management, LLC.

24           THE COURT:  Thank you, Ms. Bonthuis.

25           All right.  Mr. Lobbin.

```
1              MR. LOBBIN:  Good morning, everyone.
2              My name is Stephen Lobbin.  I'm a lawyer here in
3    San Diego.  My law firm is SML Avvocati, PC.
4              My associate, Christopher Ferri, he's with my firm.
5              Our client in this case are the defendants,
6    Franklin Wireless Corporation, which is a company here in
7    San Diego.  They do Wi-Fi and technology, things like that.
8              I would ask their president and CEO, OC Kim, please
9    stand up and --
10             This is OC Kim.  He's the president and CEO of
11   Franklin Wireless.
12             Thank you, Mr. Kim.
13             This gentleman here is Mr. Bill Bauer.  He's also a
14   lawyer, but he works for the company, in-house, as the general
15   counsel of Franklin Wireless.
16             THE COURT:  All right.  Thank you, Mr. Lobbin.
17             So in addition to those names, I have a couple more
18   names to give you.  These are folks who may be called as
19   witnesses in this case.  One person is Rachel Kim.  Rachel
20   Kim.
21             The other is Orin Hirschman.  First name O-r-i-n;
22   last name, H-i-r-s-c-h-m-a-n.
23             So having heard all those names, have any of you
24   heard of or otherwise been acquainted with or to your
25   knowledge done business with or been employed by any of the
```

1       parties, attorneys, or witnesses that have been named?

2               Having heard the names, does anybody have any

3       feeling toward any of the parties, attorneys, or witnesses

4       that might be regarded as a bias or prejudice, either against

5       them or for them?

6               All right.  Does anyone, to their knowledge, have

7       any interest, financial or otherwise, in the outcome of this

8       particular case?

9               I'm going to read to you a short statement about the

10      nature of the case.  This case involves the securities laws of

11      the United States.  The plaintiff in this lawsuit is a company

12      called Nosirrah Management.  Nosirrah Management owns stock in

13      Franklin Wireless Corporation, a company that sells wireless

14      access products.

15              The defendant, OC Kim, is the president of

16      Franklin Wireless.

17              Nosirrah has brought one claim under § 16 of the

18      Securities Exchange Act of 1934.  § 16 looks at purchases and

19      sales of stock within a six-month period.  If a company

20      insider makes a profit from buying and selling his company's

21      stock, and the purchase and sale are within six months of each

22      other, that profit is called a short-swing profit because of

23      the relative short period of time between the two

24      transactions.  § 16(b) requires that the insider give this

25      profit back to the company.  An insider can be liable under

| | |
|---|---|
| 1 | § 16(b) even if he did not use any insider information and |
| 2 | even if he did not know or understand the law.  An insider can |
| 3 | also be liable for someone else who makes a purchase or sale |
| 4 | if that person is financially dependent on the insider or if |
| 5 | the insider has a pecuniary interest in the stock that is |
| 6 | traded.  If the insider does not return the short-swing |
| 7 | profit, § 16(b) authorizes the company to sue the insider to |
| 8 | recover that profit, and if the company does not sue the |
| 9 | insider, § 16(b) allows a shareholder of the company to sue |
| 10 | the insider on the company's behalf to make the insider return |
| 11 | the profit. |
| 12 | In this case, the plaintiff is asking Mr. Kim to pay |
| 13 | back $2 million in profit allegedly resulting from two |
| 14 | transactions that occurred within six months of each other in |
| 15 | 2020.  Mr. Kim claims that he is not liable under § 16(b), |
| 16 | because, one, the first transaction was not a purchase; two, |
| 17 | he was not involved in the transaction nor is it attributable |
| 18 | to him; and/or three, there was no resulting profit. |
| 19 | Now, having heard that description of the case -- |
| 20 | which is not evidence; it's instead intended to orient you to |
| 21 | the nature of the dispute here -- is there anybody here that |
| 22 | has heard of or has any knowledge of the facts or events in |
| 23 | this particular case? |
| 24 | All right.  Is there anyone here -- again, having |
| 25 | heard that description -- who has had any experiences, |

1    attitudes, or opinions regarding this type of case which you

2    think might interfere with your ability to be fair and

3    impartial?

4             All right.  Let's see.  Juror No. 15.

5             PROSPECTIVE JUROR NO. 15:  I don't know if this is

6    relevant, but for 25 years, I was the CFO of a publicly traded

7    company and dealt with the securities laws ad infinitum.  I'm

8    just putting it out there.  I don't know if it would --

9             I don't think it would bias me.

10            THE COURT:  All right.  Thank you for speaking up,

11   Juror 15.

12            Now, in this case, you haven't received the

13   instructions yet, but if you were selected as a juror and you

14   heard the evidence and then you received instructions from me,

15   one of those would be along the lines of you have to set aside

16   any other experience you have with what the law might be, and

17   you have to follow only my instructions on the law.

18            Would you be able to do that?  Do you think you

19   would be able to follow the Court's instructions even if it's

20   different than your own past experience?

21            PROSPECTIVE JUROR NO. 15:  I believe I could.

22            THE COURT:  Thank you, sir.

23            Any other hands on that question?

24            All right.  Have any of you or any member of your

25   family or close friends, to your knowledge, been involved in a

1    dispute like this one, a dispute involving the purchase or

2    sale of securities?

3            All right.  During the course of the case, I will

4    instruct the jury on the law as it applies to this case.  It's

5    the duty of the jury to follow and accept the law as I state

6    it, whether you agree with the law or not.

7            Is there any member of the jury panel who would have

8    trouble with this?  That is to say who would substitute his or

9    her own ideas about what the law should be for my instructions

10   as to what the law is?

11           Does anybody have religious or moral beliefs which

12   would make it hard for you to make a decision based on the

13   evidence and the law in this case?

14           And as I mentioned, it would be your job to consider

15   only the evidence you hear in the courtroom and not do your

16   own independent research.  Is there anybody that would have a

17   problem with following that instruction?

18           All right.  I see no hands on that.

19           So each of you should now answer the questions on

20   the paper in front of you.  So on your seat, you should have a

21   laminated page.  It has your Juror No. on one side, and on the

22   other, it has the questions.  What we're going to do is we're

23   going to start with Juror No. 1 and go down the list of

24   questions.

25           Now, you haven't gone through these before, so it

```
 1     will certainly take you a minute.  You don't need to read the
 2     question.  You can certainly read it to yourself.  We just
 3     need the answers.  And I think as people get accustomed to
 4     this process, it will probably go a little bit faster.
 5               But let's start with you, Juror No. 1.
 6               PROSPECTIVE JUROR NO. 1:  Hi.
 7               My name is Joseph Castanho.  I'm a computer systems
 8     engineer.  My wife is a project manager.
 9               We have three children.  The eldest is a medical
10     technician, our middle child is logistics, and my daughter's
11     in law school.
12               I have served on a jury before, but I was an
13     alternate, so I didn't get into deliberations.  I do know that
14     there was a verdict.
15               My daughter's an intern at a law firm.
16               I have no members that have been a party or a
17     witness to any lawsuit.
18               I can be completely fair and impartial.
19               THE COURT:  All right.  Thank you, sir.
20               Juror No. 2, good morning.
21               PROSPECTIVE JUROR NO. 2:  My name is
22     Kathlyn Satcher.
23               I'm a financial management analyst.  My husband is
24     retired from the Navy.
25               I have one son that is a sales store checker.
```

1          I have been on criminal cases, and we did reach a
2    verdict.
3          I don't have any immediate family.
4          Number 7 is "no."
5          And then number 8, yes, I can be completely fair.
6          THE COURT:  Thank you, ma'am.
7          PROSPECTIVE JUROR NO. 3:  Hi.  My name is
8    Travis Graham.
9          I'm an engineering technician.  I am married, and my
10   wife is currently unemployed.  I don't have any children.
11         I was called to be here before, but I wasn't
12   selected.
13         I don't have any immediate family or close friends
14   that have been involved in law-related work.
15         Number 7, no.
16         And, yes, I can be completely fair and impartial.
17         THE COURT:  Thank you, sir.
18         Juror 4, good morning.
19         PROSPECTIVE JUROR NO. 4:  I'm Albert Reyes.
20         I'm a chef.  My spouse is a scientist.  No children.
21         Never a juror before.  I have a close friend who is
22   a parole officer.
23         "No" on number 7 and "yes" to number 8.
24         THE COURT:  All right.  Thank you, sir.
25         Good morning.

1              PROSPECTIVE JUROR NO. 5:  Good morning.

2              My name is Lisa Cheah.  I'm a materials processing

3        engineer.  I do not have a spouse.  No children.

4              5, 6, and 7 are "no" and yes, I could be completely

5        fair and impartial.

6              THE COURT:  All right.  Thank you very much.

7              Good morning again.

8              PROSPECTIVE JUROR NO. 6:  Good morning.

9              My name is Adrienne Franklin, and I am a nurse

10       practitioner.  I do not have a spouse.  I have an adult child

11       that is a nurse practitioner.

12             I have never served on a jury.

13             I do not have any immediate family members that are

14       in law-related work.

15             I have not -- myself or any immediate family

16       members -- been a party to any lawsuits.

17             I can be completely fair and impartial as a juror.

18             THE COURT:  All right.  Thank you.

19             Good morning.

20             PROSPECTIVE JUROR NO. 7:  Good morning.

21             My name is Jittra Jootar.

22             I am a wireless systems engineer at Qualcomm.

23             I have a partner who is retired.

24             "No" to number 4, 5, 6, 7.

25             Then, yes, I can be fair and impartial.

```
 1                    THE COURT:  All right.  Thank you, Ms. Jootar.
 2                    Before we pass the mic, Ms. Jootar, you mentioned
 3          you work for Qualcomm in the wireless space.  Just to confirm,
 4          you don't have any familiarity with Franklin Wireless; is that
 5          correct?
 6                    PROSPECTIVE JUROR NO. 7:  Correct.  Yeah.
 7                    THE COURT:  Okay.  Thank you.
 8                    Good morning.
 9                    PROSPECTIVE JUROR NO. 8:  Good morning.
10                    My name is Eugene Rhee.  I am a systems engineer.
11          My wife is a registered nurse.  We do have two small children.
12                    I have served as a juror before on a criminal case.
13          There were two counts.  One did reach a verdict.  The other
14          did not.
15                    I have a sister, brother-in-law, and a couple of
16          friends who are all lawyers.
17                    Number 7, no, and 8, yes, I can be fair and
18          impartial.
19                    THE COURT:  Mr. Rhee, do you know what area of the
20          law your sister practices in?
21                    PROSPECTIVE JUROR NO. 8:  My sister is in-house
22          counsel for a corporation.
23                    THE COURT:  Would the fact that your sister is in
24          that line of work, would that tend to -- having heard the
25          nature of this case -- push you in favor or against one party
```

1    or the other here?

2              PROSPECTIVE JUROR NO. 8:  No.

3              THE COURT:  Okay.  Thank you.

4              Good morning again.

5              PROSPECTIVE JUROR NO. 9:  Hi.  Good morning.

6              Joan Vargo.  I am a retired banker, bank manager for

7    40 years.  My husband is a retired nurse.

8              I do have a son.  Works in middle management for

9    Walmart.  I've never served as a juror, and "no," "no," and I

10   believe I could be impartial.

11             THE COURT:  All right.  Thank you.

12             Good morning.

13             PROSPECTIVE JUROR NO. 10:  Good morning.

14             My name is Kyle Frazier.  I'm an accountant.  I am

15   divorced.

16             My husband was a practicing attorney, and he is a

17   Superior Court judge across the street.

18             We have three adult children.  My oldest child is

19   not employed.  He is autistic.  My middle son is an

20   accountant.  My youngest son is licensed to practice law, but

21   he's not practicing at this time.

22             I've served for a jury twice, once on a civil case,

23   once on a criminal case.  We did reach a verdict in both

24   cases.

25             My father was a police officer.

```
 1              Number 7 is "no," and number 8 would be "yes."
 2              THE COURT:  All right.  Ms. Frazier, given your
 3    exposure to the legal profession and the business of law, does
 4    that cause you in any way to question your ability to be fair
 5    in this case to the parties?
 6              PROSPECTIVE JUROR NO. 10:  No.  No, it does not.
 7              THE COURT:  All right.  Thank you.
 8              PROSPECTIVE JUROR NO. 11:  Good morning,
 9    Your Honor.
10              THE COURT:  Good morning.
11              PROSPECTIVE JUROR NO. 11:  My name is Sam Lenett.
12    I'm currently unemployed.  I'm applying to jobs.
13              I do not have a spouse or partner.  I do not have
14    any children.
15              I have not served as a juror before.
16              My mom is an attorney.  She does trusts and estate
17    planning.
18              I've never been a party to a -- or witness to any
19    lawsuit, and I certainly can be fair and impartial in this
20    case.
21              THE COURT:  All right.  Thank you very much.
22              PROSPECTIVE JUROR NO. 12:  Good morning.
23              THE COURT:  Good morning.
24              PROSPECTIVE JUROR NO. 12:  My name is Chaka Gulley.
25    I'm an insurance agent for property and casualty.
```

```
1              I am single.  I do not have a spouse.  I have two
2      small children, 15 and 7.
3              I've never served as a juror before.
4              6 and 7 are "no."
5              I can be completely fair and impartial.
6              THE COURT:  All right.  Thank you, ma'am.
7              Good morning.
8              PROSPECTIVE JUROR NO. 13:  Good morning.
9              My name is Iswar Radhakrishna.  I'm a core design
10     analyst in the medical device industry.
11             Questions 3 and 4 are "no."
12             I was called for a criminal jury, but I was not
13     selected.
14             Question 6 and 7 are "no," and question 8 is "yes."
15             THE COURT:  All right.  Thank you, sir.
16             PROSPECTIVE JUROR NO. 14:  Good morning.
17             THE COURT:  Good morning.
18             PROSPECTIVE JUROR NO. 14:  My name is Cesar Sanchez.
19             I work for a telecommunication -- I'm a
20     telecommunications technician.  I'm divorced, but I do have --
21     we have two daughters.  One just recently -- like a few years
22     ago, she was operated by open heart surgery, so I help her on
23     and off with my grandkids.  And, you know, she needs a lot of
24     help sometimes.  So that's -- I kind of put myself out there
25     to help.
```

1               The questions --

2               I never served on jury duty.  I don't have any

3       friends with that, they did.

4               And Question No. 8, yes, I can --

5               THE COURT:  All right.  Thank you.

6               PROSPECTIVE JUROR NO. 15:  Good morning.

7               My name is Ron Devos.  I'm currently retired after

8       having been the CFO for a publicly traded company for the past

9       25 years.

10              I'm currently divorced, and my ex-wife lives up in

11      Idaho somewhere.  She was a homemaker.

12              I have two children, two adult daughters.  My oldest

13      works for one of the big four accounting firms in the mergers

14      and acquisitions group as a director.  My youngest daughter

15      is -- she's a park ranger with the City of San Diego up in the

16      beach area.

17              I recently was called to sit on a jury, although

18      prior to us going into the jury room, the judge came out and

19      indicated that they had reached an agreement and dismissed us

20      all.  So that was the closest I came to being on the inside of

21      a courtroom.

22              I've had numerous relatives and friends, both as

23      police officers, both back home in New York as well as here in

24      San Diego, and a close friend who was a corrections officer

25      down in Otay Mesa.

1           Given the nature of my work, I have lots of close

2      friends back on the East Coast that are all attorneys, focused

3      primarily in franchise law, corporate law, as well as SEC

4      compliance.

5           Once again, in my prior capacity, I'm sure I was

6      named many times in lawsuits when they issued the names of the

7      businesses, directors, and officers.  There were a couple of

8      large lawsuits that unfortunately we lost, but that's the way

9      it goes.

10          Then, lastly, I think I can be impartial.

11               THE COURT:  Thank you, sir.

12          We discussed this a moment ago in the context of

13     your work as a CFO, but taking a step back and also looking at

14     your professional relationships, your friendships with folks

15     in the legal or compliance space, again, do you have any

16     concerns about your ability to be fair in this case to both

17     parties?

18               PROSPECTIVE JUROR NO. 15:  I don't believe so.

19               THE COURT:  Okay.  Thank you.

20          Good morning.

21               PROSPECTIVE JUROR NO. 16:  Good morning.

22          My name is Steve Gutierrez.  I work for

23     Windmill Bakers.

24          I've been married 30 years.  My wife is a retired

25     dental assistant, takes care of our grandkids.

1           I have four children, adult children.  One son is

2    going to college to be a physical therapist; another son works

3    for a beer company, and another son works for a tire company.

4    My daughter, she cleans houses.

5           Never served on a jury before.  I've been willing to

6    go, but I never got selected.

7           6 and 7 are "no."

8           Yes, I completely can be fair.

9           THE COURT:  All right.  Thank you.

10          PROSPECTIVE JUROR NO. 17:  Good morning.

11          My name is Colin Hydorn.  I'm a retired

12   San Diego County Probation Officer; however, I just returned

13   as a retiree.  My wife is a retired probation officer.  She's

14   now a CNA.

15          I have two adult children.  My oldest daughter

16   manages an escape room in Hawaii.  My youngest daughter is a

17   senior at UCLA.

18          I served on a criminal jury years ago, and we did

19   reach a verdict.

20          The majority of my friends are all law enforcement.

21          I've never been involved or a witness to a lawsuit,

22   and I can be impartial.

23          THE COURT:  All right.  Sir, have you had occasion

24   to go through your daughter's escape room?

25          PROSPECTIVE JUROR NO. 17:  Not yet.  It's back in

```
 1        Hawaii, but I'm trying to get there.  There's six or seven in
 2        her thing.
 3                THE COURT:  Sounds interesting.
 4                PROSPECTIVE JUROR NO. 17:  If you're in Hawaii,
 5        check her out.
 6                THE COURT:  I will.
 7                Good morning.
 8                PROSPECTIVE JUROR NO. 18:  Good morning.
 9                My name is Shannon Lonsberry.  I'm in medical device
10        sales.  I'm married, and my husband is retired from the Navy.
11        He now works for a Navy contractor.
12                I have four children, two adults.  One works in
13        manufacturing; the other one just joined the Navy.
14                I have been on a jury.  It was a criminal case, and
15        we did reach a verdict.
16                I don't have any lawyer in my family or friends.  I
17        was sued once for defamation for a Yelp review, so if that
18        counts as -- so that would be yes.
19                And then yes, I can be fair and impartial.
20                THE COURT:  All right, ma'am.  Anything about that
21        process of being a defendant in a civil case that would leave
22        a bad taste in our mouth such that you wouldn't be able to be
23        fair to both sides here?
24                PROSPECTIVE JUROR NO. 18:  No.
25                THE COURT:  Okay.  Thank you.
```

1              PROSPECTIVE JUROR NO. 19:  Hi.  My name is

2    Trevor Powers.  I'm a software support analyst.  No spouse or

3    partner.  No children.

4              I have not served as a juror.

5              Don't have any immediate family or close friends

6    involved in law-related work.  No immediate or close friend

7    involved in a lawsuit.

8              And, yes, I can be fair and impartial.

9              THE COURT:  All right.  Thank you, sir.

10             Good morning.

11             PROSPECTIVE JUROR NO. 20:  Good morning, Your Honor.

12             Ryan Andrzejewski.  I'm a filmmaker.  My wife is a

13   homemaker; just went back to college.  My son is a student at

14   USD.

15             I have served as a juror before in a civil case.  We

16   did reach a verdict.

17             I've got a lot of close friends who are

18   entertainment attorneys.  Some corporate mergers/acquisitions.

19             Brother-in-law was a Border Patrol agent.

20             "No" to 7.  And, 8, honestly, I'm not sure.

21             THE COURT:  All right.  Do you have -- are there

22   particular issues that cause you to question whether you could

23   be fair and impartial in this case?

24             PROSPECTIVE JUROR NO. 20:  This civil case that I

25   was involved was quite frivolous in my opinion, and that took

```
 1    quite some time out of my -- it took longer than it should
 2    have.
 3              THE COURT:  Understood.
 4              Do you think you would be able to set that
 5    experience aside and approach this case with an open mind
 6    and --
 7              PROSPECTIVE JUROR NO. 20:  Honestly, Your Honor, I
 8    don't know the case.  So that's one of those things where I'm
 9    looking at it going, "I really don't know."  I've heard the
10    very basics of it.  I don't know if I could do that.
11              THE COURT:  Okay.  All right.  Thank you for
12    speaking up.  It's appreciated.
13              PROSPECTIVE JUROR NO. 20:  Yes.
14              THE COURT:  Good morning.
15              PROSPECTIVE JUROR NO. 21:  Good morning, Your Honor.
16              My name is Barbara Carlton.  I'm a mostly retired
17    architect and a writer.  My husband is a retired criminal
18    prosecutor, appellate, for the California Department of
19    Justice.  He was a career prosecutor.
20              We have two grown children.  Our daughter works for
21    a video game company in Vancouver, British Columbia, and our
22    son is a musician.  Both grown obviously.
23              I have served as a juror on a civil case some years
24    ago.  We did reach a verdict.
25              We have been -- we have a lot of friends, obviously,
```

```
 1      who are attorneys, most of them prosecutors.  No paralegals or
 2      police officers.
 3              I was a party to a lawsuit some years ago regarding
 4      real property that went on and on and on.
 5              I believe that I can be fair and impartial.
 6              THE COURT:  Okay.  Thank you, ma'am.
 7              Good morning.
 8              PROSPECTIVE JUROR NO. 22:  My name is
 9      Todd Barberini.  I work as a delivery associate at Home Depot.
10      My wife is a medical biller.  No children.
11              I have not served as a juror.
12              My sister is a paralegal.
13              "No" to No. 7 and "yes" to No. 8.
14              THE COURT:  All right.  Thank you.
15              PROSPECTIVE JUROR NO. 23:  My name is Emma Trees.
16              I'm a tax accountant.
17              3 is not applicable.
18              4 is "no."
19              5 is "no."
20              6 is "no."
21              7 is "no."
22              And 8 is "yes."
23              THE COURT:  All right.  Thank you, ma'am.
24              PROSPECTIVE JUROR NO. 24:  I am Glynn Shoquist.  I'm
25      an instructional assistant at Santee School District.  I work
```

1     with visually-impaired children.

