UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOSIRRAH MANAGEMENT, LLC,<br><br>                                    Plaintiff,<br><br>v.<br><br>FRANKLIN WIRELESS CORP., et al.,<br><br>                                    Defendants. | Case No.:  21-cv-1316-RSH-JLB<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR A NEW TRIAL, AND FOR STAY OF ENFORCEMENT;**<br><br>**(2) GRANTING PLAINTIFF'S MOTION FOR AN AWARD OF PREJUDGMENT AND POST-JUDGMENT INTEREST; AND**<br><br>**(3) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>[ECF Nos. 124, 125, 131] |

Before the Court are Defendants' renewed motion for judgment as a matter law, for a new trial, and for stay of enforcement [ECF No. 131]; Plaintiff's motion for an award of prejudgment and post-judgment interest [ECF No. 124]; and Plaintiff's motion for attorneys' fees [ECF No. 125]. As set forth below, the Court denies Defendants' motion;

grants Plaintiff's motion for an award of prejudgment and post-judgment interest; and grants in part and denies in part Plaintiff's motion for attorneys' fees.

## I.    BACKGROUND

Plaintiff, a shareholder of nominal Defendant Franklin Wireless Corporation ("Franklin") brought a single claim under Section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b), seeking, on behalf of the issuer, to recover short-swing profits that Defendant O.C. Kim, an insider, realized in two securities transactions. ECF No. 1 ¶¶ 30-37. O.C. Kim has been the President and CEO of Franklin for nearly 20 years. TT[1] 147:4-5.

The case involves two transactions of Franklin shares.

In the first transaction (the "September 25, 2020 Transaction"), Misun Kim, O.C. Kim's sister residing in Korea, transferred title to 160,000 Franklin shares to O.C. Kim's adult daughter, Rachel Kim. TT 360:18-20. On September 29, 2020, O.C. Kim filed an SEC Form 4, disclosing the transaction. Ex. 4.

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | | | | | | | | 1,596,695 | D | |
| Common stock | 09/25/2020 | | P | | 400,000 | A | $2.5 | 160,000 | I | By Child |

*Id.*

As illustrated above, the Form 4 indicated a transaction date of September 25, 2020 and applied the transaction code "P," which refers to an "[o]pen market or private purchase of non-derivative or derivative security."[2] *Id.* O.C. Kim designated his beneficial

---

[1]    "TT" refers to the trial transcript. *See* ECF Nos. 122, 127-129.

[2]    *Form 4 General Instructions*, https://www.sec.gov/about/forms/form4data.pdf (last visited February 9, 2024).

ownership with code "I" (*i.e.*, indirect) and the nature of his indirect ownership of the 160,000 Franklin shares as "By Child." *Id*.

In the second transaction, O.C. Kim sold 500,000 of his own shares to an investor on December 31, 2020 at a price of $15.00 per share. *See* TT 178:16-19 (Parties' stipulation).

This matter was tried before a jury in a three-day trial beginning on October 16, 2023. The focus of the dispute was whether the first transaction was a purchase of shares attributable to O.C. Kim as a beneficial owner; the Parties did not dispute that the second transaction was a sale of O.C. Kim's shares.

At trial, Plaintiff relied heavily on O.C. Kim's Form 4 – which characterized the September 25, 2020 Transaction using codes for "purchase" and for "indirect" ownership – as an admission by O.C. Kim that that transaction was indeed a purchase by which he acquired indirect ownership of shares obtained by his daughter from his sister. Plaintiff emphasized that O.C. Kim signed the one-page Form 4, which stated below his signature that "Intentional misstatements or omissions of facts constitute Federal Criminal Violations." Ex. 4. Plaintiff argued that together, the September 25, 2020 purchase transaction and the December 31, 2020 transaction resulted in short-swing trading profits to O.C. Kim of $2,000,000.

Defendants argued that the September 25, 2020 Transaction was not a purchase by Rachel Kim from her aunt Misun Kim, but rather a consignment, in which Rachel Kim agreed to seek a buyer for her aunt's shares. Defendants also argued that, regardless of whether the transaction was characterized as a purchase or a consignment, it was Rachel Kim's transaction and not her father's; in other words, O.C. Kim was not a beneficial owner of those 160,000 shares. Defendants argued that O.C. Kim's coding of the Form 4 was erroneous; that the fact that he had misunderstood and incorrectly completed the form was apparent from the face of the form itself; and that he was simply not required to file the form in the first place because he was not the direct or indirect owner of the shares at issue in that transaction.

On October 19, 2023, the jury returned a verdict in favor of Plaintiff, and determined that O.C. Kim's short-swing profits were $2,000,000.00. ECF No. 120.

On November 24, 2023, Defendants filed a motion for judgment as a matter of law, for a new trial, and/or stay of enforcement, ECF No. 131, which is fully briefed, ECF Nos. 137 (opposition); 138 (reply). Plaintiff filed a motion for an award of prejudgment and post-judgment interest, ECF No. 124, which is fully briefed, ECF Nos. 133 (opposition); 135 (reply); and a motion for attorneys' fees, ECF No. 125, which is also fully briefed, ECF Nos. 132 (opposition); 136 (reply).

## II.   LEGAL STANDARD

### A.   Renewed Motion For Judgment As A Matter Of Law

Under Federal Rule of Civil Procedure 50(b), a party that has moved for judgment as a matter of law at trial "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "A renewed motion for JMOL is properly granted 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.' A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (quoting *Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002)). "In assessing the jury's verdict, [a court] may not weigh the evidence but simply ask[s] whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016). "Reviewing a renewed motion for JMOL requires scrutiny of the entire evidentiary record, but the court 'must not weigh the evidence, [and instead] should simply ask whether the [nonmoving party] has presented sufficient evidence to support the jury's conclusion. In so doing, the court must draw all reasonable inferences in favor of the nonmoving party and 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Escriba*, 743 F.3d

at 1242-43 (quoting *Harper v. City of Los Angeles,* 533 F.3d 1010, 1021 (9th Cir. 2008)) (internal citations omitted).