2              My husband owned a pool service business, but he's

3     now retired.

4              I do have an older son.  He's in computers.

5              I have been on a jury before.  It was a criminal

6     case.  We did reach a verdict.

7              6 is "no," 7 is "no," and yes, I think I can be

8     completely fair.

9              THE COURT:  All right.  Thank you, ma'am.

10             Good morning.

11             PROSPECTIVE JUROR NO. 25:  Hi.  My name is

12     Christine Shultz.  I am a registered nurse, and I am a

13     clinical supervisor.  My husband was a welder.  He's retired.

14     He's now a bus driver.

15             I have four children.  Four adult children.  My

16     oldest is a director of a skilled nursing facility.  My

17     daughter works in IT -- telephone something -- in Texas; one

18     of my sons is in college; and the other one, my daughter, she

19     works at the Lawrence Welk Resort.  I think she moves bags.

20             Let's see.  I served on a criminal case, and we did

21     not reach a verdict.

22             No family members work in law, no close friends.

23             "No" to number 7, as well, and then "yes" to 8.

24             THE COURT:  All right.  Thank you.

25             Good morning.

1              PROSPECTIVE JUROR NO. 26:  Good morning.

2              My name is Joseph Iorio.  Current occupation is

3      part-time stagehand.  My girlfriend is retired.

4              Two adult children.  Don't know their occupation.

5              5 is "no," 6 is "no," 7 is "no," and 8 is --

6              I'm here to learn something.  I can be impartial.

7              Thank you.

8              THE COURT:  All right.  Thank you.

9              PROSPECTIVE JUROR NO. 27:  My name is Jessica Ganan.

10     I'm a nurse.  I'm not married.  I don't have any kids.

11             5, 6, and 7 are "no," and 8 is "yes."

12             THE COURT:  All right.  Thanks very much.

13             And last but not least.

14             PROSPECTIVE JUROR NO. 28:  Hello.  My name is

15     Edward Macias.  San Diego Unified School District.

16             Not married, never been divorced, no kids.

17             I did serve on a jury six or seven years ago.  I

18     don't remember if it was civil or criminal.  We did reach a

19     verdict.

20             6 and 7, "no."

21             8, "yes."

22             THE COURT:  All right.  Thank you, sir.

23             Ladies and gentlemen --

24             Yes.  And, Loraine, after you pick up the mic,

25     Juror No. 13 has something to add.

1            PROSPECTIVE JUROR NO. 13:  I beg your pardon,

2      Your Honor.  I just realized that I misread part of

3      Question 7.

4            THE COURT:  Okay.

5            PROSPECTIVE JUROR NO. 13:  In fact, I have been a

6      party to two small lawsuits.  One was a contract dispute for

7      just an air-conditioning install, and the second was a civil

8      harassment case.

9            THE COURT:  Each of those sounds a bit different

10     than one about buying and selling securities.

11            Anything about those experiences that would cause

12     you to question your ability to be fair in this case?

13            PROSPECTIVE JUROR NO. 13:  I believe I can be fair

14     and impartial.  No question.

15            THE COURT:  Okay.  Thanks for speaking up.

16            All right.  Ladies and gentlemen, thanks for your

17     patience in going through this.

18            At this time, I'm going to give each side a chance

19     to follow up.  They have up to ten minutes to ask some

20     follow-up questions as they see fit.

21            Ms. Bonthuis, we'll start with the plaintiff.

22            MS. BONTHUIS:  Yes.  Thank you and good morning

23     again.

24            The question I have is for all jurors -- and whoever

25     has an answer, I'd like to hear from you -- is whether or not

1    you have experience with buying or selling individual stocks.

2              I'm sure some of you may have retirement accounts

3    where you put your money in every month, and it's in a mutual

4    fund managed by Charles Schwab, or maybe you don't know.  But

5    I'm not interested in that.  I'm interested in whether you

6    have experience with buying or selling stocks.

7              If we could hear --

8              THE CLERK:  All right, sir.

9              PROSPECTIVE JUROR NO. 1:  Just like you said:  In my

10   account is a set of mutual funds.  I have bought specific

11   stocks, bought and sold.

12             MS. BONTHUIS:  Okay.

13             THE COURT:  And that was Juror No. 1.

14             And even though I know who you are, for the record,

15   if you get the mic, please just state again your number.  If

16   you forget, no problem.  I'll say it for you.

17             PROSPECTIVE JUROR NO. 2:  I have a TSP with my --

18   Thrift Saving Plan with my job.

19             MS. BONTHUIS:  Do you buy or sell stocks

20   individually?

21             PROSPECTIVE JUROR NO. 2:  Well, you can put it in

22   different funds --

23             MS. BONTHUIS:  Okay.

24             PROSPECTIVE JUROR 2:  -- but I haven't done that.  I

25   did it, and then I put it somewhere safe.  I didn't want to

1    mess with it anymore.
2              MS. BONTHUIS:  Just to clarify, mutual funds, it's
3    more if you personally have gone on E-Trade and bought Apple.
4              PROSPECTIVE JUROR NO. 2:  Oh, no.  Yeah.  This is
5    work.  TSP, Thrift Savings Plan, for retirement.
6              MS. BONTHUIS:  Okay.
7              PROSPECTIVE JUROR NO. 2:  Uh-huh.
8              PROSPECTIVE JUROR NO. 4:  Yes, I have bought stock.
9    Retirement plans.  But some other stock, I have.
10             MS. BONTHUIS:  Okay.
11             THE COURT:  And that was Juror No. 4.
12             Thank you.
13             Juror No. 5.
14             PROSPECTIVE JUROR NO. 5:  When I started learning
15   about stocks and bonds, I bought individual stocks at one
16   point back in 2015, and then I haven't bought any individual
17   stocks since then.
18             MS. BONTHUIS:  Okay.
19             PROSPECTIVE JUROR NO. 6:  I have purchased stock.
20             PROSPECTIVE JUROR NO. 7:  I have purchased stocks.
21             PROSPECTIVE JUROR NO. 13:  Yes.  I have purchased
22   stocks, both retirement and brokerage accounts.
23             PROSPECTIVE JUROR NO. 15:  Hi.  When I was working,
24   I was -- whenever I wanted to liquidate stock in my company, I
25   had to be very, very cautious when I sold because of the

1    trading windows, as we were prohibited from putting a 10b5
2    plan in place to pre-program sales.
3              Additionally, I currently trade stocks rather
4    extensively as well as options.
5              THE COURT:  Thank you, Juror 15.
6              PROSPECTIVE JUROR NO. 17:  I have stocks through
7    Charles Schwab.
8              PROSPECTIVE JUROR 18:  I have an E-Trade account
9    with $2,000 in it.  I'm not very good with stock trading.
10             PROSPECTIVE JUROR NO. 19:  I've bought stock on
11   E-Trade.
12             PROSPECTIVE JUROR NO. 21.  Hi.  I have bought and
13   sold individual stocks, but I rely on professional advice to
14   do that.  I don't research it myself until they say something.
15             PROSPECTIVE JUROR NO. 23:  I've bought stocks but
16   not super recently.
17             PROSPECTIVE JUROR NO. 25:  I bought stocks, but I
18   lost all the money, so I stopped.
19             PROSPECTIVE JUROR NO. 26:  I bought stocks, but I
20   just lost the money.
21             MS. BONTHUIS:  Okay.
22             PROSPECTIVE JUROR NO. 10:  Yes.  I have bought and
23   sold stocks, bonds, options, T bills, both through personal
24   brokerage accounts for retirement and personal investment for
25   probably 45 years.

1              PROSPECTIVE JUROR NO. 11:  Hi.

2              I bought a couple of stocks in college a couple

3      years ago, but that's about it.

4              PROSPECTIVE JUROR NO. 12:  In 2020, I purchased some

5      stock in Robinhood, but I didn't know what I was doing.  So I

6      sold a little bit after.

7              MS. BONTHUIS:  That's all I have.

8              THE COURT:  Thank you, Ms. Bonthuis.

9              Mr. Lobbin.

10             MR. LOBBIN:  Thank you.

11             Hi again, everyone.  I may need to go over everyone

12     who just spoke, because my question is related to people that

13     have bought stocks.  I'm interested to know, when you look

14     back at that experience, was it a positive experience or was

15     it, like, a negative experience?  I heard some comments

16     that -- you know, kind of funny -- that "I didn't know what I

17     was doing."  I think it was back here.

18             So I'm interested to know.  For those of you who

19     spoke about your trading in individual stocks, positive or

20     negative experience as you look back on it?

21             PROSPECTIVE JUROR NO. 1:  Can I go with neutral?  It

22     was kind of a neutral experience.

23             MR. LOBBIN:  Sure.  Sure.

24             PROSPECTIVE JUROR NO. 1:  I would go neutral.

25             MR. LOBBIN:  No strong feelings either way?

```
1                    PROSPECTIVE JUROR NO. 1:  No, sir.
2                    MR. LOBBIN:  Okay.  Thank you.
3                    PROSPECTIVE JUROR NO. 2:  Same.  Neutral.
4                    MR. LOBBIN:  Neutral?
5                    PROSPECTIVE JUROR NO. 2:  Uh-huh.
6                    MR. LOBBIN:  Okay.
7                    PROSPECTIVE JUROR NO. 4:  Positive.  Generally I try
8      to do some research, especially in the technical world,
9      hi-tech.  I told my friends to buy some Tesla 12 years ago,
10     and they're doing really well --
11                   MR. LOBBIN:  Good.
12                   PROSPECTIVE JUROR NO. 4:  -- because they sold.
13     Bought it for, like, 30 bucks.
14                   MR. LOBBIN:  Everyone just heard you, so now you're
15     buying lunch.
16                   PROSPECTIVE JUROR NO. 4:  I told my friends.
17                   PROSPECTIVE JUROR NO. 5:  Neutral.  I still need to
18     work.
19                   PROSPECTIVE JUROR NO. 6:  I will take a neutral
20     stance, as well.
21                   MR. LOBBIN:  Okay.
22                   PROSPECTIVE JUROR NO. 7:  Neutral.
23                   PROSPECTIVE JUROR NO. 10:  I would say very
24     positive.
25                   MR. LOBBIN:  Good.  Good.
```

1              PROSPECTIVE JUROR NO. 11:  Positive financially and

2    personally.  I thought it was fun, and I learned a lot.

3              PROSPECTIVE JUROR NO. 12:  I would say positive.  I

4    was excited to do it.  So it was pretty positive, but I was

5    bummed later that it -- I had to cash it out.

6              PROSPECTIVE JUROR NO. 13:  I've had both large

7    losses and gains.  I would say overall positive.

8              PROSPECTIVE JUROR NO. 15:  By and large, it's been

9    positive, although there are a couple of situations where I

10   felt management made certain misrepresentations with respect

11   to their business and public filings only to have things go

12   bad, such as AT&T's purchase of Warner Bros., and also when

13   Shell swore that the dividend was safe only to reduce it less

14   than 30 days later.

15             MR. LOBBIN:  Thank you.

16             PROSPECTIVE JUROR NO. 17:  I'd say overall positive,

17   but I haven't checked the stock, yet, today.

18             PROSPECTIVE JUROR NO. 18:  I guess I would say

19   neutral.  I was never a big-time trader, so --

20             MR. LOBBIN:  Okay.  Thank you.

21             PROSPECTIVE JUROR NO. 19:  Neutral.

22             PROSPECTIVE JUROR NO. 21:  Hi.

23             I'd say it's been positive.

24             PROSPECTIVE JUROR NO. 23:  Neutral.

25             PROSPECTIVE JUROR NO. 25:  Neutral.  It was $200.

1              MR. LOBBIN:  Thank you.

2              So quick follow-up to that.  Those of you --

3              I suppose the positives, we can exclude you, but for

4    the folks who said it was a neutral or even those that didn't

5    speak at all, is there anyone who has a view of the stock

6    market, that it's unfair to individual traders?  For example,

7    you know, "Tesla, Elon Musk, yeah, he's always going to make

8    money because he knows when to buy, when to sell, but me just

9    buying and trying to figure out how to make money, it's not

10   fair for someone like me.  It's only fair for someone on the

11   inside"?

12             Does anyone have that view?

13             PROSPECTIVE JUROR NO. 4:  Yeah.  I do.  I think

14   there's a lot of people who do make money who have information

15   that maybe they shouldn't have, and they've made money off of

16   stock.  I know a couple people who have.  So I'm not going to

17   name names, but yeah.  But it doesn't mean that normal people

18   can't get it done, either.  So you just have to do your

19   research.

20             MR. LOBBIN:  I understand.  Thank you for sharing.

21             Does anyone agree with Mr. Reyes?

22             PROSPECTIVE JUROR NO. 7:  So I'm in the hi-tech

23   industry.  Right?  And you don't really have to be very high

24   up to actually have some idea about where things are going,

25   you know.  So, I mean, it doesn't -- you don't really have to

1    be, like, very, like, high-up executive.  So, yeah, there's
2    definitely inside information even just to normal people
3    working in the company.
4              MR. LOBBIN:  So as a normal person, you feel like
5    you have a fair -- as good a shot as the CEO to buy and sell
6    stock?
7              PROSPECTIVE JUROR NO. 7:  He has more, but I do have
8    more than other people.  There were times when I kept looking
9    at the stock market and wondering why it still hasn't gone
10   down yet.
11             MR. LOBBIN:  So, overall, you think the market is
12   fair.  It's a fair system?
13             PROSPECTIVE JUROR NO. 7:  It's fair?  What do you
14   mean by "fair"?  Like --
15             MR. LOBBIN:  Well, like I said, for example, if you
16   bought Tesla stock, Elon Musk owns Tesla stock.  Do you feel
17   like you and he have an equal chance at making money with your
18   stock?
19             PROSPECTIVE JUROR NO. 7:  No.  He's has more.  Like
20   I said, the CEO would know more information than me, and I
21   know more information than my friends who don't work for the
22   company.
23             MR. LOBBIN:  Understood.
24             PROSPECTIVE JUROR NO. 7:  Yeah.
25             MR. LOBBIN:  Thank you.

1              Anyone else?

2              PROSPECTIVE JUROR NO. 15:  I'm assuming that you're

3     just referring to corporate officers and not necessarily going

4     beyond, such as legislators who have access to family members

5     that may be on certain committees that may pull purse strings

6     that may benefit certain companies?

7              MR. LOBBIN:  Not naming names.

8              PROSPECTIVE JUROR NO. 15:  No names, but those are

9     actual situations that have been reported upon and commented

10    on.

11             The fact that folks on CNBC are so restricted in

12    their inability to buy and sell any shares but yet so many

13    people have virtually no restrictions, that's something that's

14    improper and should be resolved.

15             Then, obviously, you know, the quants have a much

16    greater access to be able to trade at a much faster speed than

17    either you or I could, no matter how fast our modem is.  But,

18    by and large, the access to information is the bigger issue,

19    who has what and when, even though the securities laws are

20    supposed to ensure that everybody has access at the same time.

21             MR. LOBBIN:  Overall, do you think the market is a

22    fair system?

23             PROSPECTIVE JUROR NO. 15:  I do.

24             MR. LOBBIN:  Okay.

25             PROSPECTIVE JUROR NO. 15:  Can I just finish?

1                   When not abused.

2                   MR. LOBBIN:  When not abused.

3                   To all of you, have any of you had experience --

4          good or bad -- and I'll be interested if you have had

5          experience, whether it's good or bad -- with Wi-Fi devices?

6          Mobile hotspots?  For example, I used to have one.  I don't

7          anymore.  But you take it in the car; you have Wi-Fi in the

8          car on a vacation or a trip.  I think a lot of it now is in

9          your phone.

10                  But any experience where you had a problem or the

11         hotspot didn't work right or the battery got swollen?

12         Anything like that?

13                  PROSPECTIVE JUROR NO. 4:  Yeah.  You know, I used to

14         travel quite a bit, and so I had -- I got a hotspot that said,

15         "Oh, worldwide.  Great coverage everywhere" and even -- like,

16         in California, I'll go to, like, my neighbor's house, and it

17         won't work.  So it really depends on the coverage.

18                  So, yeah, they obviously overexaggerate coverage,

19         and, like, its use and power, but now you just kind of take

20         that for granted.

21                  MR. LOBBIN:  Okay.

22                  THE COURT:  Mr. Lobbin, you have about one minute

23         left.

24                  MR. LOBBIN:  Thank you.

25                  PROSPECTIVE JUROR NO. 8:  I used to use Mi-Fi

```
 1      devices for work and experienced coverage issues as well as
 2      overheating and battery longevity.  Just --
 3              MR. LOBBIN:  Did it ever melt or explode or
 4      anything?
 5              PROSPECTIVE JUROR NO. 8:  No.  Not to that degree.
 6              MR. LOBBIN:  Anyone else?
 7              PROSPECTIVE JUROR NO. 13:  Hi.  I've had no battery
 8      explosion issues, but with several prior cellular services,
 9      they advertise Wi-Fi connectivity in geographic areas, which
10      does not always occur.
11              PROSPECTIVE JUROR NO. 25:  We live in Ramona, and
12      we've used one for a very long time.  Sometimes they work;
13      sometimes they don't.  We live in Ramona.
14              MR. LOBBIN:  Overall, your experience was positive?
15              PROSPECTIVE JUROR NO. 25:  It's fine.
16              MR. LOBBIN:  Thank you, Your Honor.
17              THE COURT:  Thank you, Mr. Lobbin.
18              Ladies and gentlemen, at this time, I'm going to
19      excuse the panel for a short break.  It is 11:00 o'clock now.
20      We'll expect to call you back no sooner than 11:20.  The
21      reason we're taking the break is so that the attorneys and the
22      Court can discuss challenges for cause or peremptory
23      challenges.
24              So what I would ask is please take your break on
25      this floor.  Obviously use the restroom.  You can stretch out,
```

1     walk around the hall a little bit, but please don't leave this

2     floor, because there's a very small chance we might need to

3     call a particular juror back in to answer some follow-up

4     questions.  If that happens, we want you to be on this floor

5     so we can find you.  But, as I say, we'll resume no earlier

6     than 11:20.

7                    THE CLERK:  Please leave your numbers on your

8     chairs.

9                    (Jury panel out at 11:02 a.m.)

10                   THE COURT:  All right.  So we'll start with

11    challenges for cause and hardship challenges.

12                   MR. SMALL:  Ms. Bonthuis just went to use the

13    restroom.  She'll be back any minute.

14                   MR. LOBBIN:  We're missing a lawyer.  Who knew?

15                   THE COURT:  We are.

16                   (Ms. Bonthuis present before the Court.)

17                   MS. BONTHUIS:  Apologies for delay.

18                   THE COURT:  It's quite all right.

19                   So we're starting with challenges for cause or

20    hardship challenges.

21                   Any of those challenges on plaintiff's part?

22                   MS. BONTHUIS:  Your Honor, I believe No. 3 should be

23    excused for hardship because of the exam.  I'm concerned about

24    his ability to focus during the trial knowing that he has a

25    final exam and that this trial may interfere with his ability

1    to take that final exam.

2              THE COURT:  I tend to agree.  The issue is not just

3    the exam itself, which would have to be rescheduled, but when

4    you have a final exam, especially after an eight-month

5    program, you have to prepare for it.  And this would displace

6    not only the test but his ability to prepare for it.

7              Any objection, Mr. Lobbin, to excusing No. 3 for

8    hardship?

9              MR. LOBBIN:  No objection.

10             THE COURT:  All right.  Number 3 is excused.

11             Any others, Ms. Bonthuis?

12             MS. BONTHUIS:  Number 6, Your Honor.  The woman who

13   has the tumor and is in pain and has all sorts of commitments,

14   I think we should excuse her for hardship.

15             THE COURT:  Mr. Lobbin?

16             MR. LOBBIN:  Well, her last name is Franklin, so I

17   definitely want to keep her.

18             I'm kidding.  We agree.  Hardship is fine.

19             THE COURT:  All right.  Number 6 is excused on the

20   basis of hardship.

21             MR. LOBBIN:  Are we allowed to make jokes on the

22   lectern?  Are we allowed to crack jokes?

23             THE COURT:  Well, you are.  I can't get away with

24   it, but you and Ms. Bonthuis can.