### B.    Motion For New Trial

Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "Such reasons may include a 'verdict [that] is contrary to the clear weight of the evidence,' a verdict 'based upon false or perjurious evidence,' or 'to prevent a miscarriage of justice.'" *Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "[T]he authority to grant a new trial . . . is *confided almost entirely* to the exercise of discretion on the part of the trial court." *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)). "[T]he district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix LLC v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

### C.    Motion For Stay of Enforcement

Rule 62 allows a party to stay enforcement of a judgment by providing a supersedeas bond or other security. Fed. R. Civ. P. 62(b). "The purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of execution." *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1505 n.1 (9th Cir. 1987). "District courts have inherent discretionary authority in setting supersedeas bonds." *Id*.

However, "[a] party is entitled to a waiver of a bond and a discretionary stay in 'extraordinary cases.'" *Waine-Golston v. Time Warner Ent.-Advance/New House P'ship*, No. 11cv1057–GPC(RBB), 2013 WL 5278636, at *2 (S.D. Cal. Sept. 18, 2013). In determining whether to waive the bond requirement, the Court considers the following factors, sometimes referred to as the *Dillon* factors following a Seventh Circuit opinion:

(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in a insecure position.

*K.J.P. v. Cnty. of San Diego*, No. 3:15-CV-02692-H-MDD, 2022 WL 2167674, at *1 (S.D. Cal. May 2, 2022) (citing *Dillon v. Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988)). "The party seeking the waiver bears the burden showing the relief from the bond requirement is justified." *Waine-Golston*, 2013 WL 5278636, at *2.

## III.   ANALYSIS

### A.   Standing

Defendants first challenge Plaintiff's standing. ECF No. 131 at 5 ("Judgment as a Matter of Law is Warranted for Lack of Standing"). To demonstrate standing pursuant to Article III of the U.S. Constitution, a party must show that it has "(1) suffered an 'injury in fact' that is concrete, particularized, and actual or imminent, (2) the injury is 'fairly traceable' to the defendant's conduct, and (3) the injury can be 'redressed by a favorable decision.'" *Matter of E. Coast Foods, Inc.*, 80 F.4th 901, 906 (9th Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Section 16(b) provides that "[s]uit . . . may be instituted . . . by the owner of any security of the issuer . . . ." 15 U.S.C. § 78p(b). The definition of security includes stock, among other instruments; and there is no "restriction in terms of either the number or percentage of shares, or the value of any other security, that must be held." *Gollust v. Mendell*, 501 U.S. 115, 123 (1991) (citation omitted). Additionally, Article III requires that a plaintiff maintain a financial stake in the outcome of the case throughout the litigation. *Id.* at 125-26.

In ruling on the Parties' summary judgment motions, the Court has previously held that Plaintiff has standing in this case based on Plaintiff's ownership of a single share in Franklin. *See* ECF No. 59 at 7 ("The Court is satisfied that Plaintiff has standing."); *see*

*also Gollust*, 501 U.S. at 127 (stating "indirect interest derived through one share of stock is enough to confer standing, however slight the potential marginal increase in the value of the share."). Defendants expressly conceded in their summary judgment briefing that standing exists. *See* ECF No. 51 at 4 ("As much as it may strain fairness, standing exists."). Consistent with the foregoing, Plaintiff's witness Robert Kantowitz testified that Plaintiff has owned stock in Franklin since June 2020. TT 121:4-8. Defendants are not entitled to judgment as a matter of law based on lack of standing.

### B.    Amendment of Pretrial Order

Defendants also contend that they are entitled to a new trial because the Court acted with unfairness and manifest injustice by allowing Plaintiff to call a witness, not listed in the Pretrial Order, to testify to establish standing. ECF No. 131 at 14.

As discussed above, in connection with the summary judgment motions, the Court previously found, and Defendants previously agreed, that Plaintiff has standing in this case. The Pretrial Order, entered on March 24, 2023, did not identify any trial witnesses as being called to testify about Plaintiff's standing. ECF No. 78 at 3-4. Approximately four days before trial, Plaintiff served an amended witness list that included a witness not listed in the Pretrial Order: Robert Kantowitz, a representative of Plaintiff, who was to testify for purposes of establishing Plaintiff's standing. TT 12:13-15.

Before jury selection, Defendants objected to Plaintiff calling this witness on the grounds that he had only been identified days before the trial. Plaintiff responded that it had been pursuing a trial stipulation with Defendants about standing, but that Defendants refused, and so Plaintiff was now seeking to call Kantowitz to testify on that topic. TT 13:2-14:4. Plaintiff argued that its standing to sue had previously been established and accepted by the Court. TT 13:4-10. Plaintiff opined that the proposed testimony would take less than two minutes. TT 14:10-13. The Court then directed Plaintiff to identify the exact questions that Plaintiff intended to ask the witness, which Plaintiff did:

Q. Ms. Bonthuis, let me ask you this: So we call Mr. Kantowitz to the stand. You ask him, "What's your name? Who do you work for? How long have you worked for Nosirrah?"

What exactly do you intend to ask him after that? Because if I understood you correctly, we're talking about maybe two questions. But let's just be as concrete as possible, because I think that will inform the prejudice inquiry.

A. "Does Nosirrah own stock in Franklin Wireless today?" "When did Nosirrah purchase stock in Franklin Wireless?" "Has Nosirrah held that stock continuously since that time?"