25             All right.  Ms. Bonthuis, any others?

```
 1                    MS. BONTHUIS:  No.  I don't believe there are any
 2         others.
 3                    THE COURT:  All right.  Mr. Lobbin, any challenges
 4         for hardship or for cause?
 5                    MR. LOBBIN:  Well, I don't know if it's a challenge,
 6         but the nurse, No. 27, who's doing the orientation, I don't --
 7         I mean, I don't want to object to it -- I won't object to a
 8         hardship excuse for her.  I don't know that I want to
 9         challenge her.  You know, I feel like we probably don't need
10         her.
11                    THE COURT:  Well, if you're not challenging her,
12         then that's that.  It may well become moot, because if there
13         are only two hardship challenges, she's No. 27.  The parties
14         each have three peremptories.  She's No. 27.  I don't think
15         she'll be called anyway.
16                    So, at this time, we're going to complete the
17         so-called strike sheet reflecting these challenges for
18         hardship, and Loraine's going to give each side a copy.  Take
19         a few minutes and indicate on this form your three
20         peremptory challenges.
21                    So, Ms. Bonthuis, you would say "P-1," "P-2," "P-3."
22                    Mr. Lobbin, you would say, "D-1," "D-2," "D-3."
23                    When you're finished, hand them up.  Loraine will
24         reconcile them and then will hand them back.
25                    MR. LOBBIN:  Your Honor, I apologize.
```

```
1                P-1, P-2, P-3 for both of us?
2                Oh.  We'd use (D)?
3                THE COURT:  You would use "D."
4                MR. LOBBIN:  Got it.  I didn't know, (P) for
5        "peremptory."
6                THE COURT:  Oh, I see.
7                And I think counsel know this -- it's on my chambers
8        rules -- but the jury to be impaneled will be the first eight
9        individuals that haven't been challenged or stricken.
10               MS. BONTHUIS:  We each mark three.  If by some
11       chance we mark the same three, we get them back to make
12       additional or --
13               THE COURT:  No.
14               MS. BONTHUIS:  Okay.
15               MR. LOBBIN:  Your Honor, question:  Are we skipping
16       over challenges for cause?
17               THE COURT:  We covered those.
18               MR. LOBBIN:  The hardship?
19               THE COURT:  We covered challenges for cause and
20       hardship challenges.
21               MR. LOBBIN:  I thought we were just doing hardship,
22       because I --
23               THE COURT:  It was both.
24               MR. LOBBIN:  Oh.  I misheard.  I mean, I have some
25       cause challenges I wanted to present.  Sorry.  I didn't
```

```
 1          know.
 2                    THE COURT:  We covered that.
 3                    MR. LOBBIN:  Sorry.  I didn't hear --
 4                    Did you guys hear that?  I thought it was just
 5          hardship we were talking about.
 6                    (Pause in proceedings.)
 7                    THE COURT:  Okay.  Each side has been given a strike
 8          sheet with the reconciled peremptories listing the eight
 9          jurors, J-1 through J-8.  Please take a look.
10                    My question for each side will be whether one side
11          has a challenge to the other side's exercise of its
12          peremptory challenges.
13                    MS. BONTHUIS:  No, Your Honor.
14                    MR. LOBBIN:  No, Your Honor.
15                    THE COURT:  All right.  So we're, I guess, six
16          minutes ahead of schedule, so we'll be in recess until
17          11:20.
18                    MS. BONTHUIS:  Okay.
19                    THE COURT:  Ms. Bonthuis, how long do you expect
20          your opening statement will take?
21                    MS. BONTHUIS:  Ten minutes.
22                    THE COURT:  All right.  Mr. Lobbin, your opening
23          statement?
24                    MR. LOBBIN:  15 minutes.
25                    THE COURT:  All right.  So we'll plan --
```

1               After we swear the jury, we'll go right into

2      preliminary instructions, then opening, then we'll break for

3      lunch.

4               MS. BONTHUIS:  Okay.

5               (Recess taken 11:14 a.m. - 11:20 a.m.)

6               (Jury panel present before the Court.)

7               THE COURT:  All right.  Members of the jury panel,

8      an eight-person jury has been selected.

9               Loraine, would you please call the names of the

10     members of the jury.

11              THE CLERK:  Yes.

12              So for the first seat in the top back corner, can I

13     please have Kathlyn Satcher.  Please come up.

14              In the second seat, which will be two seats over, I

15     have Lisa Cheah.

16              All right.  In the third seat, Jittra Jootar.

17              In the fourth seat, Joan Vargo.

18              Down in the front row in the fifth seat, can I

19     please have Kyle Frazier.

20              Our sixth seat, Chaka Gulley.

21              Our seventh seat, Ronald Devos.

22              Our eighth seat, Steve Gutierrez.

23              THE COURT:  All right.  Loraine, would you please

24     swear in the members of the jury.

25              THE CLERK:  Of course, Judge.

1          (Jurors sworn.)

2          THE COURT:  All right.  Ladies and gentlemen of the

3     jury, for those of you who were not selected, again let me

4     thank you for your time this morning.  It was a pleasure to

5     get to know you, even if it was just a little bit.

6          Please don't take it personally that you weren't

7     selected for this jury.  Don't feel in any way like your

8     integrity or ability to serve have in any way been questioned.

9     Quite the opposite.  We're grateful to you for being here and

10    serving.  We've been informed by Jury Services that there's no

11    need for you to check back in with them, so your federal jury

12    service is discharged.  You're excused.  You can go back to

13    resume your normal lives.

14         So thank you again, and I wish you all the very

15    best.

16         (Prospective jurors excused at 11:27 a.m.)

17         THE COURT:  Members of the jury, you are now the

18    jury in this case.  It is my duty to instruct you on the law.

19    It's your duty to find the facts from all the evidence in the

20    case.  To those facts, you will apply the law as I give it to

21    you.  You must follow the law as I give it to you, whether you

22    agree with it or not, and you must not be influenced by any

23    personal likes or dislikes, opinions, prejudices, or sympathy.

24    This means that you must decide the case solely on the

25    evidence before you.  You recall that you took an oath to do

1    so.

2             At the end of the trial, I will give you final

3    instructions.  It is the final instructions that will govern

4    your duties.

5             Please do not read into these instructions or

6    anything that I may say or do that I have an opinion regarding

7    the evidence or what your verdict should be.  To help you

8    follow the evidence, I'll give you a brief summary of the

9    positions of the parties.

10            The plaintiff asserts that Defendant Kim purchased

11   and sold Franklin Wireless common stock within a six-month

12   period in violation of § 16(b) of the Securities Exchange Act

13   of 1934, realizing a profit of $2 million.  The plaintiff has

14   the burden of proving these claims.  The defendant denies

15   these claims.

16            When a party has the burden of proving any claim by

17   a preponderance of the evidence, it means you must be

18   persuaded by the evidence that the claim is more probably true

19   than not true.  You should base your decision on all the

20   evidence regardless of which party presented it.

21            You should decide the case as to each party

22   separately.  Unless otherwise stated, the instructions apply

23   to all parties.

24            The evidence you are to consider when deciding what

25   the facts are consist of, one, the sworn testimony of any

1    witness; two, the exhibits that are admitted into evidence;

2    three, any facts to which the lawyers have agreed; and, four,

3    any facts that I may instruct you to accept as proved.

4            In reaching your verdict, you may consider only the

5    testimony and exhibits received into evidence.  Certain things

6    are not evidence, and you may not consider them in deciding

7    what the facts are.  I will list them for you.  One, arguments

8    and statements by lawyers are not evidence.  The lawyers are

9    not witnesses.  What they may say in their opening statements,

10   closing arguments, and at other times is intended to help you

11   interpret the evidence, but it is not evidence.  If the facts

12   as you remember them differ from the way the lawyers have

13   stated them, your memory of them controls.

14           Two, questions and objections by lawyers are not

15   evidence.  Attorneys have a duty to their clients to object

16   when they believe a question is improper under the Rules of

17   Evidence.  You should not be influenced by the objection or by

18   the Court's ruling on it.

19           Three, testimony that is excluded or stricken or

20   that you are instructed to disregard is not evidence and must

21   not be considered.  In addition, some evidence may be received

22   only for a limited purpose.  When I instruct you to consider

23   certain evidence only for a limited purpose, you must do so,

24   and you may not consider that evidence for any other purpose.

25           And, fourth, anything you may see or hear when the

1    court was not in session is not evidence.  You are to decide

2    the case solely on the evidence received at the trial.

3          Some evidence may be admitted only for a limited

4    purpose.  Again, when I instruct you that an item of evidence

5    has been admitted only for a limited purpose, you must

6    consider it only for that limited purpose and not for any

7    other purpose.

8          Evidence may be direct or circumstantial.  Direct

9    evidence is direct proof of a fact, such as testimony by a

10   witness about what that witness personally saw or heard or

11   did.  Circumstantial evidence is proof of one or more facts

12   from which you could find another fact.  You should consider

13   both kinds of evidence.  The law makes no distinction between

14   the weight to be given to either direct or circumstantial

15   evidence.  It is for you to decide how much weight to give to

16   any evidence.

17         There are Rules of Evidence that control what can be

18   received into evidence.  When a lawyer asks a question or

19   offers an exhibit into evidence and a lawyer on the other side

20   thinks that it is not permitted by the Rules of Evidence, that

21   lawyer may object.  If I overrule the objection, the question

22   may be answered or the exhibit received; if I sustain the

23   objection, the question cannot be answered, and the exhibit

24   cannot be received.  Whenever I sustain an objection to a

25   question, you must ignore the question and you must not guess

1    what the answer might have been.

2            Sometimes I may order that evidence be stricken from

3    the record and that you disregard or ignore that evidence.

4    That means when you are deciding the case, you must not

5    consider the stricken evidence for any purpose.

6            In deciding the facts in this case, you may have to

7    decide which testimony to believe and which testimony not to

8    believe.  You may believe everything a witness says or part of

9    it or none of it.  In considering the testimony of any

10   witness, you may take into account, one, the opportunity and

11   ability of the witness to see or hear or know the things

12   testified to; two, the witness's memory; three, the witness's

13   manner while testifying; four, the witness's interest in the

14   outcome of the case, if any; five, the witness's bias or

15   prejudice, if any; six, whether other evidence contradicted

16   the witness's testimony; seven, the reasonableness of the

17   witness's testimony in light of all the evidence; and, eight,

18   any other factors that bear on believability.

19           Sometimes a witness may say something that is not

20   consistent with something else he or she said.  Sometimes

21   different witnesses will give different versions of what

22   happened.  People often forget things or make mistakes in what

23   they remember.  Also, two people may see the same event but

24   remember it differently.  You may consider these differences,

25   but do not decide the testimony is untrue just because it

1    differs from other testimony.

2              However, if you decide that a witness has

3    deliberately testified untruthfully about something important,

4    you may choose not to believe anything that witness said.  On

5    the other hand, if you think the witness testified

6    untruthfully about some things but told the truth about

7    others, you may accept the part you think is true and ignore

8    the rest.  The weight of the evidence as to a fact does not

9    necessarily depend on the number of witnesses who testify.

10   What is important is how believable the witnesses were and how

11   much weight you think their testimony deserves.

12              I will now say a few words about your conduct as

13   jurors.  First, keep an open mind throughout the trial and do

14   not decide what the verdict should be until you and your

15   fellow jurors have completed your deliberations at the end of

16   the case.

17              Second, because you must decide this case based

18   solely on the evidence received in the case and on my

19   instructions as to the law that applies, you must not be

20   exposed to any other information about the case or to the

21   issues it involves during the course of your jury duty.  Thus,

22   until the end of the case or unless I tell you otherwise, do

23   not communicate with anyone in any way and do not let anyone

24   else communicate with you in any way about the merits of the

25   case or anything to do with it.  This includes discussing the

1    case in person; in writing; by phone, tablet, or computer or

2    any other electronic means, be it e-mail, text messaging or

3    any Internet chatroom, blog, website, or application including

4    but not limited to Facebook, YouTube, Twitter, Instagram,

5    LinkedIn, Snapchat, TikTok, or any other forms of

6    social media.

7              This applies to communicating with your fellow

8    jurors until I give you the case for deliberation, and it

9    applies to communicating with everyone else, including your

10   family members, your employer, the media or press, and the

11   people involved in the trial, although you may notify your

12   family and your employer that you have been seated as a juror

13   in the case and how long you expect the trial to last.

14             If you are asked or approached in any way about your

15   jury service or anything about this case, you must respond

16   that you have been ordered not to discuss the matter and

17   report the contact to the Court.

18             Because you will receive all the evidence and legal

19   instruction you properly may consider to return a verdict, do

20   not read, watch, or listen to any news or media accounts or

21   commentary about the case or anything to do with it.  Do not

22   do any research such as consulting dictionaries, searching the

23   Internet, or using other reference materials, and do not make

24   any investigation or in any other way try to learn about the

25   case on your own.  Do not view or visit any place discussed in

1      this case and do not use the Internet or any other resource to

2      search for or view any place discussed during the trial.

3              Also, do not do any research about this case, the

4      law, or the people involved, including the parties, the

5      witnesses, or the lawyers until you have been excused as

6      jurors.

7              If you happen to read or hear anything touching on

8      this case in the media, turn away and report it to me as soon

9      as possible.

10             These rules protect each party's right to have this

11     case decided only on evidence that has been presented here in

12     court.  Witnesses here in court take an oath to tell the

13     truth, and the accuracy of their testimony is tested through

14     the trial process.  If you do any research or investigation

15     outside the courtroom or gain any information through improper

16     communications, then your verdict may be influenced by

17     inaccurate, incomplete, or misleading information that has not

18     been tested by the trial process.  Each of the parties is

19     entitled to a fair trial by an impartial jury, and if you

20     decide the case based on information not presented in court,

21     you will have denied the parties a fair trial.

22             Remember you've taken an oath to follow the rules,

23     and it is very important that you follow these rules.  A juror

24     who violates these restrictions jeopardizes the fairness of

25     these proceedings, and a mistrial could result that would

1    require the entire trial process to start over.  If any juror

2    is exposed to any outside information, please notify the Court

3    immediately.

4         If there is any news media account or commentary

5    about the case or anything to do with it, you must ignore it.

6    You must not read, watch, or listen to any news media account

7    or commentary about the case or anything to do with it.  The

8    case must be decided by you solely and exclusively on the

9    evidence that will be received in the case and on my

10   instructions as to the law that applies.  Again, if any juror

11   is exposed to any outside information, please notify me

12   immediately.

13        I urge you to pay close attention to the trial

14   testimony as it is given.  During deliberations, you will not

15   have a transcript of the trial testimony.  If you wish, you

16   may take notes to help you remember the evidence.  If you do

17   take notes, please keep them to yourself until you go to the

18   jury room to decide the case.  Do not let note-taking distract

19   you.  When you leave, your notes should be left in the

20   courtroom.  No one will read your notes.  Whether or not you

21   take notes, you should rely on your own memory of the

22   evidence.  Notes are only to assist your memory.  You should

23   not be overly influenced by your notes or those of other

24   jurors.

25        Only the lawyers and I are allowed to ask questions

1    of witnesses.  A juror is not permitted to ask questions of

2    witnesses.  If, however, you are unable to hear a witness or a

3    lawyer, please raise your hand, and I will correct the

4    situation.

5           From time to time during the trial, it may become

6    necessary for me to talk with the attorneys out of the hearing

7    of the attorney, either by having a conference on the bench

8    while the jury is in the courtroom or by calling a recess.

9    Please understand that while you are waiting, we are working.

10   The purpose of these conferences is not to keep relevant

11   information from you but to decide how certain evidence is to

12   be treated under the Rules of Evidence and to avoid confusion

13   and error.  Of course we will do what we can to keep the

14   number and length of these conferences to a minimum.

15          I may not always grant an attorney's request for a

16   conference.  Do not consider my granting or denying a request

17   for a conference as any indication of my opinion of the case

18   or of what your verdict should be.

19          Trials proceed in the following way:  First, each

20   side may make an opening statement.  An opening statement is

21   not evidence.  It is simply an outline to help you understand

22   what that party expects the evidence will show.  A party is

23   not required to make an opening statement.

24          The plaintiff will then present evidence, and

25   counsel for the defendant may cross-examine.  Then the

1     defendant may present evidence, and counsel for the plaintiff
2     may cross-examine.
3              After the evidence has been presented, I will
4     instruct you on the law that applies to the case, and the
5     attorneys will make closing arguments.
6              After that, you will go to the jury room to
7     deliberate on your verdict.
8              So that concludes the preliminary instructions.
9              We're going to go directly into opening statements,
10    starting with the plaintiff.
11             Ms. Bonthuis, you may proceed.
12             MS. BONTHUIS:  Thank you, Your Honor.
13             I think I mentioned we will be using documents.
14    Mr. Small is hooked up and --
15             We're not bringing them up immediately, but --
16             THE COURT:  All right.  Very good.
17             THE CLERK:  Okay.  All right.
18             MS. BONTHUIS:  Great.
19             So I have to check my watch.  It is still morning.
20             Good morning.  Thank you very much for your service.
21    I greatly, greatly appreciate you taking the time.
22             My name is Mari Bonthuis.  I represent the plaintiff
23    in this case, Nosirrah Management.
24             You will hear evidence that Nosirrah is a
25    shareholder of the defendant company here, which is

1    Franklin Wireless.

2              Now, our judge has already told you a little bit

3    about this case; that it's brought under a law known as § 16.

4    § 16 applies to company insiders.  You will hear evidence that

5    the individual defendant here, Mr. Kim, is the CEO of

6    Franklin Wireless, and that as a CEO, he is considered an

7    insider of the company.  As the judge stated, § 16 looks at

8    purchases and sales of stock within a six-month period.

9              The evidence here will show that there's no dispute

10   as to whether or not there was a sale.  That question is not

11   in dispute here.

12             So the dispute in this case is whether, in fact,

13   there was a purchase of stock and whether that purchase was

14   made by Defendant Kim.

15             Now, you may be saying at this point, "Those seem

16   like very simple questions, whether or not there was a

17   purchase, whether or not someone made it.  Why are we sitting

18   here, us eight members of the jury, possibly for four days, to

19   decide those questions?  How hard can it be?"

20             And the answer is it's not hard.  It's simple.

21   Here's why:  In this case, you're going to see a form that

22   Defendant Kim filed with the government about this

23   transaction.  That form is known as a Form 4, and we're going

24   to bring it up for you.

25             THE COURT:  We're not seeing it.

1              We're trying again.

2              Members of the jury, while we are waiting, I assure

3    you that these things happen from time to time.  Courtroom

4    technology malfunctions, and it's not a function of lack of

5    preparation.  The attorneys in this case, as attorneys usually

6    do, they come in to test out the equipment.  It works fine in

7    testing, but there's something about --

8              Here we go.  All right.

9              MS. BONTHUIS:  Thank you.  Thank you for your

10   patience.

11             Now, this is what's called a Form 4.  I know it's a

12   very exciting name.  It's not a very exciting form, it may

13   seem like.  We're going to talk about what this shows.  You'll

14   hear in this case that these forms are what insiders at a

15   company fill out when they buy or sell stock.  You don't just

16   fill out this form.  You file this form with the federal

17   government, with the Securities and Exchange Commission or the

18   SEC, you might hear it called.

19             Now, here you can see this Form 4, and you can see

20   at the top in square one, you see OC Kim.  If it will let me

21   circle --

22             Loraine, it's not letting me circle.

23             Now, you see that the name of the person who filled

24   this out was the defendant, OC Kim.  You see it identifies a

25   transaction that happened on September 25, 2020.

```
 1                If you could scroll down, Eric --
 2                Scroll up so that way we can see it.
 3                Here we go.
 4                This transaction involved 160,000 shares of
 5      Franklin Wireless stock and the price of those shares.  So
 6      there's this box here for price.  The price was $2.50 a share.
 7      Then there's the amount here, and total amount in that
 8      transaction was $400,000.
 9                Now, you see here that there's a box called
10      "Transaction Code," and here you see that there's a letter
11      (P).
12                Now, like lots of government forms, there are codes
13      and there are letters.  We're not going to make you guess what
14      they stand for.  We'll show you the instructions, but I bet
15      you can guess what (P) stands for.  It stands for "purchase."
16      There's also a place where you can write -- where you fill out
17      if it was securities acquired or disposed of, and here
18      Defendant Kim put (A) for "acquired."
19                You'll see a box, then, on the right.  If we go to
20      the right, it asks about the form of ownership, direct or
21      indirect.  And you'll see that next to this transaction we're
22      talking about, the 160,000 shares at $2.50 a share, you'll see
23      that Defendant Kim put (I), and as it says right there above,
24      it says (I) is for "indirect ownership."
25                And then next to that box, you see it gives you a
```

1    place to explain the nature of that indirect beneficial

2    ownership, and Defendant Kim put "by child."

3              Now, if we can go to the bottom, Eric --

4              So you'll see then here on the right, this is a

5    signature signed by the defendant, Mr. Kim.

6              And then if we could go just back to the right,

7    you'll see that there's instructions, reminder, and you'll see

8    one of those notes is that "intentional misstatements or

9    omissions of facts constitute federal criminal violations."

10             The question of whether or not there was a purchase

11   and whether or not Defendant Kim made that purchase is simple.

12   There is a Form 4.  It was filed with the government.

13   Intentional misstatements on that Form 4 are a federal

14   criminal violation.  That Form 4 states that there was a

15   purchase.  That form states that Defendant Kim was the

16   indirect owner of those shares in the purchase.

17             Now, that note you saw, "by child," the evidence

18   will show that the child in that transaction was Rachel Kim,

19   Defendant Kim's daughter.  You'll hear that Rachel Kim

20   received these shares from a woman named Misun Kim.  That's

21   Defendant Kim's sister; her aunt.

22             Now, in addition to what you'll see on the Form 4

23   about the purchase, you will also hear that after this

24   transaction occurred but before this litigation started,

25   defendants described this transaction as a purchase.  You'll

1    see documents where Franklin Wireless's in-house lawyer,

2    Mr. Bauer, used the word "purchase" to describe this

3    transaction, and you'll hear about sworn statements submitted

4    in this litigation by both Defendant Kim and Rachel Kim, which

5    describe this as a purchase.

6         The evidence will also show that Defendant Kim was

7    the indirect or beneficial owner of the shares.  You already

8    saw on Form 4, he already identified himself as the indirect

9    owner.  When asked to describe the nature of that indirect

10   beneficial ownership, he said "by child," and that statement

11   was made on a document that was submitted to the government in

12   which intentional misstatements are a federal criminal

13   violation.

14        Now, "beneficial owner" might be a term that makes

15   your eyes glaze over slightly.  It's a legal term.  The judge

16   will give you instructions on what that means.  It's not my

17   job to explain that to you.  But what you will hear is

18   testimony about the relationship between Defendant Kim and his

19   daughter Rachel Kim.  You'll hear that Defendant Kim and his

20   wife provided financial support for Rachel.  They paid for her

21   college, they paid for her graduate school tuition.  They

22   loaned her $100,000 to buy a home in San Diego.  They gave her

23   gifts of cash, gifts of $15,000.  You will also hear testimony

24   about how this transaction between Rachel -- who had no prior

25   experience with individual buying and selling of stocks at

1    all -- how that transaction came about.  You will hear that

2    there was a brief conservation between Rachel and her dad, and

3    then there was a brief conversation with her aunt, and then

4    160,000 shares of Franklin Wireless stock showed up.

5          You will decide whether or not that makes sense in

6    light of what you saw there on the Form 4 in Defendant Kim's

7    indirect ownership.  So, in sum, this case really is that

8    simple.  There was a purchase of 160,000 shares of Franklin

9    stock in 2020.  The price of that stock was $2.50 a share.

10   Defendant Kim is identified as the indirect beneficial owner

11   of those shares, and then three months later, you will hear

12   that Defendant Kim sold some of his own shares, and the price

13   wasn't $2.50 a share.  The price was $15 a share.