TT 18:1-14. The Court gave Plaintiff permission to call the witness to ask these, and only these, questions. TT 20:3-6. The Court noted that there has been no dispute throughout the case that Plaintiff was a shareholder of Franklin, and that this fact was "not a surprise." TT 19:10-12. The Court also found a lack of prejudice to Defendants. TT 199:8-9.

Kantowitz testified consistently with Plaintiff's proffer. On direct examination, the questions asked and answers given totaled 16 lines of the trial transcript. TT 120:18-121:8.

The Court may, in its discretion, modify a pretrial order to prevent manifest injustice. *See* Fed. R. Civ. P. 16(e); *Hooper v. Cnty. of San Diego*, No. 3:07-cv-01647-JAH-KSC, 2020 WL 6565847, at \*1 (S.D. Cal. Nov. 9, 2020). Courts consider the following factors when determining whether to modify a pretrial order:

> (1) the degree of prejudice to the party seeking modification resulting from failure to modify; (2) the degree of prejudice to the opposing party from the modification; (3) the impact of modification at the stage of the litigation on the orderly and efficient conduct of the case and (4) the degree of willfulness, bad faith or inexcusable neglect on the part of the party seeking modification.

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. SACV 14-1664 JVS (DFMx), 2020 WL 1224288, at \*7 (C.D. Cal. Jan. 21, 2020) (citing *U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 887 (9th Cir. 1981)).

Here, the Court's decision to allow Kantowitz to testify was warranted. The Court having already determined and Defendants having already agreed that standing exists, there

was no unfair surprise or prejudice associated with allowing the witness to provide limited, focused testimony to that effect. Indeed, one of the exhibits listed in the Pretrial Order—which exhibit Defendants themselves moved *in limine* to admit—reflected that Plaintiff had purchased a share of Franklin stock prior to the transactions at issue. *See* ECF Nos. 78 at 15 (Pretrial Order listing Exhibit A); 46-3 at 2 (brokerage notice reflecting Plaintiff's ownership of one share of Franklin stock on June 5, 2020), 84 (Plaintiff's motion *in limine*). This testimony at issue was fully previewed to Defendants earlier that day. Defendants' counsel came to the trial prepared to defend the case on the merits—not merely banking on a failure to prove standing—and in the Court's opinion, defended the case vigorously and skillfully.

On the other hand, refusal to allow Plaintiff to offer evidence of its share ownership at trial would have been, in the context of this case, unfair and highly prejudicial; it would have been akin to a default. Admission of the testimony at issue—which was narrowly limited, fully made known to Defendants earlier in the trial day, and lasted approximately one minute—did not have an adverse impact on the orderly and efficient conduct of the case. Although Plaintiff's failure to anticipate earlier the need to prove standing at trial was an error, plain and simple, the Court does not find bad faith.

The Court concludes that its decision to allow Kantowitz to testify in this case does not provide a basis for a new trial.

### B.    Purchase

Defendants next argue that the jury did not have a legally sufficient evidentiary basis to find a "purchase." As set forth below, the Court concludes that there was sufficient evidence to support the jury's determination that there was a purchase.

Under Section 16(b), "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). "The statutory definitions of 'purchase' and 'sale' are exceedingly general." *Blau v. Max Factor & Co*., 342 F.2d 304, 306 (9th Cir. 1965). "[A] transaction is held to be a 'purchase' within section 16(b) 'if in any way it lends itself to the accomplishment of what the statute is designed to prevent.'"

*Id.* (quoting *Blau v. Lehman*, 286 F.2d 786, 792 (2d Cir. 1960), *aff'd* 368 U.S. 403 (1962)). "Section 16(b) was enacted for the purpose of preventing the unfair use of information which may have been obtained by a statutory insider by reason of his relationship to the issuing corporation." *Kay v. Scientex Corp.*, 719 F.2d 1009, 1012 (9th Cir. 1983) (citing 15 U.S.C. § 78p(b)).

First and foremost, Defendant O.C. Kim's filing of the Form 4 itself – signed under penalty of perjury – described the September 25, 2020 Transaction as a "purchase" by using the transaction code denoting a purchase. Ex. 4. As the Court explained in denying Defendants' motion for judgment as a matter of law during trial:

> Ms. Bonthuis mentioned a number of different types of evidence -- declarations that refer to purchase, for example -- but the fact remains there's a Form 4. It's signed by Mr. Kim. It's signed with notice that intentional misrepresentation could be a federal crime, and the form, the way it's filled out, it indicates that the transaction was a purchase ….

TT 415:1-7. The evidence at trial revealed that Defendant O.C. Kim never amended this Form 4, even though he has previously signed amendments to other Form 4s. TT 168:7-11; TT 170:20-23; TT 173:14-16.

Further, Rachel Kim's testimony at trial supports that there was a purchase with a definite price paid for a fixed number of shares. *See* TT 353:6-7 ("There was a discussion of the number of shares, which was the 160,000, and a dollar price of $2.50 per share."). Rachel Kim testified that she took title to the 160,000 shares and exercised voting rights.

> Q. But after your aunt transferred the 160,000 shares to you, they were under your name; correct?
>
> A. They were under my name.
>
> Q. So you owned those shares; correct?
>
> A. Yes. I owned the shares.

Q. And you're aware that shareholders of a company have the right to vote on certain things.

A. I believe so.

Q. In fact, you yourself voted as part of Franklin Wireless's 2021's shareholder meeting?

A. I guess I did. Honestly, I don't remember the specifics of that other than I just clicked a couple buttons and I sent it.

TT 364:1-13; *see also* ECF No. 59 at 5-6 (Court's order denying summary judgment on the issue of "purchase").