14         Thank you.

15         THE COURT:  All right.  Thank you, Ms. Bonthuis.

16         Mr. Lobbin.

17         MR. LOBBIN:  Thank you.

18         I'll turn this slightly.  Thank you.

19         Good morning again.  It's still morning, barely.

20         So in case you've forgotten, my name is

21   Stephen Lobbin.  I'm an attorney here in San Diego.  My law

22   firm is SML Avvocati.

23         My associate is Mr. Ferri over here.  My client is

24   Franklin Wireless.

25         Mr. Bauer is the in-house counsel for

1    Franklin Wireless and Mr. OC Kim is also my client.  He's the

2    president and CEO of Franklin Wireless.

3         What's Franklin Wireless?  It's a company here in

4    San Diego.  They do Wi-Fi technology, they invent things, they

5    develop technologies.  They make those hotspots we talked

6    about during the voir dire.

7         Who's OC Kim?  Well, you'll see him testify, and

8    you'll see that he grew up in Korea.  English is not his first

9    language.  So although he can speak very good English and do

10   business in English, here in court, we're going to allow him a

11   translator, because a lot of these questions about this form

12   and these SEC regulations that plaintiff's counsel wants you

13   to think are so simple are not quite so simple.

14        He's lived here in San Diego for 20 years.  He's an

15   entrepreneur; he's a businessman.  He's not a lawyer.

16   Probably a good thing; right?  Too many lawyers.  He's a

17   businessman and entrepreneur.  That's a good thing.

18        He started the company, Franklin Wireless, over

19   20 years ago.  Franklin Wireless, as I said, engineers

20   wireless technology solutions including mobile Wi-Fi hotspots.

21   You may have one, use one in your car or on vacation.

22        OC Kim is a good man.  He's a good husband, he's a

23   father.  His company, Franklin, is a public company, meaning

24   that it has shares of stock which could be traded and bought

25   and sold.  Before 2020, for all those years, OC Kim never sold

| | |
|---|---|
| 1 | any of his shares.  Instead, he invested in his company.  He |
| 2 | worked hard to grow it from just one person -- guess who? |
| 3 | him -- to what it is today, a San Diego-based international |
| 4 | company, 30-some employees here in San Diego, employing people |
| 5 | right here in our community. |
| 6 | So what's this case really about?  This case is |
| 7 | about greed.  Greed of this plaintiff -- they call themselves |
| 8 | Nosirrah -- to go after Mr. Kim -- |
| 9 | MS. BONTHUIS:  Objection. |
| 10 | THE COURT:  Hang on.  There's an objection. |
| 11 | MS. BONTHUIS:  Your Honor, we discussed this before; |
| 12 | that what plaintiff is or what plaintiff's motives are are not |
| 13 | relevant. |
| 14 | Moreover, this is getting argumentative.  It's |
| 15 | opening statements, not closing arguments. |
| 16 | THE COURT:  Well, we are getting pretty close to |
| 17 | arguing, Mr. Lobbin.  So objection's overruled. |
| 18 | MR. LOBBIN:  It's about the greed of this plaintiff, |
| 19 | to go after Mr. Kim and his company. |
| 20 | For what?  To give them money. |
| 21 | MS. BONTHUIS:  Objection.  Your Honor, that |
| 22 | misstates the law. |
| 23 | MR. LOBBIN:  For what? |
| 24 | THE COURT:  That's sustained. |
| 25 | MR. LOBBIN:  For what? |

1              As you will learn, in 2020, Mr. Kim made an honest

2       mistake.  How many of us have ever made a mistake on a form?

3              Mr. Kim made a mistake by filing that one-page stock

4       form he was never required to file in the first place, as you

5       will learn.  He filed this Form 4, which is for insiders to

6       report stock transactions.

7              What's an insider?  An insider is an officer of the

8       company.  He's an officer, a director of a company -- he's a

9       director -- and 10% holders of shares.

10             The form was not required, because the transaction

11      he was trying to report was not his transaction.  The shares

12      on the form were never owned by OC Kim.  The shares he

13      reported on the form were owned by his sister, as you will

14      learn.  Her name is Misun Kim, and she lives in Korea.  She

15      has owned shares of Franklin Wireless for many years, going

16      back seven, eight years.

17             OC Kim also has a 33--year-old daughter.  Her name

18      is Rachel Kim, and you'll hear from Rachel Kim during this

19      trial.  She's an independent, adult, professional woman.

20      She's highly educated.  She's lived in her own home for many

21      years.  She's making her own decisions.  She's a pharmacist at

22      UCSD Hospital.  She works hard.

23             As you will learn, Rachel Kim, his daughter, agreed

24      to help Misun Kim, his sister, try to sell her shares in the

25      United States.  Why?  At the time, there was no way to sell

| | |
|---|---|
| 1 | shares in Korea.  You could only do that in the United States. |
| 2 | As you will learn, the agreement between Misun Kim |
| 3 | and Rachel Kim was a consignment, not a purchase.  As you will |
| 4 | learn, no money ever changed hands.  Misun Kim, no money; |
| 5 | Rachel Kim, no money; OC Kim, no money.  Only if and when |
| 6 | Rachel Kim might be able to sell the shares for Misun Kim |
| 7 | would there be a purchase and sale.  This is known as a |
| 8 | consignment.  You may have heard that term before, or another |
| 9 | way to say it is a contingent payment agreement.  The payment |
| 10 | was contingent on somebody being able to find someone who |
| 11 | wanted to buy those shares. |
| 12 | What's a consignment?  Well, if you're like me, you |
| 13 | use Wikipedia for things like that, and Wikipedia says |
| 14 | consignment is when a person gives permission to take care of |
| 15 | their property but keeps full ownership until the item is sold |
| 16 | to the final buyer. |
| 17 | I'm sure some of you have dealt with consignment |
| 18 | clothing stores.  I searched online, there's one right down |
| 19 | the street from here.  If you're an online buyer and seller, |
| 20 | you might have heard of The RealReal, where you can sell |
| 21 | handbags that you don't want anymore that someone else might |
| 22 | want to buy, and you can make some money off things like that. |
| 23 | That's what this was, between Misun and Rachel.  Rachel Kim is |
| 24 | a nice person; she's a good niece.  Rachel Kim agreed to try |
| 25 | helping her aunt.  As I said, she's a pharmacist at |

```
 1   UCSD Hospital, but she's not a stockbroker.  So ultimately she
 2   never was able to sell the shares for her aunt.  She returned
 3   them to her aunt a couple years later, and as you will learn,
 4   the arrangement never made anyone any money.
 5             When he first learned of their agreement from his
 6   daughter, Mr. Kim thought he was required to file that form.
 7   He had never filed it before, but he knew of the form.  The
 8   rules require filing the form within just a few days so he had
 9   to hurry.  Five days between when he learned of the
10   consignment arrangement between his daughter and his sister,
11   he had to get that form filled out and filed.  Why did he
12   think that?  Because his sister and his niece are family
13   members.  As a CEO of a public company, he thought that if
14   there was something involving family members and the stock,
15   you have to report that on this form.  But they are not
16   management and they're not insiders.  Sister's not an insider,
17   daughter's not an insider.  The arrangement had nothing to do
18   with Mr. Kim.  He never owned or had any interest in the
19   shares so the form was not even required.  It should not have
20   been filed.  That was his first mistake.  Should not have
21   filed that form.  But Mr. Kim thought, well, I have to provide
22   information to the shareholders of the company and I'm being
23   transparent and disclosing as much as I can."
24             But he shouldn't have filed that form.
25             He tried his best but made mistakes on the form
```

| | |
|---|---|
| 1 | which we'll go through -- not now, but we'll go through with |
| 2 | him testifying about what the mistakes were.  Some of the |
| 3 | numbers that counsel pointed to were not accurate. |
| 4 | Again, he's not a lawyer.  As you will learn, this |
| 5 | is his first time filing this form.  He made a mistake on the |
| 6 | form that could happen to anyone.  In the future, make sure a |
| 7 | lawyer does that form for him.  He won't try to do it himself. |
| 8 | And, as you will learn, there's no way to amend or |
| 9 | correct the form.  Once it's filed, it's there.  You can't |
| 10 | bring it back.  It's a government form.  There's no way to get |
| 11 | it back and re-do it.  No way to amend or correct the form. |
| 12 | So what does all this have to do with this plaintiff?  Well, |
| 13 | the form created problems several months later when Mr. Kim |
| 14 | sold some of his own shares in a private transaction.  Again, |
| 15 | this is the first time he had sold shares in 20 years. |
| 16 | December 2020, private investor approached Mr. Kim |
| 17 | about purchasing some of his shares.  You will learn this |
| 18 | transaction -- the second time for this form -- he reported it |
| 19 | correctly, on a second Form 4.  It's called a Form 4. |
| 20 | You will also learn that the number of shares OC Kim |
| 21 | reported on those Form 4s are consistent with his number of |
| 22 | shares he reported on other statements that the company has to |
| 23 | do.  You may have heard of a 10-K; you may have heard of a |
| 24 | proxy statement.  All those share reports show consistently |
| 25 | how many shares of stock Mr. Kim owned.  What they don't show |

1    is the mistake he made on that Form 4.  So did he make a

2    mistake once or did he make a mistake many, many, many times?

3    You'll have to decide that.

4          So the plaintiff, Nosirrah, found these forms which

5    are online and sent a demand.  You'll hear about that.

6    Mr. Bauer, general counsel for Franklin, will testify that as

7    soon as that form was filed, he got an e-mail from Nosirrah

8    demanding millions of dollars.  Nosirrah claimed that part of

9    this transaction was illegal because of the prior consignment

10   between Misun Kim and Rachel Kim, but the consignment is not a

11   purchase.  It did not involve OC Kim or benefit him in any

12   way, and there were never any profits or money even exchanging

13   hands for anyone.  In fact, the company investigated the

14   claim, and they sent a letter explaining the real facts.  That

15   should have been the end of it, but instead we're here in

16   court, all the way at the end of the case, having you make

17   this decision.

18         For any one of those reasons -- not a purchase, not

19   by OC Kim, no profits for anyone -- we will ask you at the end

20   of this trial to give us your judgment in favor of Mr. Kim,

21   because he did nothing wrong except his honest mistakes on the

22   first Form 4.

23         You know, I don't want to ask anyone their age, but

24   if you're as old as I am, you remember an '80s movie called

25   "Wall Street."  In that movie, Michael Douglas played a

1    character called Gordon Gekko, and he made popular in our

2    culture a phrase, "Greed is good."  That was the line from

3    that movie.  But greed is not good.  We all know that.

4            What is good is forgiving insignificant and innocent

5    mistakes.  What is good is the truth.  Forgiveness and the

6    truth will be your guides in this trial, and you will make the

7    right decision.  An honest man made an honest mistake, and

8    there was no resulting profit for anyone.  Didn't hurt anyone;

9    no one lost any money.

10           Thank you for your time.

11           THE COURT:  Thank you, Mr. Lobbin.

12           Members of the jury, it's six minutes past noon.

13   We'll go on lunch break now.

14           Let's resume at 1:15, so a quarter past 1:00.

15   Please be outside, and we'll call you back in and resume then.

16           Have a good lunch and see you soon.

17           Oh.  You're going to hear this from me more than

18   once, but it's what I call the Court's admonition.  There are

19   a number of instructions I went through, but there's one I

20   want to emphasize as it pertains to your breaks, and that is

21   don't do any independent research.  Anything you've heard,

22   don't look it up.  Remember, base your decision on the

23   evidence you hear here in court.

24           Second, don't talk to anybody about the case, and

25   that includes -- most people don't know that -- that includes

1    your fellow jurors until you retire as a group to deliberate.

2    You shouldn't be discussing the case.  You can talk about

3    other things in your life, but don't talk about this case with

4    each other or anybody else until you're instructed and given

5    the case to decide in the jury room.

6              So thank you all, and we'll see you at 1:15.

7              THE CLERK:  There should also be business cards on

8    your notebooks.  If you are delayed during lunch, please send

9    me an e-mail or leave me a voicemail so we know where you

10   are.

11             (Jury out at 12:08 p.m.)

12             THE COURT:  The jury has left the courtroom.

13             Anything from counsel before we break for lunch?

14             MS. BONTHUIS:  Your Honor, we'd like to request a

15   curative instruction.  Defendants are suggesting that

16   plaintiff is motivated by greed and that somehow the funds

17   that are being sought to recover, it's implying that somehow

18   we financially benefit from that.  We discussed this earlier

19   in our motion in limine on attorneys' fees.  Either Mr. Lobbin

20   is suggesting that we will recover attorneys' fees should we

21   prevail -- which I think you ruled is not permissible -- or

22   he's suggesting that we somehow receive the profits to be

23   disgorged, which is just a gross misstatement of the law.

24             We would like you to instruct the jury that if it is

25   found that there were profits, then those profits go back to

1    the company.

2                THE COURT:  Well, I think Mr. Lobbin's point --

3                Look.  I don't want this to be overplayed.  The

4    first time when you said this is a case about greed, I'm going

5    to let it stand.  The second time, I sustained the objection.

6    So the defense theory is that this case doesn't have merit and

7    that it's motivated by financial interest.  That's what

8    Mr. Lobbin is referring to by "greed."

9                Mr. Lobbin, you know, you've had your wiggle room.

10   So I'm going to be on the lookout for questions that are

11   argumentative rather than purposeful and consistent with the

12   Rules of Evidence.

13               That said, I think your point is that plaintiff has

14   a financial motivation.  You haven't gone into any further

15   detail, so you haven't said they have a financial motivation

16   because of attorneys' fees, they have a financial motivation

17   because of something else.

18               Ms. Bonthuis, I mean, it is -- it's accurate, and

19   it's not surprising your client does have a financial

20   motivation.  It sounds like you want me to go into greater

21   detail and talk about where the $2 million would go but not

22   talk about the attorneys' fees part.  So I granted the motion

23   in limine as far as preventing the defendants from talking

24   about attorneys' fees, but I also don't want to create a

25   misleading impression that the plaintiff has no financial

1    interest.  So I think we're at the right level of generality

2    right now, and I'm concerned that if you want to go further,

3    then we may have to present a complete picture of the

4    plaintiff's financial interest.

5              MS. BONTHUIS:  Can we have a ruling that Mr. Lobbin

6    is precluded from talking about greed?

7              THE COURT:  Well, I'm not going to make a blanket

8    ruling in that regard, but again, Mr. Lobbin, I gave you some

9    wiggle room the first time; I sustained it the second time.

10   I'm not going to be receptive to it the third time if you're

11   talking about greed in questioning the witness.  It's one of

12   your themes in the case, so I can't say you're not allowed to

13   present a theme that this case has no merit; that it's brought

14   because of financial interest.  But, you know, I'm going to be

15   on the lookout for questions that are unduly argumentative.

16             Anything else from counsel at this time,

17   Ms. Bonthuis?

18             MS. BONTHUIS:  No.

19             THE COURT:  Mr. Lobbin?

20             MR. LOBBIN:  Well, thank you, Your Honor.

21             My closing probably may, in fact, use the same word.

22   So -- but not -- I'm not going to be talking to witness about

23   it.  That's the evidence.  That's the evidence.  That's our

24   theme of the case:  Why are we here?  Nobody was -- there's no

25   injured party; there's no money that changed hands.

| | |
|---|---|
| 1 | MS. BONTHUIS:  That's not how § 16 works. |
| 2 | MR. LOBBIN:  So why are we here?  We're here because |
| 3 | somebody wants to make money.  That's our theme of the case. |
| 4 | The jury needs to know, and they're allowed to consider -- |
| 5 | What's going on here? |
| 6 | THE COURT:  Well, Mr. Lobbin, it sounds like you're |
| 7 | saying your intention is not to question the witnesses using |
| 8 | the term "greed," but that you may try to used that term again |
| 9 | in closing. |
| 10 | In light of the way the evidence comes in and in |
| 11 | light of the comments that counsel make over the course of |
| 12 | trial, we'll want to revisit that again before we start |
| 13 | closing, but I'm not sure there's anything to be ruled on at |
| 14 | this point beyond what I've already said. |
| 15 | Ms. Bonthuis, what else do you have to say on this? |
| 16 | MS. BONTHUIS:  I think I agree there's nothing to be |
| 17 | ruled on at this moment, but to talk about greed in a closing |
| 18 | statement when there's been no evidence as to how plaintiff |
| 19 | benefits, it's implicit arguing that there's some sort of |
| 20 | attorneys' fees here.  It's a way of getting at attorneys' |
| 21 | fees without using the word, but we'll address it when we get |
| 22 | to that point. |
| 23 | THE COURT:  We'll address it at that point. |
| 24 | The other thing is in the opening statement, Counsel |
| 25 | are basing their remarks on what they expect the evidence to |

1    show.  We may get to the end of the trial, and there may be no

2    evidence that the plaintiff stands to financially benefit, in

3    which case that wouldn't be an apt term.  We'll address it at

4    that point in time.

5            MR. LOBBIN:  There will be evidence.  There will be

6    evidence.

7            THE COURT:  Ms. Bonthuis, anything else?

8            MS. BONTHUIS:  No.  We're curious to see that.

9            THE COURT:  Okay.

10           MR. LOBBIN:  It's Exhibit 58.  It's a letter you

11   wrote asking for $5 million.

12           THE COURT:  We'll see you in one hour.

13           Thanks, Counsel.

14           (Lunch recess 12:15 p.m. - 1:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN DIEGO, CALIFORNIA; MONDAY, OCTOBER 16, 2023

 2                        1:15 p.m. - 4:46 p.m.

 3                           -   -   -   -

 4              (Court called to order.)

 5              MS. BONTHUIS:  Your Honor, if I might address --

 6              THE COURT:  Well, we're bringing the jury in right

 7      now.

 8              MS. BONTHUIS:  Okay.

 9              THE COURT:  Is this something that can wait until

10      the break?

11              MS. BONTHUIS:  Well, it's about the demonstrative we

12      intended to use with the stock price.  One of those --

13              THE COURT:  But --

14              Because the jury's coming back in right now.  Does

15      it need to be discussed right now?

16              MS. BONTHUIS:  I think we can wait until the break

17      probably.

18              THE COURT:  Okay.  Thanks.

19              (Jury present at 1:18 p.m.)

20              THE COURT:  Members of the jury, welcome back from

21      lunch.

22              You've now heard opening statements.  We're going to

23      proceed with the plaintiff's case in chief.

24              Ms. Bonthuis and Mr. Small, you may call your first

25      witness.
```

```
 1                    MS. BONTHUIS:  Yes.  We call Robert Kantowitz to the
 2         stand.
 3                    THE COURT:  All right, Mr. Kantowitz.
 4                    Please come this way and then pause right about
 5         where those headphones are.
 6                    (Witness sworn.)
 7                    THE CLERK:  Please take a seat.
 8                    Sir, please state your name for the record and spell
 9         your first and last name.
10                    THE WITNESS:  Robert Kantowitz.
11                    R-o-b-e-r-t, K-a-n-t-o-w-i-t-z.
12                                ROBERT KANTOWITZ,
13              having been first duly sworn, testified as follows:
14                              DIRECT EXAMINATION
15         BY MS. BONTHUIS:
16         Q.   Good afternoon, Mr. Kantowitz.
17         A.   Thank you.
18         Q.   Are you testifying here on behalf of Plaintiff,
19         Nosirrah Management, LLC?
20         A.   Yes.
21         Q.   What is Nosirrah?
22         A.   It's a limited liability company.
23         Q.   Are you authorized to speak on behalf of Nosirrah?
24         A.   Yes.
25         Q.   Do you have a title?
```

```
1    A.    Authorized signatory.

2    Q.    Does Nosirrah own stock in Franklin Wireless?

3    A.    Yes.

4    Q.    When did Nosirrah purchase stock in Franklin Wireless?

5    A.    June 2020.

6    Q.    Has Nosirrah continuously owned stock in

7    Franklin Wireless since June 2020?

8    A.    Yes.

9          MS. BONTHUIS:  No further questions.

10          THE COURT:  All right.  Mr. Lobbin?

11                    CROSS-EXAMINATION

12    BY MR. LOBBIN:

13    Q.    Good afternoon, Mr. Kantowitz.

14    A.    Thank you.

15    Q.    How many shares of stock does Franklin Wireless own?

16    A.    One share.

17    Q.    And how much did you pay for that?

18    A.    I do not remember the exact amount.

19    Q.    Was it $5.60?

20    A.    It could have been.  It's whatever the price was in June

21    of 2020.

22    Q.    Was it under $10?

23    A.    I can't say for sure, but it might have been.

24    Q.    So you can remember that the transaction was in June of

25    2020, but you can't remember what the price was?
```

```
 1    A.    That's correct.

 2    Q.    What does the word Nosirrah mean?

 3              MS. BONTHUIS:  Objection.  Beyond the scope of

 4    direct.

 5              THE COURT:  Mr. Lobbin?

 6              MR. LOBBIN:  We're talking about the company and

 7    what it does and what it owns.  It's not beyond the scope.

 8              THE COURT:  What's the relevance?

 9              MR. LOBBIN:  I want to know what the company -- what

10    the company name means and what kind of company it is and to

11    understand what its business is.

12              THE COURT:  Objection sustained.

13    BY MR. LOBBIN:

14    Q.    Mr. Kantowitz, Nosirrah is an LLC; correct?

15    A.    That's right.

16    Q.    What is an LLC?

17              MS. BONTHUIS:  Objection.  Beyond the scope.

18              THE COURT:  Overruled.

19              THE WITNESS:  It's a limited liability company.

20    BY MR. LOBBIN:

21    Q.    How many employees does Nosirrah have?

22              MS. BONTHUIS:  Objection.

23              THE COURT:  Sustained.

24    BY MR. LOBBIN:

25    Q.    Where is Nosirrah located?
```

```
 1                MS. BONTHUIS:  Objection.

 2                THE COURT:  Sustained.

 3     BY MR. LOBBIN:

 4     Q.   And what's the business of Nosirrah?

 5                MS. BONTHUIS:  Objection.

 6                THE COURT:  Mr. Lobbin?

 7                MR. LOBBIN:  This is fully within the scope of the

 8     opening.  She asked the witness what Nosirrah is.