Finally, the evidence at trial demonstrated that there was no contemporaneous evidence describing Rachel Kim's acquisition of shares from Misun Kim as a "consignment." Rather, the evidence reflected that the term "consignment" was not used to describe the September 25, 2020 Transaction until after the lawsuit was filed in July 2021. TT 329:10-330:7; TT 531:5-10.

Viewing the evidence in the light most favorable to Plaintiff, consistent with the standard on a Rule 50(b) motion, a reasonable jury could find that there was a purchase. Moreover, the evidence described above reveals that the jury's finding of a purchase was not against the weight of the evidence such that a new trial is warranted.

### C.    Beneficial Ownership

Defendants further assert that there was a lack of evidence that Defendant O.C. Kim was the beneficial owner of the shares from the September 25, 2020 Transaction.

Section 16(b) prevents "the unfair use of information which may have been obtained by [a] beneficial owner . . ." 15 U.S.C. § 78p(b). A "beneficial owner" under Section 16(b) means "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities . . ." 17 C.F.R. § 240.16a-1(a)(2). A "pecuniary interest" is "the opportunity, directly or indirectly, to profit or share in any profit derived from a

transaction in the subject securities." *Id*. § 240.16a-1(a)(2)(i); *see also id*. § 240.16a1(a)(2)(ii) (listing examples of "indirect" pecuniary interests).

Here, O.C. Kim's Form 4 is evidence that he was a beneficial owner of the shares at issue. The Form 4 indicates that he "[b]eneficially [o]wned" those shares indirectly through Rachel. Ex. 4 (designating his beneficial ownership with code "I" (*i.e.*, indirect) and the nature of his indirect ownership as "By Child"). Although Defendant O.C. Kim maintained that the filing of this form was a mistake, he also testified that he filed it under penalty of prosecution and did not amend it. TT 155:3-11; TT 168:7-11. He testified that he took care in filling out this form and that he made the decision to write "I" for indirect ownership on the form. TT 155:14-15; TT 162:10-14.

Additionally, the trial evidence reflects that O.C. Kim in some measure prompted the September 25, 2020 transaction, that the transaction was highly unusual for his daughter, and that the transaction would likely not have occurred without his urging. O.C. Kim testified that around August 2020, he had asked his daughter to help his sister sell her 160,000 shares. TT 135:16-136:14. Rachel Kim testified that she had no previous experience buying or selling stock. TT 355:20-25. She did not question why her father could not help her aunt nor why her aunt wanted to sell the shares at that moment. TT 351:12-13; TT 352:18-19. She rarely communicated with her aunt and had not seen her in five to six years. TT 348:15. Nevertheless, Rachel Kim spoke with her aunt on the phone at her father's home around August 2020 about obtaining her aunt's 160,000 shares. TT 352:7-10. After Rachel Kim obtained the shares, she did not hire a stockbroker or monitor the share price of the Franklin stock. TT 362:13-14. When asked about her voting at a Franklin 2021 shareholder meeting, Rachel Kim responded:

> A. I clicked a couple buttons, and I sent it. I don't know anything about it.
>
> Q. Do you remember what these buttons were that you were clicking? For what purpose?
>
> A. I don't remember. No.

TT 366:20-24. All of the foregoing indicates that the September 25, 2020 transaction was unusual, even unique, for Rachel Kim given the volume of shares involved and her lack of experience; and was undertaken at least in part at her father's direction, and without any expectation that she would ultimately profit from the transaction herself. The jury could have inferred that, under these circumstances, O.C. Kim maintained "the opportunity, directly or indirectly, to profit or share in any profit derived from" the sale of the shares when it eventually occurred. *See* 17 C.F.R. § 240.16a-1(a)(2)(i). In other words, the jury could have concluded that O.C. Kim, while not owning title to the 160,000 shares, in practical terms had the ability to tell his daughter what to do with them and how to dispose of any proceeds.

Such an inference is strengthened by trial evidence regarding the substantial support that O.C. Kim and his wife provided to Rachel Kim in the past. O.C. Kim paid for Rachel Kim's college and pharmacy school tuition, and gave her at least one gift of $15,000. TT 148:10-11; TT 152:9-11. Rachel Kim also testified that she lived with her parents for about a year and a half after pharmacy school around 2018 to 2019, TT 370:10-15, the year before the September 25, 2020 Transaction. She further testified that her parents loaned her $100,000 without interest to help her purchase a home, which she repaid. TT 371:2-374:17. At the time of trial, Rachel Kim was a pharmacist employed by a prestigious university, earning a significant salary. TT 271:11-12; TT 372:21-22. She was not financially dependent upon her parents. Nonetheless, the significant financial support that they had provided to her in the recent past bolsters the inference that O.C. Kim would have had the opportunity, if he had so chosen, to dispose of any proceeds from the sale of the 160,000 shares that he requested his daughter—a first-time purchaser of stock—to obtain in the first place.

Viewing the evidence in the light most favorable to Plaintiff, consistent with the standard on a Rule 50(b) motion, a reasonable jury could find that O.C. Kim had an indirect pecuniary interest in the 160,000 shares at issue. Additionally, even if the Court as

factfinder would not have concluded that O.C. Kim was a beneficial owner, in the Court's analysis, the jury's verdict was not against the clear weight of the evidence.

### D.   Profit

Finally, Defendants argue that they are entitled to judgment as a matter of law or a new trial because the jury did not have a legally sufficient evidentiary basis to find Plaintiff proved that the purchase and sale of Franklin stock "resulted in profit." Defendants contend that because Rachel Kim never paid any money or other consideration for the shares, there could not be any "resulting profit" that was ever realized by Defendant O.C. Kim. ECF No. 131 at 13.