 9                THE COURT:  All right.  Objection overruled.

10                THE WITNESS:  Could you repeat the question?

11     BY MR. LOBBIN:

12     Q.   What is the business of Nosirrah?

13     A.   Nosirrah owns shares of companies.

14     Q.   And asserts legal claims against those companies in some

15     cases; correct?

16                MS. BONTHUIS:  Objection.  Relevance.

17                THE COURT:  Sustained.

18     BY MR. LOBBIN:

19     Q.   And Nosirrah in this case owns shares of a company that

20     it's suing; right?

21     A.   Correct.

22                MR. LOBBIN:  No further questions.

23                THE COURT:  All right.  Ms. Bonthuis, anything else?

24                MS. BONTHUIS:  No.

25                THE COURT:  All right.  Mr. Kantowitz, you may step
```

```
 1    down.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  Ms. Bonthuis, you may call your next

 4    witness.

 5              MS. BONTHUIS:  We'd like to call the defendant.

 6    OC Kim.

 7              And his interpreter is here, as well.

 8              THE COURT:  All right, Mr. Kim.

 9              (Korean interpreter sworn.)

10              (Witness sworn.)

11              THE CLERK:  Sir, please take a seat.

12              Would you like a chair?

13              Sir, please state your name for the record and spell

14    your first and last name.

15              THE WITNESS:  O-k, C-h-a-e, K-i-m.

16                        AERYONG KIM,

17          the interpreter, having been first duly sworn,

18          interpreted the tesimony from English to Korean

19          and Korean to English to the best of her ability.

20                        OK CHAE KIM,

21          having been first duly sworn, testified through the

22      Korean interpreter, unless otherwise indicated, as follows:

23                        DIRECT EXAMINATION

24    BY MS. BONTHUIS:

25    Q.   Good afternoon, Mr. Kim.
```

1    A.    Good afternoon.

2    Q.    Is your full name Ok Chae Kim?

3    A.    Yes.

4    Q.    Do you regularly go by OC Kim?

5    A.    Yes.

6    Q.    You've lived in the United States since approximately

7    2000?

8    A.    Yes.

9    Q.    At work, do you primarily speak English or Korean?

10   A.    English.

11   Q.    Korean is your first language, though?

12   A.    Yes.

13   Q.    You are the CEO of Defendant Franklin Wireless; correct?

14   A.    Yes.   Correct.

15   Q.    You own stock in Franklin Wireless?

16   A.    Yes.

17   Q.    You have a sister in Korea named Misun Kim?

18   A.    Yes.

19   Q.    And, as of 2020, Misun Kim owned stock in

20   Franklin Wireless?

21            MR. LOBBIN:  Objection.  Leading.

22            THE COURT:  Objection's overruled.

23            THE WITNESS:  No.

24   BY MS. BONTHUIS:

25   Q.    Your sister, Misun Kim, did not own stock in

1    Franklin Wireless in 2020?

2    A.   She started owning stocks of the company --

3         You said 2020.  She started owning stocks since 2022.  I

4    don't know exactly since when she started owning stocks, but

5    not in 2020.  Not from 2020.

6    Q.   Did she purchase the stock prior to 2020?

7    A.   Yes.

8    Q.   And was that 160,000 shares of Franklin Wireless?

9    A.   I did not know that at the time of purchase.

10   Q.   I understand.  My question is:  Did she own 160,000

11   shares of Franklin Wireless?

12             MR. LOBBIN:  Objection.  Vague as to time.

13             THE COURT:  Objection sustained.

14             Can you be more specific, Counsel?

15   BY MS. BONTHUIS:

16   Q.   The shares of Franklin Wireless that your sister

17   purchased, was it 160,000 shares at the time she purchased

18   them?

19   A.   I don't know for sure.

20   Q.   Well, in 2020, did Misun Kim ask you to buy her 160,000

21   shares?

22   A.   No.  She never did.

23   Q.   You never had a conversation with your sister in which

24   she asked you to purchase shares?

25   A.   That is correct.  She never asked me to buy stock.

1    Q.   She never asked you to buy her stock?

2    A.   That is correct.

3    Q.   Okay.  Let's talk about that.

4         Your sister, Misun Kim, lives in South Korea; correct?

5    A.   Yes.

6    Q.   And at some point in 2015, she purchased shares in

7    Franklin Wireless?

8    A.   I heard as to that at a later time, but I still don't

9    remember as to the exact time.

10   Q.   Mr. Kim, you provided several declarations in this

11   matter; correct?

12   A.   Through my lawyers.  Correct.

13   Q.   These were statements, though, made by you; correct?

14   A.   Those were my statements.  Correct.

15   Q.   And you executed those statements?  You signed them?

16   A.   Yes.

17   Q.   We're going to show you a declaration in this case.

18        MR. LOBBIN:  Objection.  Counsel requests time to

19   review this first per 613(a).

20        THE COURT:  I'm sorry, Mr. Lobbin.  Can you say that

21   again, what the objection is?

22        MR. LOBBIN:  The objection is that counsel requests

23   permission to see this alleged statement first.

24        THE COURT:  Oh, yes.  Yes.

25        Is there an exhibit number for this?

```
1              MS. BONTHUIS:  Yes.  Plaintiff's Exhibit 14.

2              THE COURT:  Is this in the binder?

3              MS. BONTHUIS:  Yes.

4              THE COURT:  Okay.  You may proceed, Ms. Bonthuis.

5              MS. BONTHUIS:  Great.

6              Eric, if you could scroll to the last page and make

7      sure --

8              Not the attorney's signature but --

9              Okay.  Thanks.

10     Q.   Is this your signature, Mr. Kim?

11     A.   Yes, it is.

12             MS. BONTHUIS:  And, Eric, if you could scroll up to

13     the top of the statement so we can see --

14             If you could go now to paragraph 6 --

15     Q.   Could you please read the second sentence of paragraph 6

16     into the record?

17             MR. LOBBIN:  Objection.  Hearsay.

18             THE COURT:  Objection sustained.

19             Are you offering this into evidence, Ms. Bonthuis,

20     or are you refreshing the witness's recollection or what?

21             MS. BONTHUIS:  I'm offering it into evidence.

22             THE COURT:  Is there a motion to offer Exhibit 14

23     into evidence?

24             MS. BONTHUIS:  Yes.

25             THE COURT:  Mr. Lobbin?
```

```
 1              MR. LOBBIN:  Objection.  Hearsay.
 2              MS. BONTHUIS:  It's a statement of a party
 3    opponent.
 4              THE COURT:  Objection's overruled.  14 is admitted.
 5              (Exhibit 14 received into evidence.)
 6              MS. BONTHUIS:  If we may publish it to the jury --
 7              THE COURT:  Yes, you may.
 8              MS. BONTHUIS:  Thank you.
 9    Q.   Mr. Kim, will you read the second sentence of
10    paragraph 6.
11    A.   Yes.
12    Q.   This is a declaration that you signed in 2021; correct?
13    A.   Yes.
14    Q.   So Misun Kim purchased these shares in 2015; correct?
15    A.   I'm not exactly sure.
16    Q.   Did you state in this declaration under penalty of
17    perjury she purchased the shares six years earlier?
18    A.   Yes.
19    Q.   In 2020, is it your testimony that Misun Kim did not ask
20    you to help her sell her shares?
21    A.   She did ask me to help sell, but she did not ask me to
22    purchase them.
23    Q.   At the start of 2020, do you recall what the price of
24    Franklin Wireless stock was?
25              MR. LOBBIN:  Objection.  Vague as to time.
```

```
 1              THE COURT:  The question is whether Mr. Kim could
 2     remember what the stock price was at any time during the
 3     year --
 4              MS. BONTHUIS:  At the start of 2020.
 5              THE COURT:  Okay.  Objection overruled.
 6              THE WITNESS:  I don't know for sure.
 7     BY MS. BONTHUIS:
 8     Q.    Your sister reached out to you about selling her Franklin
 9     stock in 2020 when the share prices started to go up; correct?
10     A.    Correct.
11     Q.    That was in August of 2020?
12     A.    No.
13     Q.    When did your sister reach out to you about selling the
14     shares?
15     A.    June or July of that year.
16     Q.    It was so important to your sister to sell the shares
17     that she was willing to sell them for the price she paid;
18     correct?
19     A.    I didn't quite catch the question.
20     Q.    It was so important to your sister to sell the shares,
21     she was willing to sell them for the price that she paid for
22     them.
23     A.    I'm not sure.
24     Q.    Again, Mr. Kim, let me direct your attention to
25     paragraph 6.  Can you please read the sentence that begins
```

1    with "Her aunt."

2         Can you please read that out loud.

3    A.   "Her aunt had been complaining and demanding to sell the

4    shares even at the original investment cost."

5    Q.   That was $2.50 a share?

6    A.   I'm not quite sure.

7    Q.   Do you know where Franklin stock historically had traded

8    prior to 2020?

9              MR. LOBBIN:  Objection.  Vague.

10             THE COURT:  Are you asking for a range of dollar

11   amounts, Ms. Bonthuis?

12             MS. BONTHUIS:  Around where it generally traded.  It

13   generally traded around a fairly limited range of prices.

14             MR. LOBBIN:  Same objection.

15             THE COURT:  Okay.  Can you rephrase to make sure

16   you're asking the range rather than a single number?  Because

17   of course the number is going to --

18   BY MS. BONTHUIS:

19   Q.   Do you remember the range of prices at which

20   Franklin Wireless stock traded prior to 2020?

21   A.   I don't know for sure.

22   Q.   Do you have any idea of the range where Franklin stock

23   traded prior to 2020?

24             MR. LOBBIN:  Objection.  Asked and answered.

25             THE COURT:  Overruled.

```
1        THE WITNESS:  No.  Not really.  I don't recall.

2   BY MS. BONTHUIS:

3   Q.   You told your sister that you couldn't sell her

4   Franklin Wireless for her; correct?

5        THE WITNESS:  Can I have the translation one more

6   time, please.

7        THE INTERPRETER:  Can I have the actual question one

8   more time?

9   BY MS. BONTHUIS:

10  Q.   You told your sister that you could not sell her shares

11  in your name; correct?

12  A.   I told her that as one option in the course of having a

13  conversation about various other things.

14  Q.   And the reason you told her that you couldn't sell the

15  shares in your name was because you are a company insider;

16  correct?

17  A.   I did not say that to her.

18  Q.   Let me be quite precise.

19       You told your sister that you could not sell the shares

20  in her name because you are in management of the company.

21       Did you tell your sister that or not?

22  A.   I told her that, and that the reason was because I'm the

23  president of the company.

24  Q.   And because you are the president of the company, there

25  are restrictions on your ability to buy and sell Franklin
```

1   stock; correct?

2   A.   I never said that.  No.

3   Q.   My question wasn't whether you said that.  My question

4   is:  Do you understand that there are restrictions on your

5   ability to buy and sell Franklin stock because you are

6   president?

7   A.   I did understand that there is such a rule.  Yes.

8   Q.   When you told your sister that, what was her response?

9   A.   I don't recall.

10  Q.   Mr. Kim, your deposition was taken in this case; correct?

11  A.   Yes.

12  Q.   And in that deposition --

13       It was recorded by a court reporter, like the one here in

14  the courtroom?

15  A.   Yes, there was.

16  Q.   And in that deposition, you swore to tell the truth?

17  A.   Yes.

18  Q.   Did you review your deposition transcript after that?

19  A.   Yes, I did.

20  Q.   Did you make any corrections to that deposition

21  transcript?

22  A.   Are you asking me if I made any corrections to the

23  transcript?

24  Q.   Yes.

25  A.   Are you asking me to make corrections now?

1      MS. BONTHUIS:  No.  I'm asking if he ever made any

2  corrections to the transcript.

3      THE WITNESS:  When are you saying that I made

4  corrections?

5  BY MS. BONTHUIS:

6  Q.   I didn't say whether you did.  My question is:  When you

7  reviewed your transcript, did you make any corrections?

8  A.   I never made corrections.

9  Q.   So your testimony is that when you told your sister that

10  you could not sell the stock for her, you did not recall her

11  response; is that correct?

12  A.   Correct.

13  Q.   Okay.

14      MS. BONTHUIS:  Eric, bring up the transcript, 61.

15  Q.   Mr. Kim, I'd like to read a question and answer from your

16  deposition.

17      THE COURT:  Ms. Bonthuis, this is not in evidence.

18  So if you want to refresh his recollection, you can state for

19  the record what part, page and line number, you're having him

20  review.  If you want to offer something into evidence, you can

21  offer it into evidence, but unless this is in evidence, I

22  don't want you reading.

23      MS. BONTHUIS:  Okay.

24      Could you please review the question and answer on

25  lines 15 to 17?

```
1              THE COURT:  What page is this?
2              MS. BONTHUIS:  This is page 61.
3              Can you take it down, please.
4    Q.   Mr. Kim, does this refresh your recollection that your
5    sister suggested that you -- your sister -- excuse me --
6    suggested that you sell the shares in somebody else's name?
7    A.   It was not a suggestion really.  That was discussed
8    amongst -- talking about various options.  That was just
9    mentioned.
10   Q.   Did your sister say, "We can do it in somebody else's
11   name or in my own name" in that conversation?
12   A.   Yes.  That's what she said.  Yes.
13   Q.   And she asked about doing it in your daughter's name;
14   correct?
15   A.   Yes, she did.
16   Q.   And after that conversation with your sister, you asked
17   your daughter, Rachel, if she would be willing to purchase
18   those shares; correct?
19   A.   I did not ask her if she had any willingness to purchase,
20   but I asked her if she could help towards that.
21   Q.   So your testimony is that the conversation with your
22   daughter was about was she willing to help?
23   A.   Correct.
24   Q.   What did you mean by willing to help?
25   A.   By that, I meant for her to help sell the shares of my
```

1     sister.

2     Q.   And that conversation was in August 2020?

3     A.   I don't remember exactly.

4                MS. BONTHUIS:  Okay.  Eric, if we could again bring

5     up the declaration, paragraph 6.

6                Can the witness see it?

7                THE INTERPRETER:  Yes.

8     BY MS. BONTHUIS:

9     Q.   Reading this declaration, does this refresh your

10    recollection that that conversation with your daughter was in

11    August 2020?

12    A.   Yes.

13    Q.   You had that conversation with Rachel at your home?

14    A.   Yes.  I think so.

15               MS. BONTHUIS:  Eric, you can take it down.

16    Q.   And in that conversation, you asked her to help her

17    auntie?

18    A.   I asked her if she would be willing to help.

19    Q.   And Rachel said she was willing to help?

20    A.   I think she said she'll think about it.

21    Q.   At some point after that, did Rachel say she was willing

22    to help her aunt sell her shares?

23    A.   Yes.  I think she did.

24    Q.   The initial conversation you had with Rachel at your home

25    in August about selling the shares, how long was the

1    conversation about the selling of the shares?

2    A.   It was very brief.

3    Q.   Was it more than a few minutes?

4    A.   I don't remember to the extent of how many minutes.  We

5    just talked about that.

6    Q.   The conversation you had later with Rachel when she

7    agreed to help sell her aunt's shares, how long was that

8    conversation?

9    A.   I don't remember exactly, but two to three weeks.

10   Q.   Okay.  And my question is:  The conversation you had in

11   which Rachel agreed to help her aunt sell the shares, how long

12   did that conversation last?  A few minutes?

13   A.   I don't exactly recall.  It was again a brief

14   conversation.

15   Q.   Mr. Kim, how often do you speak to Rachel by phone?

16   A.   Currently or back then?

17   Q.   In 2020.

18   A.   Almost at no time.  So very rare.

19   Q.   So you rarely spoke to Rachel on the phone in 2020?

20   A.   Correct.

21   Q.   The conversation in which she agreed to help her aunt,

22   was that in person or by phone?

23   A.   I don't recall exactly as to whether that particular

24   conversation was in person or by phone.

25   Q.   Did Rachel purchase Misun Kim's shares on September 25,

1 2020?

2 A.  She did not purchase.

3 Q.  Is Franklin Wireless a publicly traded company?

4 A.  Yes, it is.

5 Q.  What does it mean to be a publicly traded company?

6 A.  I don't know the exact definition, not being a lawyer

7 myself, but according to my personal understanding, I think it

8 means the company's shares can be traded openly.

9 Q.  And that means bought by members of the public?

10 A.  Yes.  Correct.

11 Q.  And when a company is a publicly traded company, that

12 company is subject to certain regulations?

13 A.  That is my understanding.  Yes.

14 Q.  Those are regulations issued by the Securities and

15 Exchange Commission?

16 A.  I don't know to that extent, but I do know that there are

17 regulations that exist.

18 Q.  You don't know whether there are regulations on publicly

19 traded companies issued by the Securities and Exchange

20 Commission or SEC?

21          MR. LOBBIN:  Objection.  Vague and argumentative.

22          THE COURT:  Overruled.

23          THE WITNESS:  By my previous answer, what I meant to

24 say was that I understand that there would be not only

25 regulations provided by SEC but also by other organizations.

1    BY MS. BONTHUIS:

2    Q.    Thank you.

3          Mr. Kim, do you think it's important to abide by the

4    securities regulations?

5    A.    Yes, I do.

6    Q.    Franklin Wireless has been a publicly traded company for

7    about 20 years; correct?

8    A.    No.

9    Q.    Do you know when Franklin Wireless became a publicly

10   traded company?

11   A.    The company made a report with OTC in 2008.

12   Q.    And what do you mean by "a report with OTC"?

13   A.    By that, I mean we filed a report to the over-the-counter

14   market.

15   Q.    Does that mean Franklin Wireless became publicly traded

16   in 2008?

17   A.    I think that will be right from a legal perspective, but

18   for stock trade with OTC and what it means to make a report to

19   OTC is that the volume is very small, and it stays within the

20   filing stage almost.

21         Let me put it this way:  By a company who makes a report

22   with OTC is a company only makes a filing for stock trade and

23   that has almost no stock trade happening.

24   Q.    But regardless of the number of shares traded, it is

25   still a publicly traded company at that point?

1    A.    I think that would be legally right.

2    Q.    Franklin Wireless is currently traded on the NASDAQ;

3    correct?

4    A.    Correct.

5    Q.    And NASDAQ is one of the major stock exchanges in the

6    United States?

7    A.    That is my understanding.  Yes.

8    Q.    Franklin Wireless has been traded on the NASDAQ since

9    March 2021?

10   A.    As of March 29th.

11   Q.    As of March 29th?

12   A.    Yes.

13   Q.    2021?

14   A.    Yes.  2021.  Correct.

15   Q.    And before March 2021 when Franklin began trading on the

16   NASDAQ, it was traded on another stock exchange?

17   A.    Yes.  Over-the-counter.

18   Q.    And we may have touched on this, but that's an exchange

19   where smaller companies have their stock traded?

20   A.    That's correct.

21   Q.    Mr. Kim, are you aware that there are certain SEC rules

22   that apply to people who are considered insiders of a company?

23   A.    I'm not aware of the specific details, because I'm not a

24   lawyer.

25   Q.    Are you aware that there are generally rules that apply

```
 1      to insiders of a company issued by the SEC?
 2      A.   I don't know what rules you're talking about.
 3              MS. BONTHUIS:  Okay.  Your Honor, I'd like one of
 4      the stipulations of fact to be read into the record at this
 5      point.
 6              THE COURT:  All right.  Do you have some reference
 7      for the stipulation?
 8              MS. BONTHUIS:  It's --
 9              In your final pretrial order, you have two
10      stipulations.  It's ECF 78 at 16.
11              THE COURT:  Great.  You may proceed.
12              MS. BONTHUIS:  Okay.
13              MR. LOBBIN:  May I review?
14              THE COURT:  Well, it's in the pretrial order, but
15      let's take a moment and make sure we're all on the same page.
16              Ms. Bonthuis, you're proposing to read both
17      paragraphs of the stipulation?
18              MS. BONTHUIS:  Just paragraph one.
19              THE COURT:  Okay.
20              MR. LOBBIN:  Thank you, Your Honor.
21              THE COURT:  Any objection, Mr. Lobbin?
22              MR. LOBBIN:  No.
23              THE COURT:  Ms. Bonthuis, you may proceed.
24              MS. BONTHUIS:  Thank you.
25              The parties have stipulated that OC Kim is an
```

1    insider for purposes of § 16(b).

2             THE COURT:  Members of the jury, you've just heard a

3    statement that was stipulated to by the parties.  You must

4    treat those facts that were just read to you as having been

5    proved now.

6    BY MS. BONTHUIS:

7    Q.   Mr. Kim, you are an insider of Franklin Wireless because

8    you are the CEO and president of Franklin Wireless?

9    A.   Although I don't know the exact meaning of the term,

10   "insider," it is true that I am the CEO and a director of

11   Franklin Wireless.

12   Q.   And you understood that at least -- as of at least the

13   year 2020, that as president and CEO at Franklin Wireless, you

14   were considered an insider under the SEC regulations; right?

15   A.   Although I don't know the exact scope of the term

16   "insider" of a company, it is absolutely true that I am the

17   CEO and a board member of Franklin Wireless.

18   Q.   Okay.  But you understood that as of at least the year

19   2020, that as president and CEO of Franklin Wireless, you are

20   considered an insider under the SEC regulations -- right? --

21   even if you don't know the meaning of the term "insider."

22   A.   I don't know what it means exactly as to the scope of the

23   term is.  What is concern is I am the leader, the CEO, and

24   director of the company.

25             MS. BONTHUIS:  Your Honor, I'd like permission to