The Ninth Circuit adopts the "lowest purchase price, highest sale price" method when calculating the profit realized under Section 16(b). *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 531 (9th Cir. 1981), *abrogated on other grounds by Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221 (2012). Under this method of calculation, "the highest sales price is matched with the lowest purchase price in any given six month period." *Id*.

Here, Rachel Kim obtained title of 160,000 shares from the September 25, 2020 Transaction for a total of $400,000 ($2.50/share multiplied by 160,000 shares). Defendant O.C. Kim thereafter sold his shares for a total of $2,400,000 ($15.00/share multiplied by 160,000 shares). *See* TT 160:4-5 (Defendant O.C. Kim testifying that the September 25, 2020 Transaction price was $2.50 per share); TT 178:16-19 (stipulation that Defendant O.C. Kim sold his shares for $15.00 per share). Rachel Kim's subsequent return of the unsold shares to Misun Kim in 2022 did not rescind the transaction for purposes of Section 16(b). *See Rubenstein v. Cosmos Holdings, Inc.*, No. 19 CIV. 6976 (KPF), 2020 WL 3893347, at *7 (S.D.N.Y. July 10, 2020) ("Courts have found rescissions that were entered into solely for the purpose of avoiding Section 16(b) liability to be invalid."); *Volk v. Zlotoff*, 285 F. Supp. 650, 657 (S.D.N.Y. 1968) (holding that subsequent rescission "does not remove these transactions from the ambit of Section 16(b)"). The jury's award of $2,000,000 in profit was exactly consistent with its finding in favor of Plaintiff on the

question of liability. There is no basis for granting judgment as a matter of law to Defendants, or a new trial, on this issue.

### E.    Stay of Enforcement Without Bond

Defendants contend that the Court should stay enforcement without requiring a bond. Plaintiff disagrees. The Court concludes that the *Dillon* factors do not establish this as an "extraordinary case" that warrants waiver of the bond requirement.

As to the first factor, the complexity of the collection process, Defendants assert that this factor favors a stay but fails to explain why. ECF No. 131 at 15. The second factor, the amount of time required to obtain a judgment after it is affirmed on appeal, is addressed by the Parties only minimally. Although there is no indication that Plaintiff would face delay in obtaining a judgment after an affirmance on appeal, Defendants fail to address the collection process in any detail or specify any timeframe in which payment would be made. *See Consumer Fin. Prot. Bureau v. Glob. Fin. Support, Inc.*, No. 15-CV-2440-GPC, 2021 WL 4895970, at *3 (S.D. Cal. Oct. 20, 2021) (denying waiver of bond requirement in part because defendant did not offer any basis for the court to consider first and second *Dillon* factors).

As to the third, fourth, and fifth factors—the degree of confidence that the Court has in the availability of funds to pay the judgment, whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be waste of money, and whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in a insecure position—Defendants have offered no evidence regarding O.C. Kim's present financial condition, merely citing in their reply brief the proceeds that O.C. Kim received in the December 31, 2020 transaction over three years ago. The Court further notes that O.C. Kim is also a defendant in a separate shareholder action in this district that is still ongoing. *See In re Franklin Wireless Derivative Litigation*, No. 3:21-cv-01837-AJB-MSB.

Given the size of the award here, and Defendants' decision to not submit in support of their request a more current and complete picture of O.C. Kim's financial condition,

Defendants have failed to establish that this is an "extraordinary case" warranting waiver of the bond requirement. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-CV-02061-H-BGS, 2019 WL 1542110, at *4 (S.D. Cal. Apr. 8, 2019), aff'd, 784 F. App'x 786 (Fed. Cir. 2019) (declining to exercise its discretion to issue a stay of enforcement without a bond when defendant "fails to provide the Court with any evidence showing its own individual financial resources other than a single conclusory statement"); *Schutza v. City of San Diego*, No. 3:13-CV-02992-CAB-KSC, 2018 WL 2018041, at *2 (S.D. Cal. Apr. 30, 2018) (denying request to waive bond requirement as it "fails to provide any documentation regarding the financial condition" of jointly liable defendant); *Glob. Indus. Inv. Ltd. v. 1955 Cap. Fund I GP LLC*, No. 21-CV-08924-HSG, 2023 WL 6310263, at *12 (N.D. Cal. Sept. 27, 2023) ("Respondents' pure *ipse dixit* is insufficient to support a finding that this is the unusual case in which the *Dillon* factors weigh in favor of waiving the normal bond requirement, particularly given the size of the award at issue here.").

## IV.  PLAINTIFF'S MOTION FOR AWARD OF PREJUDGMENT AND POST-JUDGMENT INTEREST

Plaintiff seeks: (1) prejudgment interest at the IRS underpayment rate for the applicable quarterly rate running from December 31, 2020, and (2) post-judgment interest at the rate of 5.44% running from October 27, 2023.

### A.  Prejudgment Interest

#### 1.  *Balancing of Equities*

Although "prejudgment interest is generally considered a part of a § 16(b) recovery …. its award is not mandatory." *Whittaker*, 639 F.2d at 533. The Court balances the equities in determining the discretionary question whether to award prejudgment interest. *See id.* at 533-34. The Court considers the following factors: (1) whether the insider acted innocently or knowingly; (2) whether the insider repaid the corporation promptly upon demand; and (3) whether there has been substantial delay caused by the insider. *Id.*

Here, the second and third factors favor an award of prejudgment interest. Plaintiff served its demand letter on January 12, 2021. TT 525:17-526:1. To date, O.C. Kim has not

paid the $2,000,000 in profits to Franklin. Although O.C. Kim's decision to litigate this matter is understandable, the fact remains that Franklin has been deprived of the profits at issue for several years.