```
 1    read from the defendant's deposition of May 4th at page 42,
 2    line 2 to 6.
 3              THE COURT:  All right.  Mr. Lobbin, please take a
 4    look and let me know your position.
 5              MR. LOBBIN:  The stipulation she just read covers
 6    the exact point so I think it's cumulative.
 7              MS. BONTHUIS:  Your Honor, this goes to his
 8    knowledge of his role as an insider in 2020.
 9              THE COURT:  Ms. Bonthuis, I don't have a copy of
10    that excerpt in my binder, do I?
11              MS. BONTHUIS:  Permission to approach?
12              THE COURT:  Yes.
13              MS. BONTHUIS:  Thank you.
14              THE COURT:  Thank you.
15              MS. BONTHUIS:  Page 42, lines 2 through 6.
16              THE COURT:  I think I might have a different
17    transcript.
18              MS. BONTHUIS:  May 4th?
19              MR. FERRI:  We have an extra one here.
20              MS. BONTHUIS:  Apologies.
21              THE COURT:  That's all right.
22              May I just hang onto this in case there's a
23    reference to this one?
24              MS. BONTHUIS:  Yes.
25              THE COURT:  Okay.  The objection is overruled.  You
```

1    can read it.

2              MR. LOBBIN:  We'll stipulate to it, Your Honor.  I

3    mean, stipulate to the fact.  The fact of the answer to the

4    call of the question in this transcript.

5              THE COURT:  Slightly different than the stipulation.

6              The objection is overruled.

7              You may read it, Ms. Bonthuis.

8              MS. BONTHUIS:  Your Honor, can we bring it up on the

9    screen for the witness to read, or you would prefer we not?

10             THE COURT:  Well, you may do that.

11             MS. BONTHUIS:  Okay.

12             THE COURT:  Just one observation, Ms. Bonthuis.

13             If you're asking the witness to read something in

14   English, he's using an interpreter and there's a risk it's

15   going to get misread so it might be easier just for you to

16   read it yourself, but if you prefer to have him read it, you

17   can do that, as well.

18             MS. BONTHUIS:  I will.

19   Q.   Now, at your deposition on May 4th, were you asked the

20   question, "You understood as of at least the year 2020, that

21   as president and CEO of Franklin Wireless, you are considered

22   an insider under the SEC regulations; right?"

23        And your answer was "Yes, I did know that."

24        Did you give that answer to that question?

25             MR. LOBBIN:  Objection.  May I ask that the witness

1    be given the transcript?

2              THE COURT:  Okay.  Okay.  So let's do that.

3              Ms. Bonthuis, I may have misunderstood your request.

4    I thought you might have been asking if he should read it.  He

5    should have it in front of him but maybe you can be the one to

6    read it.  So we'll work through this.

7              MS. BONTHUIS:  Yeah.  Yeah.

8              Do we have it up?

9    Q.   For the sake of the record, Mr. Kim, at your deposition,

10   you were asked the question, "You understood as of at least

11   the year 2020, that as president and CEO at Franklin Wireless,

12   you are considered an insider under the SEC regulations;

13   right?"

14        And your answer was:  "Yes, I did know that."

15   A.   I kept talking about the scope of the term "insider"

16   here, and I believe your counsel kept asking me about the

17   concept of the CEO and president of a company, and that's why

18   I said I was the president and the CEO of the company.

19   Q.   My question is:  Were you asked this question, and did

20   you give this answer at your deposition?

21   A.   Yes.  I think so.

22   Q.   Do you have any reason to doubt that you gave this answer

23   at your deposition?

24              THE INTERPRETER:  Interpreter interjection.

25              This particular sentence, the interpreter has to

1    clarify.  The subject of the sentence is missing.  Let me

2    clarify.

3              THE WITNESS:  What I meant by my previous answer is

4    that I believe there would be other insiders other than a

5    company's CEO and the president.  Under that context, I said I

6    was the company's president, CEO, and a director.

7              THE COURT:  All right.  Let me interject for just a

8    minute now.

9              We're all working together, doing our best,

10   including with interpretation, but Mr. Kim, I think you might

11   be getting a little ahead of us.

12             So Counsel asked you the question -- counsel asked

13   the question, did you say this, and you said, "I think so."

14             Then she asked, "Do you have any reason to doubt

15   that you said it?"

16             And then I think you answered a different question.

17             So, again, we're all doing our best, but the

18   question that she's posed to you is:  Referring you to

19   page 42, lines 2 to 6, do you have any reason to doubt that

20   you said that?

21             THE WITNESS:  No.

22             MS. BONTHUIS:  Okay.  Thank you.

23             THE COURT:  Okay.

24   BY MS. BONTHUIS:

25   Q.   You are the founder of Franklin Wireless?

```
1    A.    No.

2    Q.    But you are the president and CEO of Franklin Wireless?

3    A.    Yes.  Correct.

4    Q.    And you have been the president and CEO for 20 years?

5    A.    Yes.  Correct.

6    Q.    Okay.  And as CEO, you're the ultimate manager for all of

7    the company's operations; correct?

8    A.    Yes.  Correct.

9    Q.    How many employees does Franklin Wireless have?

10   A.    27 employees in the U.S.

11   Q.    And some of those employees report to you?

12   A.    Yes.

13   Q.    And then the rest of the employees report up to those who

14   report up to you?

15   A.    Correct.

16   Q.    And as CEO, you report to the company's board of

17   directors; correct?

18   A.    Correct.

19   Q.    And you are one of those directors, as well?

20   A.    Correct.

21   Q.    How many children do you have, Mr. Kim?

22   A.    One.

23   Q.    A daughter?

24   A.    Yes.  Correct.

25   Q.    What is your daughter's name?
```

1    A.    Rachel Kim.

2    Q.    And how old is Rachel?

3    A.    She's 33 years old.

4    Q.    Did Rachel go to college?

5    A.    Yes.

6    Q.    Where did she go to college?

7    A.    What or when?

8    Q.    Where did she go to college?

9    A.    She went to UCSD.

10   Q.    Did you pay Rachel's college tuition?

11   A.    Yes.

12   Q.    Did Rachel attend school after college?

13   A.    Yes.  She went to graduate school.

14   Q.    Pharmacy school; right?

15   A.    Yes.  Correct.

16   Q.    Did you pay Rachel's tuition in pharmacy school?

17   A.    Yes, I did.

18   Q.    How many years' tuition was that?

19   A.    Four years.

20   Q.    Do you remember how much that tuition was each year?

21   A.    I don't remember exactly how much, but at the time she

22   went to college, she was accepted by both UCSD and USD.  So

23   what was discussed was that instead of her going to private

24   school, if she goes to public school, UCSD, I will sponsor her

25   graduate school tuition.

1    Q.    Thank you.

2          When did Rachel last live at home with you and your wife?

3    A.    At the time she attended graduate school.

4    Q.    Do you remember what year or years Rachel last lived at

5    home with you?

6    A.    I'm not exactly sure, but I think it has been about

7    ten years now.

8    Q.    So you think she hasn't lived at home since 2013?

9    A.    I think approximately so, although I don't remember the

10   exact year.  Over the years, she briefly stayed with us for

11   about two to three months after she graduated from graduate

12   school and before she got a job.

13   Q.    And you think that was in 2013?

14   A.    I don't exactly remember when it was.

15   Q.    You and your wife loaned money to Rachel to purchase a

16   house in 2019; correct?

17   A.    I did not.

18   Q.    But your wife --

19   A.    My wife did.

20   Q.    Okay.  Do you and your wife live in the same house?

21   A.    Yes.

22   Q.    Do you and your wife share a bank account?

23   A.    Do I share a bank account with her?  Yes.

24   Q.    Do you and your wife own property together?

25              THE INTERPRETER:  Oh, one moment, please.

```
1              THE WITNESS:  We have a joint account, but my wife

2     has her separate bank account, as well.

3     BY MS. BONTHUIS:

4     Q.   And where do the funds in her separate bank account come

5     from?

6     A.   From the money that we earn together.

7     Q.   You own real estate with your wife; correct?

8     A.   Correct.

9     Q.   And that's your home, you own?

10    A.   Yes.

11    Q.   You also own a rental property together?

12    A.   Yes.  Yes.

13    Q.   Is your wife an authorized user of your credit cards?

14    A.   We have a joint account and a separate account, as well.

15    Q.   Let me ask the question again.  I'm not sure it was

16    translated.

17         Is your wife an authorized user of your credit cards?

18    A.   Yes to some and no to others.

19    Q.   You share investment accounts with your wife?

20    A.   No.

21    Q.   So your testimony is that your wife loaned your daughter

22    the money to buy the house.  Not you?

23    A.   That is correct.  What I'm saying is that the money was

24    loaned not in my name.

25    Q.   Was there a formal document for this loan?
```

1  A.    No.

2  Q.    Then why do you say the loan was not in your name?

3  A.    What I'm saying is that the money was not withdrawn from

4  my account.

5  Q.    It was withdrawn from her separate bank account?

6  A.    I think so.

7  Q.    And that account has the money that you earn together in

8  it?

9  A.    Correct.

10  Q.    How much was that loan?

11  A.    100,000, to my understanding.

12  Q.    Did you ever have any discussions with Rachel about the

13  terms of that loan?

14  A.    I don't know about that for sure.  I don't know.

15  Q.    Did you ever talk to Rachel or your wife about when

16  Rachel would have to pay the loan back?

17  A.    It's my understanding that she paid that back already.

18  Q.    My question is:  Did you discuss with Rachel prior to her

19  paying it back when she would have to pay it back?

20  A.    No, I did not.

21  Q.    No idea?  That's your testimony?  "No idea," you said?

22  A.    No, I did not.

23  Q.    No, you did not.  Okay.  Thank you.

24        Did you discuss with Rachel whether there would be

25  interest charged on the loan?

1    A.    No, I did not.

2    Q.    And then one year after Rachel was loaned $100,000, she

3    paid it back in full?

4    A.    I don't know the exact year, but I think that would be

5    approximately right.

6    Q.    In addition to the loan, you and your wife had given

7    Rachel gifts of money in the past?

8    A.    When are you referring to?

9    Q.    At any point in the past, have you or your wife given

10   Rachel gifts of money?

11   A.    Yes.  $15,000 was given to her in 2021.

12   Q.    Were any other gifts of money given to Rachel besides

13   that $15,000 in 2021?

14   A.    Prior to that time, while she was attending graduate

15   school.

16   Q.    And how much did you and/or your wife give to Rachel at

17   that time?

18   A.    I think some monies were given to her two to three times

19   for tuition purpose.

20   Q.    Do you know how much money was given to Rachel?

21   A.    It's my understanding within the range of --

22         Now, that could be given as a gift, as a free gift.

23   Q.    And by "free gift," you mean a gift that you don't have

24   to report to the IRS?

25   A.    Correct.

```
1    Q.   So it's your testimony that two or three times, you or
2    your wife have given Rachel gifts in the maximum amount you
3    can give without having to report it to the IRS?
4    A.   Yes.  Correct.
5         MS. BONTHUIS:  Your Honor, it's -- mindful of
6    everyone's time, it's 2:35.  Might I ask when would be a good
7    time for an afternoon break?
8         THE COURT:  In the ordinary course, we'd break in
9    about ten minutes.
10        MS. BONTHUIS:  Okay.  I'm about to start a line of
11   questioning, but that's fine.  I'll start.
12        THE COURT:  Okay.
13   BY MS. BONTHUIS:
14   Q.   After Rachel -- let me -- strike that.
15        You filed a form with the SEC in or about September 2020?
16   A.   Correct.
17   Q.   That was a Form 4?
18        That's a question.  That was a Form 4?
19   A.   Yes.
20   Q.   What is a Form 4?
21   A.   That is a form that you are required to fill out in the
22   event there is a stock trading occurs by a person on the
23   management of a company or a director of a company holding 10%
24   or more shares of the company.
25   Q.   And that form is filed with the SEC, the Securities and
```

```
 1    Exchange Commission.

 2    A.   Yes.  That is my understanding.

 3             MS. BONTHUIS:  Can you bring up

 4    Plaintiff's Exhibit 4.

 5    Q.   Mr. Kim, do you recognize this document?

 6    A.   Yes.

 7    Q.   Was this document shown to you at your deposition?

 8    A.   Yes.

 9             MS. BONTHUIS:  Your Honor, I'd like to move

10    Plaintiff's Exhibit 4 into evidence.

11             THE COURT:  Any objection?

12             MR. LOBBIN:  No objection.

13             THE COURT:  Four is received.

14             (Exhibit 4 received into evidence.)

15             MS. BONTHUIS:  May we publish to the jury?

16             THE COURT:  Yes.

17             MS. BONTHUIS:  Thank you.

18    Q.   Now, can we look at the name on the bottom?

19         Mr. Kim, is this your name typed at the bottom?

20    A.   Yes, it is.

21    Q.   And does that represent your signature?

22    A.   Yes.

23    Q.   Do you see the statement that is in the double asterisk

24    at the bottom?

25    A.   I do.
```

```
1    Q.   Can you read that statement behind the double asterisk,

2    please, into the record.

3    A.   "Intentional misstatements or omissions of facts

4    constitute federal criminal violations."

5    Q.   At the time you signed this form, you understood that an

6    intentional misstatement of fact is a federal criminal

7    violation?

8    A.   I did not read this bottom statements.

9    Q.   Do you understand now that an intentional misstatement of

10   fact is a federal crime?

11   A.   Yes.

12   Q.   Were you careful in how you filled out this form?

13   A.   I don't quite understand what you're asking me.

14   Q.   Did you take care in how you filled out this form?

15   A.   Yes, I did.  On my common sense level.

16   Q.   But you didn't read the note at the bottom of the form?

17   A.   Correct.

18   Q.   Did you read the instructions on how to fill out this

19   form?

20   A.   No, I did not read --

21   Q.   Then how did you know how to fill out this form?

22   A.   I believed that I could fill out these items in general.

23   Q.   How did you know you had to fill this form out?

24   A.   You mean this Form 4?

25   Q.   Yes.
```

```
 1                MR. LOBBIN:  Objection.  Misstates testimony, "had
 2       to fill this form out."
 3                Assumes facts not in evidence.
 4                THE COURT:  Sustained.
 5       BY MS. BONTHUIS:
 6       Q.   Mr. Kim, why did you believe you had to fill out this
 7       form?
 8       A.   Why --
 9       Q.   -- did you believe you had to fill out this form?
10       A.   That I had to fill out this form?  Are you asking me why
11       I thought I had to fill out this form?
12       Q.   Yes.  Why did you think you had to fill out and file a
13       Form 4?
14       A.   Like I mentioned before, it was my understanding that
15       anybody who was on the management or a director of a company,
16       having 10% or more of shares of the company, having stock
17       trading, has to fill out Form 4.  And because my daughter
18       owned these shares, so I filled out this form and filed it on
19       behalf of my daughter, because my daughter owned the shares.
20       I filed this for my daughter.
21                THE COURT:  Ms. Bonthuis, I know you have more on
22       this.
23                MS. BONTHUIS:  Yes.
24                THE COURT:  Is this a good place to stop?
25                MS. BONTHUIS:  This is.  Yes.
```

```
1              THE COURT:  Members of the jury, it's a quarter
2      till.  Let's take a 15-minute break.  Please be back at
3      3:00 o'clock.  That clock on the wall, it's a couple minutes
4      fast compared to the cell phone clock.  So I have a quarter
5      till.  Please be back in 15 minutes or -- we'll come and get
6      you, rather, in 15 minutes.
7              Thank you.
8              (Jury out at 2:47 p.m.)
9              THE COURT:  Okay.  The jury has left the courtroom.
10             Anything before we take a break?
11             MR. LOBBIN:  We're missing a lawyer again, but no,
12     nothing from us.
13             THE COURT:  Okay.  Anything, Mr. Small?
14             MR. SMALL:  No.  Nothing from us.
15             THE COURT:  Okay.
16             (Recess taken 2:47 p.m. - 3:01 p.m.)
17             MS. BONTHUIS:  Your Honor, before the jury comes in,
18     we filed our amended request for judicial notice of stock
19     price.  It's a narrower time period.  We would like to use
20     these demonstratives that reflect the stock price during that
21     period with Mr. Kim and with Ms. Kim tomorrow.
22             I would note that we filed the original judicial
23     notice, which had a greater period, but it was filed ten days
24     ago.  Defendants have had that time to check whether or not we
25     accurately printed the Yahoo stock price.  But we would like
```

```
1    that request for judicial notice ruled on, if possible, before

2    Mr. Kim continues his testimony.

3              THE COURT:  All right.  We'll discuss it at 4:30.

4              MS. BONTHUIS:  Okay.  We were going to use it --

5              Okay.  So I can't use it with his testimony until --

6    his upcoming testimony.

7              THE COURT:  I thought you just said you wanted a

8    ruling tonight --

9              MS. BONTHUIS:  Today.  I'm sorry.

10             THE COURT:  -- because you were going to use it

11   tomorrow.

12             MS. BONTHUIS:  No.  We would like to review the

13   stock price with him today when he gets back up on the stand

14   or we would like to have the option of it.

15             THE COURT:  Well, we don't have time to hear this

16   right now.

17             MS. BONTHUIS:  Okay.  Okay.

18             THE COURT:  So I understood you to say just now that

19   you wanted to go through it tomorrow, and maybe I misheard.  I

20   think earlier today you said you wanted a ruling tonight so

21   you could go through it tomorrow.  So we need to take it up at

22   4:30.

23             MS. BONTHUIS:  Okay.  I didn't recall that that was

24   what I said, but we can take it up at 4:30.

25             THE COURT:  Okay.
```

```
1                    (Jury present at 3:05 p.m. )
2              THE COURT:  All right.  Members of the jury, welcome
3     back.  I can't remember if I told you this earlier today, but
4     we typically go to 4:30.  So no later than 4:30.
5              We have Mr. Kim on the stand, and Ms. Bonthuis is
6     continuing with her examination.
7              MS. BONTHUIS:  If we could bring back up
8     Plaintiff's Exhibit 4 for everyone --
9     Q.    Mr. Kim, do you see this first line in the table 1 where
10    the number one million -- if it will let me use this -- where
11    the number 1,596,695 is written?
12    A.    Yes.
13    Q.    Is that the number of Franklin Wireless shares that you
14    owned at the time you filed this Form 4?
15    A.    Correct.
16    Q.    And next to that, you put a (D) for "direct ownership"?
17    A.    Yes.  That means that I am owning these shares.
18              MS. BONTHUIS:  Loraine, it's not letting me --
19              THE CLERK:  Okay.
20              MS. BONTHUIS:  Thank you.
21    Q.    Now, this transaction in the second line here, is this
22    the transaction involving your daughter and Misun Kim?
23    A.    That's correct.
24    Q.    Now, in column 5 here, we have the amount of securities.
25    It's 160,000.
```

1    That means 160,000 shares were acquired by Rachel Kim in

2    this transaction?

3    A.   Yes.  Correct.

4    Q.   And then the price here is $2.50 a share; correct?

5    A.   Yes.  Correct.

6    Q.   And then here under "Amount," you entered 400,000.

7         Does that mean $400,000?

8    A.   Yes.  It means $400,000, and that was my understanding at

9    the time of filling out this form.

10   Q.   Do you have a different understanding now?

11   A.   My understanding now is that it is 400,000 shares.

12   Q.   So your understanding is that what was requested here --

13   an amount -- was not the dollar amount but the amount of

14   shares?

15   A.   I understand that I had --

16        In 2020 when I was filling out this form, I thought the

17   amount was $400,000.  That's why this figure was put in here

18   as that.  And now it's my understanding that I made a mistake

19   at the time of filing this form, and it is 400,000 shares.

20            THE INTERPRETER:  Interpreter's interjection.

21            The witness said 160,000, and the Interpreter wants

22   to clarify whether it's dollars or shares.  It was not

23   clarified.

24            THE WITNESS:  I'll start over.

25            In 2020, it was my understanding that the amount was

1    $400,000.

2          Now I realize that I made I mistake then.  It was 400,000

3    shares.

4    BY MS. BONTHUIS:

5    Q.   Mr. Kim, were you meaning to report here or do you

6    understand now -- strike that.

7          Were there an additional 400,000 shares involved in this

8    transaction?

9    A.   No.   That's not what I'm saying.

10         What I'm saying now is that upon reviewing this Form 4

11   and what was put in this form now, I can realize that I had a

12   misunderstanding back then in 2020 and made a mistake of

13   putting in 400,000 under the amount, which would refer to

14   $400,000.  That was a mistake.  And my collection of knowledge

15   tells me that it should have been 400,000 shares, not

16   $400,000.  And by paying $1 million, my daughter purchased

17   160,000 shares, and that was what was remaining.

18   Q.   So your testimony is that your daughter purchased 160,000

19   shares by paying $1 million?

20   A.   Reading this form now, this would represent that

21   $1 million was paid to purchase 400,000 shares, and there's

22   160 shares [sic] remaining.  That's how you should read this

23   form correctly.

24   Q.   Okay.  Is that what happened?

25   A.   That's how I read this form now.  This form indicates

| | |
|---|---|
| 1 | that $400,000 was paid to purchase 160,000 shares at $2.50 per |
| 2 | share, but a $400,000 amount was never paid. |
| 3 | MS. BONTHUIS:  Move to strike that last portion as |
| 4 | unresponsive to the question. |
| 5 | THE COURT:  Overruled.  Motion denied. |
| 6 | BY MS. BONTHUIS: |
| 7 | Q.  Do you see column 6 which asks for ownership form, direct |
| 8 | or indirect? |
| 9 | A.  Yes. |
| 10 | Q.  Did you write (I) for indirect ownership here? |
| 11 | A.  I chose to put (I) under this column in 2020, because |
| 12 | what I assumed was, at that time, that since my daughter owned |
| 13 | 160,000 shares, that's -- and not me.  I did not own those |
| 14 | shares.  That's why I put (I). |
| 15 | And the above figure, which is 1,596,695, is what I |
| 16 | owned.  However, the second line, I chose to put an (I), |
| 17 | because these were the number of shares owned by my daughter. |
| 18 | Q.  Did you understand at the time that you entered that (I), |
| 19 | that you were stating that you were an indirect owner of those |
| 20 | shares? |
| 21 | A.  Can I have one more time, the Korean translation will be |
| 22 | repeated? |
| 23 | I did not understand the term "beneficiary owned."  This |
| 24 | is the term I'm still rather confused about.  It is my current |
| 25 | understanding that the letter (I) refers to indirectly owned |

```
 1    by my child.
 2    BY MS. BONTHUIS:
 3    Q.    So you thought --
 4          Well, let me ask my question again.
 5          You are the one whose name is on this form; correct?
 6    A.    It is true that I filed my daughter's -- for my daughter.
 7              MS. BONTHUIS:  Scroll up, Eric, would you.  Up to
 8    the top.
 9    Q.    Is your daughter's name on this form?
10    A.    It was my knowledge and common sense that when it comes
11    to the reporting obligation, that in the event of there is a
12    change of my number of shares or that of my family, you are to
13    report as to that within five days.  Therefore, I filed this
14    form because there was a change of shares of my daughter at
15    the time.
16              MS. BONTHUIS:  Your Honor, move to strike that as
17    nonresponsive to the question.
18              THE COURT:  All right.  That motion to strike is
19    granted.
20              So I'm going to ask the jury -- direct the jury to
21    disregard the witness's answer on this question.  The question
22    was:  Is your daughter's name on the form?
23              You may ask your next question.
24    BY MS. BONTHUIS:
25    Q.    I'm going to ask the same question, Mr. Kim.
```

1        Is your daughter's name on this form?

2    A.    No, it is not.

3    Q.    It's your name that is entered as the reporting person;

4    correct?

5    A.    That's right.

6    Q.    Did you understand that to mean that you were reporting

7    on securities for yourself?

8    A.    Yes, I did.

9            MS. BONTHUIS:  Eric, can you scroll back down.

10   Q.    So when you wrote the letter (I) under the ownership

11   form, were you stating that you were the indirect owner?

12   A.    No.  My understanding was that I represent -- indirectly

13   owned by my child.

14   Q.    Your daughter didn't indirectly own these shares, though,

15   did she?

16   A.    That's why I stated earlier that I made a mistake in

17   filing this form, as to the second line.

18   Q.    My question is:  Did your daughter indirectly own these

19   shares, or did she directly own these shares?

20   A.    When I chose to put (I) on this form, what I meant to say

21   was that it was owned by my child.

22   Q.    My question is:  Is your daughter an indirect owner or a

23   direct owner of these shares?

24           MR. LOBBIN:  Objection.  Vague.  Argumentative.

25   Asked and answered.