In evaluating the first factor of whether the insider acted in bad faith, the Court considers "[t]he type and degree of the insider's inadvertence, the position of the insider in the corporation, and other circumstances of each case." *Whittaker*, 639 F.2d at 533. A finding of bad faith or willful violation is not required for an award of prejudgment interest; "rather, they justify its denial when such factors are absent." *Id*. "Interest may still be awarded in the absence of bad faith because the insider has the burden of demonstrating good faith." *Donoghue v. MIRACOR Diagnostics, Inc*., No. 00 CIV 6696 JGK RLE, 2002 WL 233188, at *3 (S.D.N.Y. Feb. 11, 2002). Here, the Court declines to find that O.C. Kim acted in bad faith. In the Court's assessment having heard the trial evidence, O.C. Kim did not intend to deceive, cheat, or defraud Franklin; to profit from inside information; or otherwise to benefit from his position as an insider. However, even under Defendants' theory, O.C. Kim was not without blame. Despite being the longtime President and CEO of Franklin, he completed and signed a Form 4 that, if taken at face value, would clearly establish the company's entitlement to short-swing trading profits following the sale transaction several months later.

An analogous case is *Dreiling ex rel. Infospace, Inc. v. Jain*, 281 F. Supp. 2d 1234 (W.D. Wash. 2003), in which the insider—the founder, Chairman, and CEO of the company—transferred shares from his trust accounts to his personal accounts. *Id.* at 1241. The district court found that even though the insider did not act in bad faith, he was not diligent in his transactions, and failed to notice discrepancies in his trust account statements. *Id*. The Court stated that it could not determine conclusively whether the defendants acted "either in good faith or in bad faith," *id.* at 1240, and ultimately awarded prejudgment interest based on the second and third factors, noting that "[w]hile it is understandable that Defendants would litigate this matter," the company "has been deprived of the use of the money at issue for several years because of" the insider's actions.

*Id.* at 1241. The same applies here. The Court exercises its discretion to award prejudgment interest.

### 2.    Calculation of Prejudgment Interest

Plaintiff originally sought prejudgment interest at the interest rate of 8.00%, running from December 31, 2020. ECF No. 124 at 2. However, subsequent to Defendants' opposition, both Parties agree that the Court should apply the IRS-listed interest rate for each quarter. ECF No. 133 at 5; ECF No. 135 at 5.

The Court has reviewed Plaintiff's proposed interest rates and calculations and finds the rates to be accurate for the applicable time period. *See* IRS, Quarterly Interest Rates, https://www.irs.gov/payments/quarterly-interest-rates (last visited February 9, 2024). The Court calculates the following prejudgment interest:

| Time Period | Interest Rate | Total Amount Owed |
|---|---|---|
| 12/31/20[3]–3/31/22 | 3% | $2,076,497.48 |
| 4/1/22–6/30/22 | 4% | $2,097,331.75 |
| 7/1/22–9/30/22 | 5% | $2,123,657.78 |
| 10/1/22–12/31/22 | 6% | $2,155,672.19 |
| 1/1/23–9/30/23 | 7% | $2,271,521.94 |
| 10/1/23–10/27/23 | 8% | $2,284,712.42 |
| **Total Interest Owed** | | $284,712.42 |

As such, the Court awards Plaintiff prejudgment interest in the amount of $284,712.42.

### B.    Post-Judgment Interest

Plaintiffs seek post-judgment interest at the rate of 5.44% running from October 27, 2023. Defendants do not contest the award of post-judgment interest or the rate that Plaintiff proposes.

---

[3]    Although Plaintiff's chart represents that the time period begins on October 1, 2020, Plaintiff begins calculating prejudgment interest from December 31, 2020, the date in which Defendant O.C. Kim sold his 500,000 shares. ECF No. 135 at 5.

Pursuant to 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). "Under the provisions of 28 U.S.C. § 1961, postjudgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id*.

Here, the calendar week preceding the date of the judgment, October 27, 2023, begins on October 16, 2023. The rate at this time equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, is 5.44%. *See* Board of Governors of the Federal Reserve System (US), Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis [DGS1], https://fred.stlouisfed.org/series/DGS1. Accordingly, the Court grants Plaintiff's request for post-judgment interest at the rate of 5.44% from the date of judgment until the judgment is paid in full.

### C. Conclusion

The Court awards Plaintiff prejudgment interest in the amount of $284,712.42, plus post-judgment interest at the rate of 5.44% from the date of judgment until the judgment is paid in full.

## V. PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES

Plaintiff requests $700,000 in attorneys' fees, which constitutes 35% of the judgment, plus $28,217.23 in expenses.[4]

---

[4] Plaintiff originally requested $27,791.23 in expenses. In its reply, Plaintiff revised the request to $28,217.23 to account for *pro hac vice* fees for Mari Bonthuis and Eric Small. ECF No. 136 at 8 n.3.

### A.    Attorneys' Fees

Although the Securities Exchange Act of 1934 does not require a grant of attorneys' fees, the Court may award such fees in the exercise of its equitable discretion. *See Huppe v. Lee*, No. CV 04-7611-RGK (FMOx), 2005 WL 8154684, at *1 (C.D. Cal. Dec. 1, 2005). The fee applicant bears the burden of establishing entitlement to an award. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The Court has the discretion to choose either the percentage of recovery method or the lodestar method. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *see also Donoghue v. Morgan Stanley High Yield Fund*, No. 10 CIV. 3131 DLC, 2012 WL 6097654, at *1 (S.D.N.Y. Dec. 7, 2012) ("Courts assessing Section 16(b) fee applications commonly employ the same reasoning utilized in 'common fund' actions."). The Ninth Circuit has stated that the "benchmark" award in common fund cases is 25% of the recovery, and that such fee awards range from 20% to 30%. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). "Under the Ninth Circuit model, the 25% benchmark can be adjusted depending on (1) the result obtained; (2) the risk involved in the litigation; (3) the contingent nature of the fee; (4) counsel's efforts, experience, and skill; and (5) awards made in similar cases." *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1019 (E.D. Cal. 2019) (citing *Vizcaino*, 290 F.3d at 1048-50). The lodestar method can be used as a cross-check of the percentage method. *See Vizcaino*, 290 F.3d at 1050.