```
 1                 THE COURT:  Counsel, can you specify what time
 2       period you're talking about?  So as of --
 3                 Your question is:  Is Mr. Kim's daughter a direct or
 4       indirect owner of shares?  What time frame do you have in
 5       mind?  At present or September 25th or some other date?
 6                 MS. BONTHUIS:  September 25th.  Mr. Kim is stating
 7       that his daughter -- he has stated she owned the shares, but
 8       he is also stating he put indirect --
 9                 MR. LOBBIN:  Object to the testimony from the
10       podium.
11                 THE COURT:  Hang on.
12                 So the objection as to vague is sustained.
13                 Counsel, ask your next question.
14       BY MS. BONTHUIS:
15       Q.   Did your daughter, at the time of this form, directly own
16       these shares or indirectly own these shares?
17                 MR. LOBBIN:  Same objection.
18                 THE COURT:  So, "at the time of this form," you mean
19       September 25th or September 29, 2020?
20                 MS. BONTHUIS:  September 2020.
21                 THE COURT:  Can you please ask the question one more
22       time?
23       BY MS. BONTHUIS:
24       Q.   At the time you completed this form on September 29,
25       2020, did your daughter directly own these shares, or did she
```

1   indirectly own these shares?

2   A.   She directly owned these shares.  That's what I think.

3   Q.   So the (I) for "indirect ownership" here that you entered

4   on September 29th, that was not indicating how your daughter

5   owned the shares?  It was indicating how you owned the shares;

6   correct?

7           MR. LOBBIN:  Objection.  Asked and answered, vague,

8   argumentative, and overbroad, Your Honor.

9           THE COURT:  Objection sustained.

10          So, Ms. Bonthuis, maybe you can rephrase.  It's not

11  clear whether you're asking what his intent was -- I think

12  he's covered his intent -- or whether you're asking him what

13  looking at this form now he now thinks the form should be

14  interpreted to mean.

15  BY MS. BONTHUIS:

16  Q.   Did you intend at the time you completed this form to

17  enter the letter (I) and represent that you were an indirect

18  owner?

19          MR. LOBBIN:  Same objections.

20          THE COURT:  Overruled.

21  BY MS. BONTHUIS:

22  Q.   But you did enter that (I) there; correct?

23  A.   Yes.  Correct.

24          MS. BONTHUIS:  Eric, could you scroll down.

25  Q.   Do you see this section here, "Explanation of Responses"?

1    A.    Yes.

2    Q.    Did you consider putting that explanation as to what you

3    were attempting to indicate there here on the form when you

4    filed it on September 29, 2020?

5    A.    There are two tables on this page.  There's the upper

6    table and bottom table.  The bottom table, as I understand, is

7    what is used at the time of filing stock options.  So I did

8    not look at the bottom portion.

9    Q.    Mr. Kim, is it your testimony that you made mistakes in

10   filling out this form?

11   A.    What time are you talking about?

12   Q.    Is it your position, Mr. Kim, that it was a mistake for

13   you to file this form in the first place?

14   A.    There was the time period of 2020 versus now, at the time

15   of deposition, two different time frames; right?

16   Q.    My question is:  Is it your position here today that it

17   was a mistake for you to file this Form 4?

18   A.    Yes.

19   Q.    Is it your position here today that information on this

20   Form 4 is incorrect?

21   A.    Yes.  That is my position.  I'm saying that line 2 is

22   inaccurate.

23   Q.    What portions of -- excuse me -- of line 2 are

24   inaccurate?

25   A.    This number of shares, 160,000 shares.  These are not my

| | |
|---|---|
| 1 | shares.  And, also -- and because of the fact that my daughter |
| 2 | and my sister do not have any obligation to file this, this |
| 3 | was an incomplete transaction, meaning that this was not a |
| 4 | transaction that any amount of money was paid.  So based on |
| 5 | what I just said, it's my position that the second line, the |
| 6 | entire line should be left empty. |
| 7 | Q.   Have you filed an amendment of this Form 4 with the SEC |
| 8 | to correct that mistake? |
| 9 | A.   I consulted about this with an SEC lawyer.  But the |
| 10 | lawyer told me that it was not possible just to remove the |
| 11 | line 2 only. |
| 12 | Q.   Did the lawyer tell you whether or not you could file an |
| 13 | amendment to the Form 4? |
| 14 | A.   Can you ask me the question again, please? |
| 15 | MS. BONTHUIS:  Madam Court Reporter, the realtime |
| 16 | has stopped working.  Is it possible for you to read that |
| 17 | question back? |
| 18 | (Record read as follows: |
| 19 | "Q:  Did the lawyer tell you whether or not you |
| 20 | could file an amendment to the Form 4?") |
| 21 | THE WITNESS:  The amendment would be to delete the |
| 22 | line 2, but the lawyer said it was impossible to remove that |
| 23 | line only. |
| 24 | BY MS. BONTHUIS: |
| 25 | Q.   Did the lawyer tell you whether you could file an |

1  amendment at all?  Not whether as to delete this, but to just

2  file an amendment?

3  A.   This form contains a mistake, an error.  So to file an

4  amendment, this mistake line has to be gotten rid of, and I

5  understand that was not possible.

6          MS. BONTHUIS:  Can you take that down, Eric.

7          We have a new exhibit we'd like it introduce, if you

8  could bring up Plaintiff's Exhibit 6.

9  Q.   Mr. Kim, do you recognize this exhibit?

10 A.   Yes.

11 Q.   Were you shown this exhibit at your deposition?

12 A.   Yes.

13         MS. BONTHUIS:  Your Honor, I'd like to move

14 Plaintiff's Exhibit 6 into evidence.

15         MR. LOBBIN:  No objection.

16         THE COURT:  Exhibit 6 is received.

17         (Exhibit 6 received into evidence.)

18 BY MS. BONTHUIS:

19 Q.   Mr. Kim, do you understand that these are the

20 instructions for completing a Form 4?

21 A.   Yes, I do.

22         MS. BONTHUIS:  Could you go to paragraph 9.

23 Q.   Do you see the section titled "Amendments"?

24 A.   Yes.

25 Q.   Do you understand now from this section that it is

1    possible to file an amendment to a Form 4?

2    A.    Without reading all the details of this section, I would

3    not know exactly what this talks about, but I understand that

4    an amendment can be filed when there is a mistake made with a

5    certain price or figure inserted into the form.  But it is --

6    my understanding, according to what I heard from the lawyer,

7    that when a given transaction is entirely a mistake in terms

8    of what was inputted into the form, an amendment cannot be

9    made to undo that.

10   Q.    Could you file an amendment that explained that it was a

11   mistake?

12   A.    According to what a SEC lawyer told me, to remove the

13   entire line two, then as a result of doing so, only mine would

14   remain which means that there is no further obligation to file

15   this form.  So that will be impossible.  That's what the

16   lawyer told me.

17   Q.    So you don't believe you have an obligation to correct

18   the Form 4 that is filed with the SEC?

19   A.    I did speak about this to the SEC lawyer.

20   Q.    Yes.  My question is:  Do you believe you have an

21   obligation to correct this mistake?

22   A.    Yes, I do, but I was told that a correction could not be

23   made.

24   Q.    Mr. Kim, was this the first Form 4 you had ever filed

25   with the SEC?

```
1    A.   Yes.  Correct.
2              MS. BONTHUIS:  Could you bring up
3    Plaintiff's Exhibit 17, please.
4    Q.   Mr. Kim, do you recognize this exhibit?
5    A.   Yes.
6    Q.   Was this exhibit shown to you at your deposition?
7    A.   Yes.
8              MS. BONTHUIS:  Your Honor, I'd like to move
9    Plaintiff's Exhibit 17 into evidence.
10             THE COURT:  Mr. Lobbin?
11             MR. LOBBIN:   I'll object that it's hearsay.
12             MS. BONTHUIS:  It's a statement by a party
13   opponent.
14             THE COURT:  Well, Ms. Bonthuis, I think you need to
15   lay a foundation for this.
16             MS. BONTHUIS:  Okay.
17             THE COURT:  If you establish it was shown to him at
18   his deposition.  That's all.
19             MS. BONTHUIS:  Eric, if you could blow up the bottom
20   part, the signature --
21   Q.   Mr. Kim, is this your name in the signature line of this
22   document?
23   A.   Yes.  Correct.
24   Q.   And is this a document --
25             MS. BONTHUIS:  If you could scroll up to the top,
```

```
 1    Eric --
 2    Q.   Was this a document that you filed as a reporting person
 3    with the SEC?
 4    A.   Yes, it is.
 5             MS. BONTHUIS:  Your Honor, I move for its
 6    admission.
 7             THE COURT:  Mr. Lobbin?
 8             MR. LOBBIN:  No objection.
 9             THE COURT:  Exhibit 17 is received.
10             (Exhibit 17 received into evidence.)
11    BY MS. BONTHUIS:
12    Q.   Mr. Kim, is this a Form 4 that you previously filed?
13    A.   I did not file this myself.  It is the correct form, but
14    I did not file this personally.
15    Q.   Well, you signed this form; correct?
16    A.   Yes, I did.
17    Q.   You reviewed the information on this form; correct?
18    A.   Stock option document is filed by a different employee of
19    the company.
20    Q.   My question is:  Did you review the information on this
21    before it was filed in your name?
22    A.   I did not review it.
23    Q.   But that's your signature on the bottom; correct?
24    A.   Yes, it is.
25    Q.   But it's your position you didn't file this because you
```

1    are not the person who physically filed it?

2    A.    When it comes to stock option document filing, there are

3    many people who handle that, and I don't go item by item

4    myself.  In other words, when there's an approval made by the

5    board of directors, then it would be the company's operations

6    side that handles it and check the information in the forms

7    and so forth.  And this is what I answered at the time of my

8    deposition, as well.

9    Q.    My question is:  Are you saying --

10         Strike that.  I'll withdraw.

11         Do you see here under box 4, it says "If amendment, date

12   of original filed"?

13   A.    Yes.

14   Q.    So do you understand that this was amending a Form 4 that

15   had previously been filed?

16   A.    Yes.

17         MS. BONTHUIS:  Eric, could you pull Exhibit 4 back

18   up?  And scroll down to column 4 in table 1.  Bring it up.

19         Thank you.

20   Q.    Do you see in column 4, it states "securities acquired,

21   (A), or disposed of, (D)"?

22   A.    Yes.

23   Q.    Did you enter the letter (A) there?

24   A.    Yes, I did.

25   Q.    Is that because these were securities that were acquired?

1    A.   At the time -- this was in 2020 -- the only options that

2    I was to either enter (A) or (D), but this was the closest

3    code that I could select to input.  That's because I could not

4    find the exact code that represents a transaction with no

5    money payment.  So I had to choose between (A) and (D) at the

6    time.

7    Q.   You said you could not find the exact code.

8         Where did you look for the code?

9    A.   It's in the box, box 4.

10   Q.   Do you see where box 4 refers to Instruction 3, 4, and 5?

11   A.   I did not see that part at the time.

12   Q.   You did not see that at the time when you were filling

13   this out?

14   A.   I just saw (A) and (D).  And I also saw the column below

15   where it says (A) or (D).

16   Q.   So your testimony is that you saw the words "securities

17   acquired," (A), or "disposed of," (D), but you did not see the

18   words immediately following in that parentheses?

19   A.   That is correct.  And of (A) and (D), I chose the closest

20   one of the two.

21   Q.   Do you see 3, transaction code?

22   A.   Yes.

23   Q.   How did you know to enter the letter (P)?

24   A.   In column 4, box 4, I had an option of either (A) or (D).

25   There were no code selection options in box 3.  So I looked at

1    the Instruction No. 8 for this.

2    Q.   So is it your testimony that you did look at the

3    instructions?

4    A.   I just saw the part where it indicated the code.

5    Q.   So you looked at the instructions for this box, 3, but

6    not for box 4?

7    A.   Yes.  I only saw the relevant portion of it.

8    Q.   Mr. Kim, did you previously testify that you did not look

9    at the instructions?

10   A.   I did not read the entire instruction.  I just looked to

11   find the relevant code in the instruction.

12           MS. BONTHUIS:  Okay.  Let's pull up those again.

13   That's Plaintiff's Exhibit 6.

14       If you can go to Section 8 and scroll back out --

15   Q.   Is this the instruction that you read, Mr. Kim, when you

16   filled out that box?

17   A.   Yes.  Correct.

18   Q.   And so you entered a (P) because the instructions stated

19   that that was an open market or private purchase of

20   nonderivative or derivative security?

21   A.   Correct.

22           MS. BONTHUIS:  Eric, you can take that down.

23   Q.   Have you previously described this transaction as "a

24   share purchase by my daughter"?

25           MR. LOBBIN:  Objection.  Vague.

1              It's unclear to what she's referring.

2              THE COURT:  Ms. Bonthuis, you're referring to

3    Mr. Kim's daughter; correct?

4              MS. BONTHUIS:  Yes.

5              THE COURT:  Overruled.

6              THE WITNESS:  When I earlier stated that there was a

7    share transaction, not share acquisition, I think I should

8    speak as to this separately, between 2020 versus now.

9    BY MS. BONTHUIS:

10   Q.   Okay.  My question is:  Have you described at any point

11   in time this transaction as "a share purchase by my daughter"?

12             MR. LOBBIN:  Objection.  Vague as to any point in

13   time.  What is she referring to?  It's vague.

14             THE COURT:  Overruled.

15             THE WITNESS:  I did mention purchase and

16   transaction, but there was no money exchanged.

17             MS. BONTHUIS:  Move to strike the last portion.

18             THE COURT:  Motion denied.

19             THE WITNESS:  I did know back in 2020 when this was

20   filed that my daughter did not give money to my sister.  So

21   (P) and (S) were the only two options that I could select

22   from.  Likewise, there are only (A) and (D) options that I

23   could select from.  In other words, I could not select the

24   exact code that would refer to this particular transaction.

25   That's why I chose the closest codes, (P) and (A).

1          So at the time of saying "purchase" or a

2     "transaction," I thought this was an insufficient transaction.

3          MS. BONTHUIS:  Your Honor, move to strike that

4     answer as not responsive to the question.

5          The question is simply:  Have you described at any

6     point in time this transaction as "a share purchase by my

7     daughter"?

8          THE COURT:  Motion's granted.

9          So, members of the jury, the last portion of the

10    witness's answer, since I said, "motion denied," you're to

11    disregard that.

12    BY MS. BONTHUIS:

13    Q.   So I'm going to ask the question again, Mr. Kim.

14         Did you submit a sworn statement in this litigation in

15    which you described this transaction as "a share purchase by

16    my daughter"?

17    A.   Yes, I did.

18    Q.   Did you submit a sworn declaration in this litigation in

19    which you stated, "I asked Rachel if she was interested in

20    purchasing the shares"?

21    A.   Yes.  I signed on a document which referred to such a

22    statement that I signed, which was drafted by my lawyer.

23    Q.   Did you review that statement before you signed it?

24    A.   Yes, I did.

25    Q.   Was that statement true and accurate?

1    A.    The way I understood the document to state was that the

2    transaction itself, as described, when it mentioned "purchase"

3    I thought it was an insufficient transaction.  And there was a

4    term, "contingency" mentioned in the document.  That's what I

5    signed it.

6              MS. BONTHUIS:  Okay.  Move to strike as

7    nonresponsive.

8              THE COURT:  Overruled.  Motion denied.

9    BY MS. BONTHUIS:

10   Q.    In December 2020, you sold some of the Franklin Wireless

11   shares that you owned; correct?

12   A.    Yes.  I sold partially.

13             MS. BONTHUIS:  Your Honor, I'd like to read the

14   second stipulation into the record.

15             THE COURT:  All right.  You may do so.

16             MS. BONTHUIS:  "On December 31, 2020, OC Kim sold

17   500,000 shares of Franklin Wireless stock to an investor at a

18   price of $15 per share.  This transaction was a sale for

19   purposes of § 16(b)."

20             THE COURT:  Members of the jury, what you just heard

21   Counsel read was a stipulation between the parties.  You're to

22   accept that as having been proved.

23             MS. BONTHUIS:  Can we bring up

24   Plaintiff's Exhibit 10.  This is a new exhibit.

25   Q.    Mr. Kim, do you recognize this exhibit?

1    A.   Yes.

2    Q.   Could you describe this exhibit?

3    A.   I understand this document to state that on December 31st

4    of 2020, I sold 500,000 shares at $15 per share, and there are

5    1 million shares remaining.

6              MS. BONTHUIS:  Your Honor, I'd like to move

7    Plaintiff's Exhibit 10 into evidence.

8              THE COURT:  Any objection?

9              MR. LOBBIN:  No objection.

10             THE COURT:  10 is received.

11             (Exhibit 10 received into evidence.)

12             MS. BONTHUIS:  May we publish?

13             THE COURT:  Yes.

14             MS. BONTHUIS:  Thank you.  Eric, if you could just

15   scroll down and blow up the bottom --

16   Q.   Is this your signature, Mr. Kim, at the bottom?

17   A.   Yes, it is.

18   Q.   Are there any inaccurate statements on this Form 4?

19   A.   No.

20   Q.   You sold 500,000 at a price of $15 a share.  So how much

21   did you receive in total for these shares?

22   A.   $7.5 million.

23   Q.   And at this time, your daughter Rachel owned the 160,000

24   shares that we were looking at before?

25   A.   Those shares were in my daughter's name, but the actual

```
1    owner of those shares was my sister.

2    Q.   Mr. Kim, I'm going to read a question and answer that you

3    were asked a few minutes ago.

4         The question was:  "Did your daughter indirectly own

5    these shares or did she directly own these shares?"

6         Your answer:  "When I chose to put the (I) on this form,

7    what I meant to say was that it was owned by my child."

8    A.   Yes.

9    Q.   Was that your testimony?

10   A.   Correct.

11   Q.   Is your testimony now that your daughter did not own the

12   shares?  They were owned by your sister?

13   A.   In September 2020, that's how I filed the form.

14        After the litigation was filed and in my declaration in

15   September 2021, I understood that there was no money

16   transaction with respect to those shares and all terms and

17   conditions were on a contingent basis.  So that's why I think

18   that the actual owner of the shares is my sister.

19   Q.   So your prior -- strike that.

20        And that's the understanding you came to after this

21   litigation was filed?