The Court adopts the percentage method and analyzes whether the *Vizcaino* factors warrant an adjustment from the benchmark of 25% under the circumstances of this case.

#### 1.    Results Obtained

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see Vizcaino*, 290 F.3d at 1048 ("Exceptional results are a relevant circumstance."). Here, following a three-day jury trial, the jury returned a verdict in favor of Plaintiff for $2 million, which was the full amount requested in the Complaint. Plaintiff was also successful on its motion for judgment on the pleadings regarding Defendants'

affirmative defenses and was successful in defeating Defendants' motion for summary judgment. *See* ECF Nos. 58, 59. As such, the results obtained favor Plaintiff.

### 2. Risk Involved in Litigation

"The risk that further litigation might result in no recovery is a 'significant factor' in assessing the fairness and reasonableness of an award of attorneys' fees." *Freeze v. PVH Corp.*, No. CV 19-1694 PSG (EX), 2021 WL 2953161, at *8 (C.D. Cal. Jan. 7, 2021) (citation omitted). Plaintiff argues that the litigation presented considerable risk because if Plaintiff failed to meet its burden to show the jury that Defendant O.C. Kim made a purchase and sale within a six-month period resulting in a profit, there would be no disgorgement award. ECF No. 125-1 at 6. Further, Plaintiff represents that it had no precedent to rely on for jury instructions and verdict forms. *Id*. at 7. The Court agrees that the jury trial and lack of precedent increased the risk that Plaintiff would not recover anything, and finds that this factor also favors Plaintiff. *See In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *12 (N.D. Cal. Aug. 17, 2018) (finding this factor supported upward adjustment in part because plaintiffs "had a scarcity of precedent to draw on"); *In re PETCO Corp. Sec. Litig.*, No. 05-CV-0823 H (RBB), 2008 WL 11508458, at *3 (S.D. Cal. Sept. 2, 2008) (noting that "proceeding to trial would have involved substantial uncertainty.").

### 3. Contingent Nature of Fee

Neither party discusses this factor. Therefore, given that it is Plaintiff's burden on a motion for attorneys' fees, this factor does not favor Plaintiff.

### 4. Counsel's Efforts, Experience, and Skill

The Court must also consider the counsel's efforts, experience, and the level of skill required in light of the complexities of the case. *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (holding attorneys' fees are "justified because of the complexity of the issues and the risks."); *In re Anthem*, 2018 WL 3960068, at *13 (considering complexities that required skill in the context of data-breach and privacy class action).

Plaintiff's counsel has submitted documentation relating to over 2000 attorney hours that its firm's six attorneys have expended on this case over the course of two years. ECF No. 125-2, Bonthuis Decl. ¶ 5. This work included taking four depositions, filing a motion for a protective order during discovery, and participating in motion practice. Plaintiff also demonstrates that its counsel have significant experience as litigators at prestigious law firms.

With respect to the complexity of the case, Plaintiff avers that the case "broke new ground" because the majority of Section 16(b) claims are resolved through private settlement. ECF No. 125-1 at 7. On the other hand, the Court finds that the issues presented in this case were relatively simple. This case involved one acquisition and one sale of securities; the issue was how the acquisition should be characterized. A plaintiff in a Section 16(b) is not required to prove intent on the part of the defendant. The relatively short docket, and the brevity of the motion practice and of the trial itself suggest that the issues in this action were not particularly complex. *See* ECF Nos. 5, 10, 45, 46, 58, 59. On balance, this factor only slightly favors Plaintiff.

### 5.   *Awards Made in Similar Cases*

The Parties focus primarily on two district court cases in the Ninth Circuit in assessing whether Plaintiff's request of 35% of the recovery is reasonable in the Section 16(b) context. In *Huppe*, the plaintiff obtained a $245,910 disgorgement on summary judgment and was awarded attorneys' fees equal to 30% of that amount. *Huppe*, 2005 WL 8154684, at *1. In *Kellett*, the plaintiff obtained a $247 million disgorgement, also on summary judgment, and was awarded attorneys' fees equal to 20% of that amount. *Dreiling v. Kellett*, No. C01-1528P, ECF No. 292 (W.D. Wash. Jan. 9, 2004). The Court in *Kellett* also referenced *Levy*, in which the court awarded 30% in attorneys' fees following a settlement of $20 million for a Section 16(b) action. *Steiner v. Williams*, No. 99 CIV. 10186 (JSM), 2001 WL 604035, at *7 (S.D.N.Y. May 31, 2001).

Here, Plaintiff obtained a jury verdict of $2 million and requests 35% of that amount in attorneys' fees. Plaintiff supports its request of a 35% award by arguing that: (1) the $2

million recovery here is eight times larger than the recovery of $245,910 in *Huppe*, and (2) *Huppe* was resolved on summary judgment, not after a jury trial. ECF No. 125-1 at 9. Plaintiff also contends that the award in *Kellett* was limited to 20% of the recovery because of the large nature of that recovery. *Id*. However, Plaintiff's requested award exceeds the percentage awards in all the aforementioned cases. Although the Court recognizes that the cases above did not go to trial, the Court finds that this factor does not favor a significant upward adjustment from the benchmark.