22   A.   Yes.

23   Q.   Who bought the 500,000 shares you sold on December 31st?

24   A.   AIGH Group did.

25   Q.   And let me just back up a second.
```

```
1          You said after the litigation was filed, your
2     understanding of who owned the shares changed, but at the time
3     you sold the 500,000 shares, you believed your daughter owned
4     those 160,000 shares; correct?
5               MR. LOBBIN:  Objection.  Asked and answered.
6     Misstates the record.
7               THE COURT:  The objection is sustained.
8               Counsel, can you rephrase without characterizing the
9     prior testimony in that manner?
10    BY MS. BONTHUIS:
11    Q.   Okay.  You testified that you came to the understanding
12    that the shares were owned by Misun Kim after this litigation
13    was filed; correct?
14    A.   Yes.  That was my understanding.
15    Q.   Prior to this litigation, did you believe that your
16    daughter owned the shares?
17    A.   I did know that there was no money payment made.  So I
18    did not think any special thoughts.  People were assuming like
19    that.  And after the litigation was filed and after I obtained
20    further information and I then could become more accurate in
21    my understanding that these shares were not owned by my
22    daughter but by my sister then.
23              MS. BONTHUIS:  Your Honor, move to strike that as
24    nonresponsive to the question.
25              THE COURT:  Denied.
```

1    BY MS. BONTHUIS:

2    Q.   Did you believe prior to the litigation --

3         Let me back up.

4         Did you believe in September 2020, when you filed that

5    Form 4, that your daughter owned the shares?

6    A.   It is true that there was a title change.

7    Q.   My question is not whether there was a title change.  My

8    question is:  Did you believe in September 2020, when you

9    filed that Form 4, that your daughter owned the shares?  Yes

10   or no.

11             MR. LOBBIN:  Objection.  Asked and answered.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes.

14   BY MS. BONTHUIS:

15   Q.   Did you believe on December 31, 2020, when you sold

16   500,000 shares, that your daughter owned the shares?

17             MR. LOBBIN:  Objection.  Vague as to "shares."

18             THE COURT:  Overruled.

19             THE WITNESS:  Because there was insufficient

20   transaction and starting from the beginning, I did not think

21   that those shares were owned by my daughter 100%; however, I

22   thought title change was ownership change.  Therefore, at the

23   end of 2020, my daughter's name was in there.  Those were in

24   my daughter's name.  That's why I assumed it.

25   ///

1    BY MS. BONTHUIS:

2    Q.   Did you understand that your daughter owned the shares on

3    December 31, 2020, the 160,000 shares?

4    A.   How could she own those shares when she did not pay any

5    money for them?

6    Q.   My question is not that.  My question is:  Did you

7    understand your daughter owned the shares on December 31,

8    2020?

9    A.   (In English:)  Assumed.  Assumed.

10   Q.   You assumed she owned them on December 31st?

11   A.   I did not have any exact knowledge as to whether my

12   daughter had ownership to those shares and whether that

13   particular transaction was properly carried out.  So I assumed

14   that my daughter had the ownership.  I guessed.

15   Q.   Thank you.

16        And the price attached to those shares and that ownership

17   was $2.50 a share?

18   A.   You mean at the time of 2020 or thereafter?

19   Q.   At the time the 160,000 shares became owned by your

20   daughter, the price attached to them was $2.50.

21   A.   You mean at the time of filing or anytime after that?

22   Q.   At the time you sold your shares for $15 a share, you

23   knew that your daughter or you assumed your daughter owned

24   160,000 shares.

25        Did you know the price of $2.50 was attached to those

1   shares?

2   A.   Are you talking about shares of 500,000 shares that

3   include 160,000 shares, or are you referring to 160,000 shares

4   as separately?  As to those 160,000 shares, I assumed that

5   there was -- that that was insufficient transaction.

6        So my question to you is:  That when you say 160,000

7   shares at the price of $2.50, are you meaning to ask that

8   question, 160,000 to be included in the 500,000 shares or

9   separate?

10  Q.   No.

11  A.   Then the price of $2.50 per share, those shares were what

12  were filed in September 2020.  That was what was filed by me

13  for my daughter.  And the sale of 500,000 shares, those were

14  the shares that I owned.

15  Q.   Yes.  My question is:  At the time that you sold those

16  500,000 shares for $15 a share, you knew your daughter or you

17  assumed your daughter owned 160,000 shares.

18       Did you know at the time you sold your shares for $15 a

19  share that your daughter owned these 160,000 shares and that

20  the price of those shares was $2.50?

21  A.   That was what was recorded in 2020.  Yes.

22  Q.   So you knew that price, $2.50, was attached to the shares

23  that -- the 160,000 shares that you assumed she owned?

24  A.   Are you saying that I attached that price on the document

25  that I filed?

1   Q.   No.  I am asking what was in your head as of December 31,

2   2020, when you sold 500,000 shares for $15 a share -- $15 a

3   share.

4        You knew at that time your daughter owned 160,000 shares.

5   Did you know that the price of those shares was $2.50 a share?

6   A.   Yes.

7   Q.   Thank you.

8        I believe you testified the 500,000 shares that you sold

9   were purchased by AIGH Capital?

10  A.   Yes.

11  Q.   What is AIGH Capital?

12  A.   That is an investment company, as I understand.

13  Q.   And by an investment company, they invest in different

14  types of companies?

15  A.   That, I don't know for sure.

16  Q.   You don't know whether or not AIGH Capital buys stock in

17  different companies?

18  A.   Correct.

19  Q.   "Correct," you know that they do buy stock, or "correct,"

20  you don't know either way?

21  A.   I don't know either way.  I don't know exactly about the

22  company.

23  Q.   Well, you described them as an investment company.

24       What did you mean by that?

25  A.   I assume that it was an investment company, because that

```
 1   company purchased my stocks.
 2   Q.   Do you remember when you were first introduced to AIGH?
 3   A.   It was in August of 2020.
 4             MS. BONTHUIS:  Could you bring up
 5   Plaintiff's Exhibit 34.
 6   Q.   Mr. Kim, do you recognize this document?
 7   A.   Yes.
 8   Q.   Could you describe this document?
 9   A.   This was an e-mail sent by Paul Packer to me to introduce
10   a company called AIGH.
11             MS. BONTHUIS:  Your Honor, I'd like to move for
12   Plaintiff's Exhibit 34 to be moved into evidence.
13             MR. LOBBIN:  Objection.  This includes hearsay,
14   Your Honor.
15             MS. BONTHUIS:  Your Honor, we're offering it not for
16   the contents but for the date.  Also, I would note that
17   portions of it are written by the defendant himself.
18             THE COURT:  Well, Ms. Bonthuis, are you offering the
19   entirety of the document?  It looks like we have six e-mails
20   on this chain.
21             MS. BONTHUIS:  We will offer -- we would like to
22   offer into evidence the middle e-mail on the first page that
23   is written by Mr. Kim.
24             THE COURT:  Okay. Just that e-mail?
25             MS. BONTHUIS:  Just that e-mail.  Yes.
```

```
1              THE COURT:  Mr. Lobbin, any objection?
2              MR. LOBBIN:  Lacks foundation.  Objection.
3              THE COURT:  Well, can you lay a foundation just for
4     this e-mail?
5              MS. BONTHUIS:  Sure.
6     Q.   Mr. Kim, is this an e-mail that you wrote?  The middle
7     one.
8     A.   Yes, it is.
9              MS. BONTHUIS:  Okay.  Move for admission.
10             THE COURT:  Mr. Lobbin?
11             MR. LOBBIN:  No objection.
12             MS. BONTHUIS:  Okay.
13             THE COURT:  So Exhibit 34 will be received, just the
14    second e-mail.  Nothing before or after that.
15             (Exhibit 34 received into evidence.)
16             MR. LOBBIN:  Before we publish --
17             Are we published, Your Honor?
18             THE CLERK:  There was no request.
19             MR. LOBBIN:  Okay.
20             THE COURT:  There's no request to publish it, but of
21    course if it's published, it would just be the part that's
22    been admitted.
23             MR. LOBBIN:  Right.  I want to make sure you block
24    it.
25             MS. BONTHUIS:  So can we blow it up so that's the
```

1    only portion that's visible.

2              We may also have a copy of it that has the other

3    portions redacted, but --

4              Is that sufficient?

5              There we go.

6              THE COURT:  All right.  We have it on the screen

7    right now.

8              You can show the jury.

9              THE CLERK:  So can we publish?

10             THE COURT:  Yes.

11             MS. BONTHUIS:  Yes.  Thank you.

12   Q.   Mr. Kim, is this an e-mail that you wrote?

13   A.   Yes, it is.

14   Q.   Okay.  Who is Paul Packer?

15   A.   He is one of the investors who made an investment to our

16   company.

17   Q.   He works at a company called Globis Capital?

18   A.   Yes.

19   Q.   Globis Capital is a major shareholder in your company?

20   A.   Yes.  One of the majority shareholders.

21   Q.   And who was Orin Hirschman?

22   A.   I understand that he is an employee of AIGH.

23   Q.   You previously testified that you were first introduced

24   to AIGH in August 2020.

25   A.   Correct.

```
1    Q.   Let me ask you again.  When were you first introduced to
2    AIGH?
3    A.   After this e-mail, there was no further contact or
4    communication.
5    Q.   But were you introduced to AIGH in November 2019?
6    A.   I was introduced to the company --
7         After Paul Packer suggested that I talk with Orin, there
8    was no further communication made in that regard.
9    Q.   But you first communicated with AIGH in November 2019;
10   correct?
11   A.   This was the entirety.
12   Q.   I understand.  My question was:  Did you first
13   communicate with AIGH in November 2019?
14   A.   Yes.  That's right.
15        MS. BONTHUIS:  Your Honor, this would be a good time
16   to stop.  I'm mostly done, but if you're sticking to 4:30 --
17        THE COURT:  Yes.  We'll adjourn for the day.
18        Members of the jury, you made it through day one.
19   Please remember at this time the Court's admonition.  No
20   independent research.  You might have heard of a financial
21   concept that maybe you're familiar with it; you might have
22   forgotten it, and want to refresh your memory.  Please don't
23   do that.
24        Don't discuss the case with others -- family,
25   employers, or each other, for that matter -- for the time
```

 1   being.

 2           So thank you.  I look forward to seeing you at

 3   9:00 o'clock tomorrow.

 4           (Jury out at 4:29 p.m.)

 5           THE COURT:  The jury has left the courtroom.

 6           What do we have to address tonight?

 7           I'll start with you, Ms. Bonthuis.

 8           MS. BONTHUIS:  Your Honor, just the request for

 9   judicial notice that was filed earlier today requesting notice

10   of the stock price from January 1, 2020 through August 31,

11   2022.

12           THE COURT:  All right.  Have you had a chance to

13   review this, Mr. Lobbin?

14           MR. LOBBIN:  Not yet.

15           THE COURT:  Do you have a copy, a hard copy in front

16   of you?

17           MR. LOBBIN:  No.  Of the new motion?

18           THE COURT:  Of the new motion.

19           MR. LOBBIN:  No.

20           THE COURT:  All right.  So, Ms. Bonthuis, you filed

21   it some time today.  I have a copy.  The defense doesn't have

22   a copy.

23           What do you propose?

24           MS. BONTHUIS:  We can go back to our hotel and print

25   copies if that's necessary.  I mean, as I noted, they have had

| | |
|---|---|
| 1 | a copy of the stock price for 10 days.  They could have looked |
| 2 | at it then.  It doesn't sound like they did. |
| 3 | THE COURT:  Well, I mean, what we have in front of |
| 4 | us is we have a request.  It was filed today.  I want to rule |
| 5 | on it promptly, but they don't have it. |
| 6 | So are you able to pull it up on your phone or on a |
| 7 | tablet, Mr. Lobbin? |
| 8 | MR. LOBBIN:  Perhaps. |
| 9 | MS. BONTHUIS:  We can e-mail it to you if that would |
| 10 | be helpful. |
| 11 | MR. FERRI:  Yeah.  If you can e-mail it, that would |
| 12 | be great. |
| 13 | MR. LOBBIN:  Your Honor, I've taken a quick look at |
| 14 | it.  It looks like it's 19 pages, daily prices of Franklin |
| 15 | stock during some period of time.  So that cut down from the |
| 16 | 30 pages that they requested before.  But our opposition still |
| 17 | stands.  This is ECF No. 105.  We filed an opposition to their |
| 18 | last request.  So they've taken it from 30 to 19 pages, but |
| 19 | our arguments in opposition still stand, the first of which is |
| 20 | that they filed this request for judicial notice after all |
| 21 | motion deadlines had passed, motions in limine had passed on |
| 22 | the eve of trial, and we weren't -- |
| 23 | You know, I literally wrote this in response last |
| 24 | night instead of preparing for trial.  So that's the first; |
| 25 | that it's untimely. |

1          The second argument is that 19 pages of stock

2     prices, you know, fair market value, we haven't verified it.

3     We need to cross-check all that.  Why does the jury need line

4     items of daily stock prices?  So it's not -- it's more

5     prejudicial than probative, because I assume they want to show

6     the chart; right?  They want to show the chart; that the stock

7     was here, and then it took a big jump and swung up and then go

8     into the whole "all of these events took place when the stock

9     was up in the clouds and the stock came back down," I suppose.

10         So we think that it would confuse the jury.  All the

11    jury needs to know is the prices of the stock at the relevant

12    times; what it was bought for, what it sold at.  There's no

13    mens rea involved in short-swing trading.  You either traded

14    or you didn't.  So to show that, "Oh," you know, "look at the

15    peak in the stock chart" over this 19 pages of stock prices,

16    that's just going to be more confusing for the jury than

17    probative.  You know, the elements are purchase of securities,

18    the sales of securities by an insider within six months

19    resulting in profit.  So what does the stock chart have to do

20    with it?  It's not helpful.

21         So, under 403, we think it shouldn't be allowed in

22    for that reason, and so we oppose.

23              THE COURT:  All right.

24              MS. BONTHUIS:  Your Honor --

25              THE COURT:  So, Ms. Bonthuis --

```
1              MS. BONTHUIS:  If I may address why it is
2       relevant --
3              THE COURT:  Well, yes.  And I'll set it up,
4       because --
5              MS. BONTHUIS:  Yeah.
6              THE COURT:  This is substantially similar to the
7       request for judicial notice I ruled on this morning.  It's
8       different in that it's 18 pages instead of 30 pages, but you
9       know, it's also 18 pages of data in 8-point font with seven
10      columns per page.
11             If you'll remember, the issues I had this morning
12      were, I think, three.  One is that relevance hadn't been
13      established.  Now, you may speak to that now, but that's
14      nowhere in this.  There's no discussion of the relevance in
15      it.
16             Second, it was the concern about confusion of the
17      issues for the jury.  This is still pretty long and detailed.
18      It's shorter than 30 pages, but it's confusing.  It's a
19      potential distraction.  I don't see how it relates to the
20      case.
21             Then, third, it's untimely.  We went through a
22      process, a very rigorous pretrial process, that included the
23      pretrial conference in March, and that included as a backstop
24      in limine motions last month to address anything that needed
25      to be addressed that hadn't been covered by the final pretrial
```

1    conference and the final pretrial order.

2          This is not a request for judicial notice in the

3    sense of you're asking the Court to take judicial notice of

4    something; that I read a sentence to the jury.  This is an

5    exhibit.  It's an 18-page exhibit rather than a 30-page

6    exhibit, but frankly, 18 pages really understates the level of

7    detail in this.  So this is clearly an exhibit and, I don't

8    understand --

9          If this was important to the plaintiff, I don't

10   understand why this wasn't part of the final pretrial

11   conference, why it wasn't in their final pretrial order, why

12   it wasn't mentioned in the in limine motions but it's filed at

13   the last minute.

14         MS. BONTHUIS:  Because defendants had -- we had

15   discussed this with defendants back at the end of August.  We

16   told them of our intent to file a request for judicial notice

17   on stock price, a routine subject of judicial notice.  They

18   expressed no objections.  They asked to see a copy of what we

19   were going to file.  We sent them a copy of our intended

20   filing in September, early September.  September 8th.  We

21   followed up with them to ask if they had objections.  We had

22   hoped to submit this as a document as to which defendants had

23   no objections.  That's how most of these are submitted.  If

24   you read the case law, nearly every single submission on a

25   stock price that comes from Yahoo, the other side doesn't

1      object.  It's so unobjectionable.  That's why we didn't raise

2      it, because we understood there was no fundamental issue with

3      asking for a judicial notice about stock price.

4                  THE COURT:  But why would you assume that?  We had

5      a --

6                  Hang on.  We had a pretrial conference in March, and

7      you were not at that conference, but the clear purpose of that

8      is to lay out what the exhibits are for trial, to lay out the

9      witnesses, to address any other number of issues including

10     jury instructions.  Why would you assume that whatever --

11                 It doesn't sound like you had prepared this at that

12     time, but whatever collection of data that you would in the

13     future compile, why would you assume that that would be

14     admissible into evidence or that the other party would agree

15     or that the Court would accept that agreement when it's not in

16     the pretrial order?  I just don't understand why you would

17     assume -- even if you raised this in August and you were

18     hopeful that the plaintiff would agree to it, how does that

19     excuse your not complying with our local rules?  This is an

20     exhibit, ma'am.  It's not -- this is not "I'm taking judicial

21     notice of X.  I'm reading it to the jury."  This is an

22     exhibit.  Why would you not --

23                 I just don't understand.  If this is part of your

24     case, why would you not include it in the pretrial order,

25     which is where we include things that are parts of the

1    parties' cases?

2           MS. BONTHUIS:  Because stock prices, as recognized

3    by Yahoo Finance, are routinely admitted by courts.

4           THE COURT:  Let me make a distinction, Ms. Bonthuis,

5    for judicial notice.  There's a distinction between whether a

6    subject matter is judicially noticeable.  All right?  Stock

7    price, that is a subject matter that's judicially noticeable,

8    but that doesn't mean that it's admissible.  For it to be

9    admissible, it has to be consistent with the Rules of

10   Evidence, including 402, 401, including 403, including

11   whatever else.  It's not enough for the subject matter to be

12   an appropriate subject matter for judicial notice.  It has to

13   be admissible.

14          MS. BONTHUIS:  I understand.

15          THE COURT:  And it doesn't just need to be

16   admissible.  It has to comport with the rules of the Court,

17   the Federal Rules of Civil Procedure in terms of how we

18   prepare the case for trial.  So the fact that it is judicially

19   noticeable --

20          And I don't dispute that.  This is a judicially

21   noticeable subject matter, but again we're dealing with this

22   at 4:40 p.m. on the first day of trial instead of in March or

23   instead of in September, and that's a function of the

24   plaintiff having waited until very, very recently to bring

25   this up.  And you may have hoped that the defendants would

1    agree to it, but that's not where we are.  So --

2              MS. BONTHUIS:  I do believe we brought it up at the

3    motion in limine conference.  Again, we had an

4    understanding -- it was my -- I understood that there was no

5    objection by defendants.  I regret that --

6              I was wrong.  I'd be happy to explain the relevance

7    of it.  It is highly relevant in this case.  Defendant's

8    position is that Rachel Kim took title of this stock to help

9    her aunt out, to sell the stock on her behalf, and what the

10   testimony and evidence will show is that despite her taking

11   this stock to sell on her aunt's behalf, to help her out, even

12   as the price of the stock climbed, she paid no attention

13   whatsoever.  She could have turned around and sold the stock,

14   and she didn't do it.  And it's highly relevant to whether or

15   not the jury should believe her story, that she was only

16   taking this on consignment to help her aunt out.  The fact

17   that she could have sold the stock for her aunt, made a profit

18   for her aunt and she chose not it severely undermines that

19   explanation that this was just a consignment to help her

20   aunt.

21             THE COURT:  All right.  Mr. Lobbin, do you have any

22   response?

23             MR. LOBBIN:  Well, the stock price is not relevant

24   unless Ms. Kim knows about the stock price, and they can ask

25   her those questions.  They did that at deposition.  But it

1    doesn't change the fact that, again, the plaintiff isn't

2    marshalling its case, just like with Mr. Kantowitz, who should

3    not have been a witness at this trial.  Now we're getting

4    judicial notice -- request for judicial notice of a whole

5    19 pages of daily stock prices in the hope that the jury takes

6    a look at it and somehow sees the chart to find some intent on

7    someone's behalf or Rachel Kim not doing what she promised to

8    help her aunt with.  It's just too much.  Under 403, it's a

9    waste of time, it's too confusing.  They can ask Rachel Kim on

10   the stand what she knew about the stock price and why she

11   didn't -- wasn't able to help her aunt by selling the stock.

12              MS. BONTHUIS:  If the concern is that it's too much

13   and overwhelming, first we have no intention of showing the

14   jury 18 pages of stock price.  Our only intent was to use it

15   to create a demonstrative to show them.  It's a simple

16   demonstrative that anyone can understand.

17              If that is the concern, I don't think that is

18   present here.  We don't want to show them the 18 pages.  We

19   just want to show them where the price was at.

20              THE COURT:  Well, so in denying it without prejudice

21   this morning, Ms. Bonthuis, I want to give you another bite at

22   the apple, but this is kind of the same apple.

23              MS. BONTHUIS:  Okay.

24              THE COURT:  Or the same bite.  And so --

25              MS. BONTHUIS:  If we submit -- if we submit a

| | |
|---|---|
| 1 | handful of dates, would that be acceptable? |
| 2 | THE COURT:  I mean, my other concern is -- |
| 3 | Look, I gave you a pass on Mr. Kantowitz.  There was |
| 4 | no reason for him not to be included in your pretrial |
| 5 | disclosure.  No valid reason in my opinion not to be included |
| 6 | in the pretrial order, but it's important to your case, it's |
| 7 | potentially dispositive to your case if you can't establish |
| 8 | standing.  So I gave you a pass on that.  I gave you a break, |
| 9 | finding that there was no prejudice to the defendants.  Now, |
| 10 | there's prejudice in the sense that they might win the case if |
| 11 | he doesn't testify, but that's a different kind of prejudice |
| 12 | than the prejudice inquiry here.  But that was one. |
| 13 | This is number two, and I just don't see a valid |
| 14 | reason for us addressing it at this time and not -- |
| 15 | That pretrial conference process is very meaningful. |
| 16 | We spent a lot of time on it, and it's not just "Raise the |
| 17 | things you want to raise."  It's "Raise the things you have to |
| 18 | raise," and this is one of those. |
| 19 | So I'm going to deny the amended request for |
| 20 | judicial notice, ECF 109. |
| 21 | Look, you may have a version 3 that you want to run |
| 22 | by the defense and you can bring that to my attention |
| 23 | tomorrow, but this request for judicial notice is denied, as |
| 24 | well. |
| 25 | Anything else to address tonight, Ms. Bonthuis? |

1          MS. BONTHUIS:  No, Your Honor.

2          THE COURT:  Mr. Lobbin?

3          MR. LOBBIN:  Nothing, Your Honor.

4          THE COURT:  Okay.  Thank you, Counsel.

5          See you at 9:00 o'clock tomorrow.

6          (Proceedings adjourned at 4:46 p.m.)

7

8                    -  -  -  -  -  -

9

10

11          CERTIFICATE OF OFFICIAL COURT STENOGRAPHER

12          I, Tricia Rosate, official court reporter, in and

13     for the United States District Court, for the Southern

14     District of California, do hereby certify that pursuant to

15     Section 753, Title 28, United States Code, that to the best

16     of my ability, the foregoing is a true and correct transcript

17     of the stenographically reported proceedings held in the

18     above-entitled matter and that the transcript page format is

19     in conformance with the regulations of the Judicial Conference

20     of the United States.

21          Dated this 6th day of November 2023

22          s/  Tricia Rosate
           Tricia Rosate, CSR No. 10891, RDR, CRR, FCRR
23          Federal Official Court Stenographer

24

25