### 6.    *Balancing of Factors*

Upon consideration of the factors above, the Court finds that 26% of the recovery constitutes a reasonable amount in attorneys' fees to Plaintiff. Plaintiff's counsel obtained a favorable jury verdict, while assuming the risk that Plaintiff would obtain no recovery at all. However, the motion practice and short duration of the trial reflect the relatively simple issues in this case. In light of all the circumstances discussed above, the Court applies a slight upward adjustment, and finds that an attorneys' fees award of 26%, or $520,000, is fair and reasonable.[5]

### 7.    *Lodestar Comparison*

"Where, as here, the lodestar is being used as a cross-check, courts may do a rough calculation 'with a less exhaustive cataloging and review of counsel's hours.'" *In re Anthem*, 2018 WL 3960068, at *16 (citations omitted). Further, "[a]n implied negative multiplier supports the reasonableness of the percentage fee request." *Schiller v. David's Bridal, Inc*., No. 1:10-CV-00616-AWI, 2012 WL 2117001, at *23 (E.D. Cal. June 11,

---

[5]    The Court declines to consider the Parties' negotiating history given that it is not relevant to deciding the attorneys' fees and in light of Plaintiff's opposition. *See McCown v. City of Fontana*, 565 F.3d 1097, 1104 n.4 (9th Cir. 2009) (stating that courts "generally refrain from referencing proposed settlement agreements in light of Federal Rule of Evidence 408," unless both parties seek to introduce evidence of it; "The purpose behind Rule 408, to protect the confidentiality of settlement negotiations, is not served when we fail to consider those negotiations against the wishes of both parties.").

2012), *report and recommendation adopted*, No. 1:10-CV-616-AWI-SKO, 2012 WL 13040405 (E.D. Cal. June 28, 2012).

Plaintiff's attorneys state that they spent a total of 2,317 hours on this case. ECF No. 136-1, Bonthuis Decl. ¶ 4. At their respective hourly rates, Plaintiff calculated a lodestar of $1,239,992.70 after a 30% market adjustment for San Diego. *Id*. When compared with Plaintiff's requested award of 35%, or $700,000, this represents a negative multiplier of approximately 0.56 of the lodestar. Although the lodestar method indicates that Plaintiff's requested award was not unreasonable, the Court finds that an award of 26%, or $520,000, is appropriate based on the factors explained above. The award of 26% also results in a negative multiplier of 0.42 of the lodestar, which supports that the award is not excessive. *See Graehl v. WellPoint Inc.*, No. CV 14-00421-BRO (FFMx), 2016 WL 11755099, at *13 (C.D. Cal. Jan. 8, 2016) (awarding attorneys' fees of 28% of the recovery, which resulted in a negative multiplier); *Pierce v. Rosetta Stone, Ltd*., No. C 11-01283 SBA, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013) ("[T]he requested fee award results in a so-called negative multiplier, which suggests that the percentage of the fund amount is reasonable and fair.").

## B. Expenses

Plaintiff also requests a total of $28,217.23 in expenses. These expenses include travel costs, printing, legal research, equipment rental and supplies for trial, and postage. ECF No. 125-1 at 11-12; Bonthuis Decl. ¶¶ 13-14, Exs. 6 & 7. The Court has reviewed Plaintiff's submissions. With the exception of Kantowitz's hotel costs and flights, the Court finds Plaintiff's requests for expenses are reasonable. *See Ross v. Bar None Enterprises, Inc*., No. 2:13-CV-00234-KJM, 2015 WL 1046117, at *11 (E.D. Cal. Mar. 10, 2015) (stating that courts "routinely approve reimbursement" of reasonable costs requested for travel, mediation expenses, filing fees, and deposition costs); *see also Sure Safe Indus. Inc. v. C & R Pier Mfg*., 152 F.R.D. 625, 626 (S.D. Cal. 1993) ("Properly included in an award of attorneys' fees are costs and fees for paralegals, out-of-pocket expenses, including travel, telephone, mailing, copying and computerized legal research expenses.").

However, the Court declines to award costs relating to Kantowitz's travel. "As a general rule, parties may not recover witness fees for their own attendance." *Stevens v. Corelogic, Inc*., 899 F.3d 666, 679 (9th Cir. 2018). "The expenses of corporate directors or officers may, however, be taxable, even when those individuals are testifying on behalf of a corporate party to the suit." *Id*. Under Federal Rule of Civil Procedure 54(d)(1), the Court has the discretion to refuse to award costs to a prevailing party. *See Berkla v. Corel Corp*., 302 F.3d 909, 921 (9th Cir. 2002). As Plaintiff recognizes, although Kantowitz attended the trial as a witness, he mainly attended the trial as a representative of Plaintiff, a party to the action. *See* ECF No. 136 at 9. As discussed above, his role as a witness was very limited—his direct testimony taking only 16 lines of the trial transcript—and indeed was permitted only at the last minute with the approval of the Court over Defendants' legitimate objection. As such, the Court declines to award costs relating to Kantowitz's travel, and deducts $1,378.39 from Plaintiff's total request of $28,217.23.

### C.    Conclusion

The Court awards Plaintiff attorneys' fees for 26% of the recovery, which amounts to a total of $520,000. The Court also awards expenses in the amount of $26,838.84.

## VI.   CONCLUSION

For the foregoing reasons:

1.    Defendants' renewed motion for judgment as a matter law, for a new trial, and/or stay of enforcement, ECF No. 131, is **DENIED.**

2.     Plaintiff's motion for an award of prejudgment and post-judgment interest, ECF No. 124, is **GRANTED.**

3.    Plaintiff's motion for attorneys' fees, ECF No. 125, is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED**.

Dated: February 16, 2024

_____
Hon. Robert S. Huie
United States District Judge